## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

NANCE M. HUTTER,

                    Plaintiff

v.

COUNTRYWIDE BANK, N.A., a
subsidiary of COUNTRYWIDE
FINANCIAL CORPORATION
WATERMARK CAPITAL, INC.
EVOLUTION MORTGAGE INC.

                    Defendants

Case no. 09-CIV-10092
(CS)

**Third Amended
Complaint**

**Jury Trial Demanded**



### Jurisdiction and Venue

1. By virtue of the authority granted in 28 U.S.C. §§ 1331 and 1343(a), the Court has federal-question jurisdiction, under the laws of the United States, over the claims of the plaintiff, Nance M. Hutter.

2. Venue is proper according to 28 U.S.C. § 1391(b)(2), because a substantial part of the events giving rise to this complaint occurred within the Southern District of New York.

[Hutter v. Countrywide Bank, N.A.: Third Amended Complaint]

## The Parties

3.  Plaintiff Nance M. Hutter lives at 175 Hickory Kingdom Road, Bedford, NY 10506-2012.

   a. On 11 December 2006, Hutter refinanced her Bedford, NY home with a $1,785,000 consolidated Pay Option adjustable-rate mortgage loan, having an 8.125% interest rate, from defendant Countrywide Bank, N.A.

4.  Defendant Countrywide Bank, N.A. is a subsidiary of Countrywide Financial Corporation, a Delaware company whose headquarters are at 4500 Park Granada, Calabasas, California 91302.

   a. Countrywide Bank refinanced Hutter's property on 11 December 2006 with a $1.785 million monthly adjustable-rate Pay Option loan.

5.  Defendant Watermark Capital, Inc. is a California corporation whose principal office is at 16485 Laguna Canyon Road, Suite 120, Irvine, CA 92618.

   a. Watermark Capital is the mortgage broker that arranged Hutter's $1,785,000 Countrywide loan.

6.–7.  [These paragraphs are deliberately left blank.]

8.  Defendant Evolution Mortgage Inc. is a New York corporation with its principal office at either 4 Martine Avenue, Suite 1002, White Plains, NY 10606, or at 100 Oser Avenue, Hauppauge, NY 11788.

   a. After Watermark Capital arranged Hutter's $1.785 million Countrywide loan, Watermark, which is a California mortgage

broker, brought in Evolution Mortgage to pose as Hutter's broker, because Watermark was unlicensed as a broker in New York State but Evolution was licensed there.

9. [This paragraph is deliberately left blank.]

## Statement of Facts

### a. Countrywide's Pay Option loan
### that endangers the borrower

10. On 11 December 2006, plaintiff Nance M. Hutter refinanced her home at 175 Hickory Kingdom Road, Bedford, NY 10506-2012 with a $1.785 million consolidated, 8.125% monthly adjustable-rate Pay Option loan from defendant Countrywide Bank, N.A.

11. The $1.785 million Pay Option loan is a particularly complex, deceptive, and risky loan for a borrower to take out.

12. On information and belief, the lender Countrywide Bank entered into a Wholesale Broker Agreement with the mortgage brokers Watermark Capital and Evolution Mortgage, which gave the brokers the right, and possibly the obligation, to market Countrywide Pay Option ARM loans to prospective mortgage borrowers.

13. Watermark Capital, Inc., the California mortgage broker who arranged the $1.785 million Countrywide consolidated loan for Hutter,

was unlicensed as a mortgage broker in New York State where Hutter's property was located.

14.  Yet Watermark did all the work to obtain the Countrywide loan for Hutter; then, with Countrywide's assistance, Watermark brought the licensed New York mortgage broker Evolution Mortgage Inc. into the transaction so that Evolution could act as a figurehead broker and receive the broker's commissions that Watermark—because it was unlicensed—could not legally accept.

15.  In particular, the form HUD-1 for Hutter's $1.785 million Countrywide loan states that Evolution Mortgage received a $1,500 "processing fee" from Hutter plus a $13,387.50 yield-spread premium from Countrywide.

16.  Upon information and belief, Countrywide also paid Evolution Mortgage a "rebate," which was a payment that the HUD-1 does not disclose, but that Countrywide frequently made to its mortgage brokers.

17.  Also, on information and belief, Evolution Mortgage shared its $1,500 processing fee and its $13,387.50 yield-spread premium with the California mortgage broker Watermark Capital, though it is illegal under New York law for an unlicensed mortgage broker to receive a fee for arranging a mortgage loan.

18. In several "preclosing" documents, including Hutter's loan application—which she actually signed at the closing ceremony of Countrywide's $1.785 million loan, after Countrywide had already agreed to make the loan to her—Hutter was promised a 1.5% interest rate; but the interest rate of the loan that she actually got is 8.125%.

19. Hutter's loan application, on which Evolution Mortgage's name appears, states that her monthly income was $38,500 at the time that she took out her $1,785,000 Countrywide loan (that is, on 11 December 2006); in actuality, Hutter had no income at all then, nor did her husband.

20. Another piece of deception that was practiced with Hutter's loan application is that it is dated 11 December 2006, the day of the closing ceremony for Hutter $1.785 million loan; that indicates that neither the California mortgage broker Watermark Capital nor the New York mortgage broker Evolution Mortgage used the "application" to apply for the loan at all; rather, the application served as after-the-fact justification for Countrywide's making the loan to Hutter after Countrywide had already approved the loan.

21. The Countrywide loan that Hutter sought was a no-documentation loan, in that it did not require her to provide any documents like pay stubs, bank statements, or tax returns to show what her income was. On

the day of the closing on Hutter's Countrywide loan, an "application" was submitted to Countrywide on Hutter's behalf with a grossly exaggerated monthly-income figure of $38,500 that Watermark Capital or Evolution Mortgage (whichever broker filled out Hutter's loan application) claimed for her.

22.  Countrywide called the type of financing that it extended to Hutter a monthly adjustable-rate Pay Option loan, or a Pay Option ARM.

23.  That type of loan provides for *negative amortization*; that is, the loan allows the borrower to pay less than the full accrued interest during the loan's early years, and unpaid interest is added to loan principal so that the principal *increases*, instead of its decreasing as normally occurs with a mortgage loan.

24.  [This paragraph is deliberately left blank.]

25.  Thus, according to the Truth-in-Lending (TILA) disclosure statement for Hutter's Countrywide loan, her initial monthly payment was $4,947.53, but after one year it increased to $5,318.59, and after two years it increased to $13,891.87—an enormous increase.

26.  [This paragraph is deliberately left blank.]

27.  [This paragraph is deliberately left blank.]

28.  [This paragraph is deliberately left blank.]

29. Another impropriety that occurred when Hutter took out her $1.785 million Countrywide loan was that loan proceeds were used to pay off the $432,567.12 balance on a Citibank home equity credit line that she had, which had a 7.125% interest rate; and loan proceeds also paid off Hutter's $1,206,500 first mortgage, which had a 5.875% interest rate.

30. Thus, refinancing *raised* Hutter's interest rate—from 5.875% and 7.125% to 8.125%—which benefited Countrywide but not Hutter.

31. The Pay Option loan's ability to become more and more expensive for the borrower, until she cannot afford it, was not explained to Hutter by her either of her mortgage brokers Watermark Capital and Evolution Mortgage.

32. Nor did anyone explain to Hutter that Countrywide paid Evolution Mortgage a $13,387.50 yield-spread premium.

33. In 2006 when Hutter took out her Countrywide loan, the lender was one of the United States' largest mortgage-lending companies and one of its largest subprime lenders.

34. On information and belief, Hutter was steered into a subprime loan—and steered to take out a Pay Option ARM in particular—by Countrywide's mortgage brokers Watermark Capital and Evolution Mortgage, by means of misrepresentations that those brokers made using

standardized sales scripts that Countrywide had written; and the two brokers were motivated to steer Hutter to a subprime loan because of Countrywide's incentive program, which offered higher commissions, and also offered yield-spread premiums, to induce brokers and loan officers to promote subprime loans, particularly the Pay Option ARM, regardless whether the loan was suitable for the borrower.

35.  Moreover, on information and belief, Countrywide taught its mortgage brokers, including Watermark Capital and Evolution Mortgage, to *omit* certain crucial information from their sales pitches for subprime loans, and from their sales pitches for the Pay Option ARM, so that Hutter and other borrowers like her would not realize that they were taking on a loan's whose monthly payments would get higher—and whose loan principal would increase through negative amortization—until the loan became unaffordable for them.

36.  Countrywide's scripted sales pitch for the Pay Option ARM deliberately did *not* include that information.

37.  Thus, Countrywide and its broker engaged in a scheme that was designed to maneuver Hutter into a subprime loan generally, and into a Pay Option ARM specifically, regardless of whether she could afford the loan's monthly payments.

38.  Thus, rather than offering Hutter a loan that worked to her advantage, Countrywide and its brokers, Watermark Capital, and Evolution Mortgage, offered her a loan that worked to *their* advantage—because it gave Countrywide higher interest rates than other loans, and it gave Watermark and Evolution higher commissions and a yield-spread premiums, that other loans did not give them.

39.  In 2006 when Countrywide lent to Hutter, subprime loans were significantly more profitable for it than higher-quality prime loans. Thus, Countrywide's 2006 regulatory filing states that. It explains that Countrywide's profit margin, on sales to investors, was 1.84% for subprime loans, but only 1.07% for prime loans. And two years earlier in 2004, the difference in the profitability of sales to investors was even greater: subprime mortgages generated a 3.64% profit margin, but sales of prime mortgages generated only a 0.93% profit margin.

40.  Hutter's closing documents contained only one notice of the right to cancel her $1.785 million Countrywide loan consolidation, though she was entitled to receive two copies of the notice; because of that error, Hutter acquired an extended right, lasting three years, to rescind her loan under the federal Truth-in-Lending Act (TILA).[1]

---

[1]    15 U.S.C. §§ 1601–67f (2006).

[Hutter v. Countrywide Bank, N.A.: Third Amended Complaint]

41. And on 18 March 2009, Hutter exercised her right to rescind the Countrywide loan under TILA, by sending Countrywide notices of rescission via certified mail.

42.–46. [These paragraphs are deliberately left blank.]

### Claim One:
### Violation of the Truth-in-Lending Act (TILA)[2]

### Against:    Countrywide Bank, N.A.

47. Plaintiff Nance M. Hutter repeats paragraphs 1 through 46, above.

48. At all relevant times, Countrywide Bank, N.A., in the ordinary course of its business, *(a)* did regularly extend, or offer to extend, consumer credit payable by written agreement in more than four installments, or for which a finance charge was, or might be, required; and *(b)* it originated two or more mortgages in a twelve-month period on which a security interest in the borrower's home was taken.

49. Accordingly, Countrywide was a "creditor" within the meaning of the Truth-in-Lending Act ("TILA").[3]

---

[2]  *Id..*

[3]  *Id.*

50. In the course of extending a $1.785 million consolidated mortgage loan to Hutter, Countrywide violated the disclosure requirements of TILA and Regulation Z as follows:

    a. Countrywide failed to give Hutter proper notice of her right to cancel her Countrywide mortgage loan. Specifically,

        *(1)* the Truth-in-Lending Act gives a borrower three days to ancel, or rescind, her loan, and TILA requires each person who has the right to rescind to be given a notice disclosing that right;[4] the lender must give each person who may cancel the loan *two copies* of the notice;[5]

        *(2)* among Hutter's closing documents for her Countrywide loan, however, there is only one notice of the right to cancel her loan.

51. The foregoing violation of TILA's notice requirement gives Hutter an extended right, lasting three years, to rescind her Countrywide loan.[6]

52. And on 18 March 2009, Hutter exercised her right to rescind the Countrywide loan by sending Countrywide notices of rescission via certified mail.

53. [stricken]

---

[4]   15 U.S.C. § 1635(a); Reg. Z, 12 C.F.R. §§ 226.5(b), 226.23(b).

[5]   Reg. Z, 12 C.F.R. §§ 226.15(b), 226.23(b).

[6]   15 U.S.C. § 1635(f); Reg. Z, 12 C.F.R. § 226.15(a)(3), 226.23(a)(3).

## Claim Two:
## Violation of New York's
## Deceptive Practices Act

**Against:      Countrywide Bank, N.A.**
**Watermark Capital, Inc.**
**Evolution Mortgage Inc.**

54. Plaintiff Nance M. Hutter repeats paragraphs 1 through 53, above.

55. In December 2006 when plaintiff Nance M. Hutter took out a $1.785 million consolidated mortgage loan from defendant Countrywide Bank, N.A., defendants Countrywide, Watermark Capital, Inc., and Evolution Mortgage Inc. conducted businesses or furnished services, as those terms are used in New York's the Deceptive Practices Act.[7]

56. And Hutter was a consumer in her relations with each of the defendants.

57. Countrywide, Watermark Capital, and Evolution Mortgage violated the Deceptive Practices Act by engaging in conduct that was misleading in a material way—and that was unfair, deceptive, and contrary to public policy and generally recognized standards of business— by doing these things:

   a. the bank and the two mortgage brokers told Hutter that she could afford the monthly payments on a $1,785,000 monthly adjustable-rate Pay Option loan, when in actuality the payments were beyond her means, particularly in light of the fact that after

---

[7]   N.Y. GEN. BUS. LAW §§ 349 to 350-e (McKinney 2004).

just two years, the payments would reset from $4,947.53 to
$13,891.87;

b. Countrywide, Watermark Capital, and Evolution Mortgage
assured Hutter that refinancing would help her, when in fact
refinancing made it more likely that she would lose her property
through foreclosure, because she would have to make larger
mortgage payments than before;

c. the defendants told Hutter that an adjustable-rate loan was right
for her, when they knew that the loan was unsuitable because
Hutter's income was unlikely to increase;

d. before making a $1.785 million loan to Hutter, Countrywide,
through her mortgage brokers Watermark Capital and Evolution
Mortgage, promised her verbally and in pre-closing documents
that her loan's interest rate would be 1.5%; but the interest rate
of the loan that was actually made was 8.125%;

e. Watermark Capital and Evolution Mortgage falsely stated in
Hutter's loan application—which "application" was not given to
Countrywide until the day of the closing on Hutter's loan—that
her gross monthly income was $38,500, when in fact she had no
income at all at that time (fall, 2006), and her husband had no
income during 2004-06;

f. before it lent to Hutter, Countrywide required her to furnish no
documentation of her income, such as  pay stubs, bank deposits,
or tax returns;

g. on information and belief, Countrywide knew that Watermark
Capital and Evolution Mortgage had exaggerated Hutter's
income in her loan application, but the bank tolerated that
falsification because its underwriting guidelines allowed it to
lend more money to Hutter if her income was exaggerated; so
Countrywide approved of the brokers' exaggerating Hutter's
income because that let it garner more interest than would
otherwise have been possible;

h. Countrywide excluded escrow charges for taxes and insurance from Hutter's disclosed monthly mortgage payment to make the payment seem more affordable;

i. given Hutter's low, or nonexistent, income, Countrywide knew that the only way that she could afford her $1.785 million Pay-Option ARM loan would be for her to sell or refinance her property within a few years of taking out the loan, before her monthly payment became unaffordable for her. And a lender's making a mortgage loan that the borrower cannot afford to service, but that is adequately collateralized, as Countrywide did, is called *asset-based lending*, and is improper;

j. to induce Hutter to take out her Countrywide loan, the lender Countrywide and the brokers Watermark Capital and Evolution Mortgage falsely assured her that housing prices would keep rising, so that in a year or two, they claimed, she could sell her house at a profit, or else refinance it again with a loan whose terms also provided for low payments during the loan's early years;

k. Countrywide, Watermark Capital, and Evolution Mortgage assured Hutter that she did not need a lawyer at her loan's closing ceremony, but that was untrue;

l. Countrywide, Watermark Capital, and Evolution Mortgage failed to explain to Hutter how a negative-amortization loan works, (i.e., they did not explain that loan principal increases because the borrower pays less than the full amount of accrued interest, and so unpaid interest is added to principal);

m. the lender and the mortgage brokers also failed to explain that with a Pay Option ARM loan, the monthly payments keep rising over the life of the loan;

n. Countrywide, Watermark Capital, and Evolution Mortgage told Hutter that Countrywide's refinancing would help her, but actually it hurt her because it increased her interest rate. Specifically, Countrywide's refinancing repaid Hutter's $1,206,500 first mortgage that had an interest rate of 5.875%,

and her $432,567.12 Citibank home-equity credit line that had a 7.125% interest rate, and it replaced those loans with Countrywide's $1.785 million consolidated loan that had an 8.125% interest rate. Refinancing thus harmed Hutter by increasing her interest rate more than two and one-quarter percentage points (from 5.875% to 8.125%);

o. Watermark Capital brokered a mortgage loan for a property in New York State when Watermark was unlicensed as a broker by New York's banking department;

p. Evolution Mortgage, who *is* a licensed mortgage broker in New York State, acted as the broker in Hutter's Countrywide loan in order to obtain a broker's commission, but it was the unlicensed broker Watermark who actually arranged the Countrywide loan. Thus Evolution deceitfully posed as the broker when the true broker was Watermark;

q. Countrywide wrongfully paid Evolution Mortgage a $13,387.50 yield-spread premium for the purpose of bribing Evolution to arrange a Countrywide Pay Option ARM loan for Hutter; and

r. on information and belief, Evolution Mortgage wrongfully shared its $1,500 processing fee and its $13,387.50 yield-spread premium with the unlicensed broker Watermark Capital.

58. The violations of the Deceptive Practices Act complained of in Hutter's Deceptive Practices Act claim affect many borrowers and consumers, not just Hutter. Indeed, those violations have helped cause a nationwide epidemic of foreclosures and a worldwide financial crisis.

59. [stricken]

60.–64. [These paragraphs are deliberately left blank.]

[Hutter v. Countrywide Bank, N.A.: Third Amended Complaint]

## Claim Three:
## Violation of the Real Estate
## Settlement Procedure Act (RESPA)[8]

**Against:  Countrywide Bank, N.A.**
**Evolution Mortgage Inc.**

65. Plaintiff Nance M. Hutter repeats paragraphs 1 through 64, above.

66. The Real Estate Settlement Procedures Act applies to "federally related mortgage loans."[9]

67. The act prohibits kickbacks and referral fees, stating: "No person shall give and no person shall accept any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person."[10]

68. And RESPA prohibits unearned fees. "No person shall give and no person shall accept any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed," the act provides.[11]

---

[8]   12 U.S.C. §§ 2601–17 (2006).

[9]   *Id.* § 2602(1).

[10]  *Id.* § 2607(a).

[Hutter v. Countrywide Bank, N.A.: Third Amended Complaint]

69.  On information and belief, Countrywide and Evolution Mortgage

violated RESPA in their relations with Hutter, in that

(a) Countrywide gave fees or kickbacks to Evolution Mortgage—
specifically, it paid a $13,387.50 yield-spread premium to
Evolution, which Evolution, on information and belief, illegally
shared with Watermark—under an agreement, either explicit or
implicit, that Watermark and Evolution would refer mortgage
borrowers to Countrywide: that violated RESPA;[12] and

(b) Evolution Mortgage accepted a $1,500 processing fee, and a
$13,387.50 yield-spread premium, as payment for acting as a
figurehead broker—because Evolution was licensed as a lender in
New York State and the true mortgage broker, Watermark
Capital, was not so licensed—rather than for services that
Evolution actually performed: that also violated RESPA.[13]

70.  Hutter is entitled to recover, and seeks to collect, from defendants

Countrywide and Evolution Mortgage, three times any charges for

"settlement services" that Hutter paid directly or indirectly.

71.–87.  [These paragraphs are deliberately left blank.]

---

[11]  *Id.* § 2607(b).

[12]  *See* 12 U.S.C. § 2607(a) and 24 C.F.R. § 3500.14(b).

[13]  *See* 12 U.S.C. § 2607(b) and 24 C.F.R. § 3500.14(c).

[Hutter v. Countrywide Bank, N.A.: Third Amended Complaint]

---

### Claim Four:
### Violation of New York's
### Licensed Mortgage Bankers Law[14]

#### Against:    Watermark Capital, Inc.

88.  Plaintiff Nance M. Hutter repeats paragraphs 1 through 87, above.

89.  New York's Licensed Mortgage Bankers Law prohibits a company from brokering a mortgage loan in New York State unless the company is either licensed by the state's banking department, or is exempt from the licensing requirement.[15]

90.  In 2006, when defendant Watermark Capital arranged Hutter's $1.785 million consolidated loan from Countrywide, Watermark was neither licensed as a mortgage broker in New York State nor exempt from the licensing requirement.

91.  Watermark Capital therefore violated New York's Licensed Mortgage Bankers Law when it brokered Countrywide's $1.785 million consolidation loan to Hutter.

92.  Watermark tried to cure its being unlicensed by bringing the New

---

[14]  N.Y. BANKING LAW §§ 589–99 (McKinney 2008).

[15]  *Id.* § 590.2(b) ("No person, partnership, association, corporation or other entity shall engage in the business of soliciting, processing, placing or negotiating a mortgage loan or offering to solicit, process, place or negotiate a mortgage loan in this state without first being registered with the superintendent as a mortgage broker in accordance with the registration procedure provided in this article and by such regulations as may be promulgated by the banking board or prescribed by the superintendent. The registration provisions of this subdivision shall not apply to any exempt organization or mortgage banker.").

[Hutter v. Countrywide Bank, N.A.: Third Amended Complaint]

York broker Evolution Mortgage into the deal as a figurehead.

93. But it was Watermark who arranged the Countrywide loan, and who did all the work that was required to place the loan.

94. [This paragraph is deliberately left blank.]

95. On information and belief, Evolution Mortgage shared, with Watermark Capital, the $1,500 processing fee and the $13,387.50 yield-spread premium that Evolution was paid for supposedly brokering Countrywide's loan to Hutter, though Watermark had no right to receive any part of those commissions because Watermark was unlicensed as a mortgage broker in New York State.

96. As a proximate result of Watermark Capital's violating New York's Licensed Mortgage Bankers Law, Hutter is entitled to one to four times the amount of her $1.785 million Countrywide loan.[16]

97.–139. [These paragraphs are deliberately left blank.]

---

[16] *See* NEW YORK BANKING LAW § 598(5).

[Hutter v. Countrywide Bank, N.A.: Third Amended Complaint]

---

## Jury-Trial Demand

140.  Plaintiff Nance M. Hutter demands a jury trial on all claims except the one for rescission under the Truth-in-Lending Act.

## Request for Damages

In light of the moral and legal wrongs that defendants Countrywide Bank, N.A., Watermark Capital, Inc., and Evolution Mortgage Inc. have done to plaintiff Nance M. Hutter, Hutter asks that the Court grant her relief. She asks that it

a. rescind, under TILA, the $1.785 million mortgage and loan that Hutter took out from Countrywide Bank, N.A., including terminating any security interest that Countrywide has in Hutter's Bedford, NY property;

b. [stricken];

c. award Hutter actual damages on all her claims except her claim under TILA, in amounts to be determined at trial;

d. award Hutter statutory damages under RESPA, New York's Deceptive Practices Act, and New York's Licensed Mortgage Bankers Law;

e. [this subparagraph is deliberately left blank];

f. award Hutter quadruple damages under New York's Licensed Mortgage Bankers Law;

g. award her reasonable attorney's fees under TILA, the Deceptive Practices Act, RESPA, and New York's Licensed Mortgage Bankers Law;

[Hutter v. Countrywide Bank, N.A.: Third Amended Complaint]

h. award Hutter the reasonable costs of this action; and

i. grant any other relief that the Court considers just.

New York, NY
9 November 2011

Respectfully presented,

Stephen A. Katz, attorney for
   the plaintiff, Nance M. Hutter
Stephen A. Katz, P.C.
111 John Street, Suite 800
New York, NY 10038-3180
(212) 349-6400
(646) 308-1170 (fax) (not for
   service of papers)
SAKatz00@AOL.com
SK0290