# Stephen A. Katz, P.C.
## Attorney at Law

111 JOHN STREET, SUITE 800
NEW YORK, NY 10038-3180
(212) 349-6400 FAX: (646) 308-1170
1-(800) 251-3529
sakatz00@aol.com

*Stephen A. Katz* (MA, NY & NJ)

**MEMO ENDORSED**

19 August 2012

Honorable Edgardo Ramos
United States Courthouse
300 Quarropas Street
White Plains, NY 10601

*By fax to (914) 390-4298*

Re: Hutter v. Countrywide Bank, N.A., Civil Action no. 09-CV-10092 (ER) (LMS)

*Plaintiff's request is DENIED. Plaintiff is directed to make expert disclosures by November 21, 2012. Defendants are directed to make expert disclosures by December 19, 2012. All other deadlines remain the same. SO ORDERED:*

*[signature]*
*Nov. 5, 2012*

Dear Judge Ramos:

I have enclosed:

1. a *Proposed* Revised Civil Case Discovery Plan and Scheduling Order, with the deadlines for disclosure of expert witnesses changed for all parties in accordance with the changes that are requested in this letter.

I represent the plaintiff, Nance M. Hutter. On 2 July 2012, I wrote to the Court asking that the expert-disclosure deadlines in the Scheduling Order be extended for all parties by about two weeks. Since then, however, my client and I have realized that a two-week extension will still leave us with many difficulties. Accordingly, Mrs. Hutter now revises her request and asks that the Scheduling Order be changed in this way:

> *Hutter asks that disclosure of expert witnesses follow the close of discovery into factual matters.*

Thus, I am writing to ask that the deadlines for providing expert witnesses' identities, curriculum vitae, and written reports be altered as follows:

   i. Hutter's expert-disclosure deadline will be changed from 1 July 2012 to 15 February 2013, and the defendants' deadline will be changed from 1 September 2012 to 15 March 2013.

   ii.–iii. Hutter has previously requested four extensions of deadlines, all of which were graned.

   iv. The reason for Hutter's present request is that her experts cannot prepare their reports until they have obtained information that Hutter seeks in factual discovery. An example of that problem is defendant Countrywide Bank, N.A.'s underwriting criteria. Hutter has requested those criteria with a view to proving that Countrywide violated its own underwriting standards by lending to Hutter. Hutter, in other words, did not qualify for a Countrywide loan. She believes that after

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/5/2012

Honorable Edgardo Ramos
19 August 2012
Page two

factual discovery has been done, she will be able to provide her expert material permitting the expert to write a report stating that Countrywide made numerous loans to borrowers who could not afford their loans, and Countrywide did that because soon after making the loans, it sold the loans to a securitization trust. That meant that by the time the borrower defaulted on her loan, Countrywide had already profited from the loan by selling it, and so the default was the securitzation trust's problem, not Countrywide's. And, the expert will conclude, Countrywide's loan to Hutter, which it knew she could not afford and which violated Countrywide's own underwriting criteria, was part of that trend. But Hutter needs to obtain through discovery Countrywide's underwriting standards, plus information about the percentages of Countrywide's loans that it sold and that went into default, before Hutter's expert can write such a report.

Other information that Hutter needs to obtain through factual discovery before her expert can write a report is the identity of the party that presently owns Hutter's Countrywide loan. If the loan has been securitized, an expert may conclude that the supposed present owner does not in fact have good title to the loan, since the paperwork in many securitized mortgage loans was done incorrectly. But an expert cannot write a report showing that the purported owner has defective title to Hutter's loan until Hutter has identified through discovery who her loan's present owner is.

Besides Hutter's experts' needing discovered information in order for them to write their reports, a second reason that Hutter wants expert discovery to follow the close of factual discovery is that she cannot afford to have her experts write both an initial report, and then a revised report after factual discovery has been done. Opposing counsel do not agree to Hutter's request for an extension of the expert-disclosure deadline, and one reason may be that the corporate defendants have the ability to out-spend Hutter. Those defendants can afford two expert's reports, but Hutter can afford only one.

v.  Opposing counsel oppose Hutter's request to postpone expert disclosure until early 2013. Defendant Countrywide Bank has explained why: "[T]his is not merely a simple request for additional time," attorney BJ Finneran has written, "but, rather, a fundamental altering of the Discovery Order you proposed and crafted less then [sic] two months ago. In addition, . . . we are not convinced the areas for which you seek expert review are suitable for expert examination and commentary. Further, we are not aware of any statutory, regulatory or judicial authority in effect at the origination of Mr. Hutter's loan that establishes a duty by a lender to a borrower to insure the borrower can afford the loan."

Hutter admits that there has been little judicial recognition of mortgage lenders' widespread scheme, during 2003–2008, to make and then sell to securitization

Honorable Edgardo Ramos
19 August 2012
Page three

trusts, numerous bad loans.[1] But journalists have described the practice.[2] Whether Countrywide's loan to Hutter was part of that widespread scheme is a legitimate subject for Hutter's factual discovery, given discovery's broad scope. And if discovery discloses that Countrywide *did* lend to Hutter knowing that she could not afford its loan, then Hutter will allege that that was a deceptive practice under New York General Business Law section 349. An expert's report will be the best way for Hutter to show that Countrywide's loan to her was part of a policy that it had of making and selling bad loans; but her expert cannot write such a report until Hutter has completed factual discovery.

If the Court will not schedule expert disclosure after the close of factual discovery, then Hutter asks that she have two weeks, after the Court makes its decision on this letter's request, to make expert disclosure; and that the defendants have four weeks after Hutter's expert-disclosure deadline, to provide their expert disclosure. Hutter will provide a revised Scheduling Order containing those new dates, if the Court rules against her request that is contained in this letter.

Thank you for considering this proposal.

Sincerely yours,

*Stephen A. Katz*

Stephen A. Katz

---

[1] *But See HSBC Bank USA, N.A. v. Seno*, No. 18600-2009, 2012 WL 662196, at *1 (Sup. Ct. Kings County Feb. 28, 2012 ("The instant matter illustrated the wild west mentality that was so prevalent in the early part of this past decade, which allowed for practically anyone breathing to obtain a mortgage by signing their name. It appears that the process of securitization of mortgages led to major improprieties, this case being a prime example.") (footnote omitted).

[2] *See, e.g., See* GRETCHEN MORGENSON AND JOSHUA ROSNER, RECKLESS ENDANGERMENT 288 (2011) 288 ("As the mortgage mania was gearing up in the early 2000s, bankers continued to sample large portions of the loans destined for mortgage pools. *They were protecting themselves from getting stuck with mortgages that went bad between the time they were originated and the moment they were bundled and sold to investors.*") (emphasis added); BETHANY MCLEAN AND JOE NOCERA, ALL THE DEVILS ARE HERE: THE HIDDEN HISTORY OF THE FINANCIAL CRISIS 83-84 (2010) ("Prior to securitization, lenders had to care about the creditworthiness of borrowers. They held loans on their books, and if a borrower defaulted, they took the hit. That's why borrowers who didn't have much money couldn't get mortgages: lenders were afraid they would default. Securitization severed that critical link between borrower and lender. Once a lender sold a mortgage to Wall Street, repayment became someone else's problem. The potential consequences of this shift were profound: sound loans are at the heart of a sound banking system. Unsound loans are the surest route to disaster.").