UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

NANCE M. HUTTER,
                              Plaintiff

        v.

COUNTRYWIDE BANK, N.A., a subsidiary of
    COUNTRYWIDE FINANCIAL
    CORPORATION
WATERMARK CAPITAL, INC.
EVOLUTION MORTGAGE INC.,

                              Defendants

Case no. 09-CIV-10092 (NSR)
(LMS)

**Hutter's Reply Memorandum to Countrywide in Support of Her
Motion to File a Fourth Amended Complaint and Join Parties**

Submitted by

Stephen A. Katz, attorney for the plaintiff,
    Nance M. Hutter
Stephen A. Katz, P.C.
111 John Street, Suite 800
New York, NY 10038-3180
(212) 349-6400
(646) 308-1170 (fax)
SAKatz00@AOL.com

# Table of Contents

**Page**

Argument   1

1. It was a deceptive practice for Countrywide and the brokers to insist that Hutter close on her loan when she was severely injured.   1

2. Hutter's charging the brokers with being Countrywide's agents will not prejudice the bank, because it anticipated that characterization of the brokers by bringing a cross-claim against them.   4

   A. The doctrine of agency by estoppel lets Hutter amend her complaint to allege that Watermark Capital and Evolution Mortgage were Countrywide's agents.   5

3. Hutter's charging that she never told Countrywide what her income was before it closed on her loan is not futile, but shows that for her supposed "stated-income loan" she never stated her income; yet the bank lent to her anyway.   11

4. Hutter's claims for consequential damages have evidentiary support.   13

5. Hutter should be allowed to allege that it was Countrywide who brought the New York broker Evolution Mortgage into her Countrywide loan transaction.   14

6. A Deceptive Practices Act claim must allege misfeasance that affects consumers generally, not just the plaintiff and defendant, so Hutter's pleading that Countrywide lent to her as part of a scheme to make and securitize thousands of bad loans is necessary for her sec. 349 claim.   15

7. Hutter should be permitted to remove the statement from her complaint that Countrywide offered her a variable-rate loan.   17

8. Hutter's making Countrywide a defendant in her Licensed Mortgage Bankers Law claim is not futile.   18

Conclusion   20

# Table of Authorities

**Cases**

*Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971) — 20

*Campbell v. WABC Towing Corp.,* 78 Misc. 2d 671, 356 N.Y.S.2d 455 (Sup. Ct. Queens County 1974) (mem.) — 7

*Canario v. Gunn,* 300 A.D.2d 332, 751 N.Y.S.2d 310 (2d Dep't 2002)

*Durante Bros Constr. Corp. v. St. John's Cemetery*, 285 A.D.2d 578, 729 N.Y.S.2d 40 (2d Dep't 2001) — 6

*Exxonmobil Inter-Am., Inc. v. Advanced Info Eng'g Servs., Inc.,* 328 F. Supp. 2d 447 (S.D.N.Y. 2004) — 16

*Fershtadt v. Verizon Communications Inc.*, 262 F.R.D. 336 (S.D.N.Y. 2009) — 10

*Getlar v. Rubinstein*, 171 Misc. 40, 11 N.Y.S. 943 (Sup. Ct. N.Y. County 1939) — 7

*Grace v. Rosenstock*, 228 F.3d 40 (2d Cir. 2000) — 2

*Hannon v. Siegel-Cooper Co.*, 5 Bedell 244, 167 N.Y. 244, 60 N.E. 597 (1901) — 7

*iMeditor, Inc. v. Access Pharmaceuticals, Inc.*, 290 F.R.D. 50 (S.D.N.Y. 2013) — 2

*Jones v. Goord*, 435 F. Supp. 2d 221 (S.D.N.Y. 2006) — 10

*McGuire v. Warren*, 490 F. Supp. 2d 331 (S.D.N.Y. 2007) — 10

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 647 N.E.2d 741 (1995) — 16

*Republic Nat'l Bank v. Hales*, 75 F. Supp. 2d 300 (S.D.N.Y. 1999) — 1

*Ruotolo v. City of New York*, 514 F.3d 184 (2d Cir. 2008) — 2

*Teller v. Bill Hayes, Ltd.,* 213 A.D.2d 141, 630 N.Y.S.2d 769 (2d Dep't 1995) — 16

*Tinlee Enters., Inc. v. Aetna Cas. & Sur. Co.,* 834 F. Supp. 605 (E.D.N.Y. 1993) — 16

**Statutes and Rules**

Fed. R. Civ. P. 15(c) — 19

N.Y. BANKING LAW § 590.2(b) — 18, 19

N.Y. BANKING LAW §§ 589–99 (McKinney 2008)                                      18

N.Y. COMP. CODES R. & REGS. tit. 3, § 38.7(a)(2) (2006)                          18

N.Y. GEN. BUS. LAW §§ 349–350-e (McKinney 2004)                         4, 5, 15,
                                                                          16, 17

N.Y. GEN. BUS. LAW §§ 349–350-e (McKinney 2004)                         4, 5, 16,
                                                                          16, 17

Securities and Exchange Act of 1934                                              20

## Secondary Authority

2A N.Y. JUR. 2D *Agency* § 25                                                    6

NAGY, PAINTER, AND SACHS, SECURITIES LITIGATION AND ENFORCEMENT: CASES
    AND MATERIALS (3d ed. 2008)                                                 20

This legal memorandum is plaintiff Nance M. Hutter's reply to defendant Countrywide Bank, N.A.'s opposition to Hutter's Motion to File a Fourth Amended Complaint and Join Parties.

## Argument

### 1. It was a deceptive practice for Countrywide and the brokers to insist that Hutter close on her loan when she was severely injured.

Nance Hutter seeks to add to the complaint a description of how, at the 11 December 2006 closing of her $1.785 million Countrywide loan, she was suffering from a brain injury caused by a recent automobile accident, because Countrywide and the brokers had pressured her to close on her loan even though her husband had tried to postpone the closing due to Hutter's injury.[1] Hutter's husband had been told that she would lose the Countrywide loan if she did not attend the scheduled 11-DEC-2006 closing,[2] so the Hutters had reluctantly attended it.

Countrywide Bank opposes the amendment because "Her Medical Condition Do[es] Not Alter her Contractual Obligations";[3] but that refutes an argument that Hutter has not made.

In the first place, the cases that Countrywide cites involve people who failed to read contractual documents before signing them[4] (except possibly a party in the *Hales* case).[5] But Hutter's situation was different: she was too severely injured to understand her loan documents. Second, Hutter has not brought a breach-of-contract or common-law rescission claim to void her Countrywide loan due to her lacking capacity to contract. Rather, she seeks to amend her Deceptive Practices Act claim to charge that it was unfair and deceptive of the

---

[1]   *See* Ex. A (proposed 4th Am. Compl.) ¶¶ 10a–10c, 11.
[2]   *Id.* ¶ 10b.
[3]   Countrywide Mem. Oppos'g 4th Am. Compl. at 5 (heading).
[4]   *See id.* at 5–6.
[5]   *See id.* at 6 (citing *Republic Nat'l Bank v. Hales*, 75 F. Supp. 2d 300, 313–14 (S.D.N.Y. 1999), *aff'd sub nom. HSBC Bank USA v. Hales*, 4 Fed. Appx. 15 (2d Cir. 2001)).

[Hutter's Reply Memorandum to Countrywide in Supp. of 4th Am. Compl.]

defendants to make Hutter close on her loan or else forfeit it, when she was so badly injured.[6] Unfair and deceptive practices—not lack of capacity to contract—is the charge that Hutter seeks to add to the complaint.

So when the jury in this case is told that Hutter signed a loan application at her closing that falsely stated that her monthly income was $38,500; or when the jury is told that Hutter had been led to expect a 1.5% fixed rate loan,[7] but at the closing she signed a note for an 8.125% variable-rate loan[8]—when the jury is exposed to those facts, Hutter should have the right to tell her side of the story, which is that she signed the documents in question while suffering from a traumatic brain injury that prevented her from comprehending what she was signing.

Countrywide carps about Hutter's seeking to describe her disability in the complaint only now, when she has known about it since she filed this case.[9] But delay alone in a party's motion to amend a pleading is not a ground for denying the motion;[10] amending must prejudice the opposing parties for the court to deny leave to amend.[11] And Hutter's referring to her disability in the complaint will not prejudice Countrywide, because the defendants and Magistrate Judge Smith inquired into the matter. In February 2013, Hutter gave opposing counsel HIPAA releases of her medical records concerning her accident. And her psychiatrist F. Carl Mueller, M.D. testified about Hutter's cognitive impairment on 5 June 2013 before Magistrate Judge Smith, at which time Countrywide cross-examined the doctor.

---

[6] *See* Ex. A (proposed 4th Am. Compl.) ¶ 57w.
[7] *See* Ex. B (good-faith estimate).
[8] *See* Ex. C (promissory note for $1.785 million Countrywide loan).
[9] Countrywide Mem. Oppos'g 4th Am. Compl. at 6 ("Plaintiff pleads for the first time that she was unaware of what she was signing at closing (see FAC ¶ 10), even though she, and presumably her attorney, were aware of her alleged disability from their initial consultation and inception [sic] of this case.").
[10] *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 191 (2d Cir. 2008); *iMeditor, Inc. v. Access Pharmaceuticals, Inc.,* 290 F.R.D. 50, 52 (S.D.N.Y. 2013) ("Delay alone does not provide a basis for denying leave to amend . . . .").
[11] *Grace v. Rosenstock,* 228 F.3d 40, 53–54 (2d Cir. 2000), *cert. denied,* 532 U.S. 923 (2001).

[Hutter's Reply Memorandum to Countrywide in Supp. of 4th Am. Compl.]

So the defendants have already done discovery into Hutter's accident and resulting disability, which means that adding information about the disability to the complaint will not prejudice Countrywide. Second Circuit caselaw therefore gives Hutter the right to add information about her disability to the complaint by amendment, because doing so will not prejudice the defendants, and delay alone in requesting an amendment is not reason enough to deny the request.

Countrywide's additional argument that Hutter was not disabled at her loan's closing because her husband who was her agent accompanied her,[12] misinterprets the scope of Mr. Hutter's agency. Mrs. Hutter and not her husband signed the loan documents, including the promissory note and mortgage instrument, because Mr. Hutter was not his wife's agent for the purpose of taking out the loan; he only negotiated the loan. That is because Mr. Hutter's agency arose orally rather than out of a written agreement, so under the statue of frauds he did not have the authority to sign real-estate documents for his wife documents that created an interest in real property.

Mr. Hutter was therefore not his wife's agent at the loan closing for the act of taking out the loan. Mrs. Hutter had no agent for that, but performed it on her own when she was mentally disabled.

---

[12]   Countrywide Mem. Oppos'g 4th Am. Compl. at 6 ("Plaintiff's allegations regarding her purported disability and inability to understand the loan documents are belied by her claim that her husband, who accompanied her to the closing, is her agent. Plaintiff cannot use agency as a sword and then abandon it when it is turned against her.").

[Hutter's Reply Memorandum to Countrywide in Supp. of 4th Am. Compl.]

## 2. Hutter's charging the brokers with being Countrywide's agents will not prejudice the bank, because it anticipated that characterization of the brokers by bringing a cross-claim against them.

Countrywide Bank describes Nance Hutter's proposed amendment that broker-defendants Evolution Mortgage and Watermark Capital were Countrywide's agents,[13] as a "brand new claim."[14] The amendment represents "a fundamental altering of Plaintiff's GBL claim against BANA," the bank complains.[15] In fact, the allegation that the brokers were Countrywide's agents is not a claim at all, but an explanation of how Countrywide perpetrated the deceptive practices that Hutter already charges it with. That is, Countrywide claims that Hutter's complaint falsely alleges that Countrywide representatives personally spoke to Hutter,[16] but that misinterprets the third amended complaint. Rather, Hutter's characterizing the brokers as Countrywide's agents completes Hutter's allegations against Countrywide,[17] because it explains how Countrywide was able to make representations to Hutter even though she never spoke to a Countrywide employee.

So Hutter's amendment regarding the brokers' agency leaves her charges of misrepresentation by Countrywide unchanged, but the amendment explains how Countrywide made the misrepresentations.

Countrywide Bank also opposes Hutter's amendment that brokers Evolution Mortgage and Watermark Capital were Countrywide's agents, on two other grounds: the brokers were *not* Countrywide's agents, and the amendment will, supposedly prejudice the bank.[18] But

---

[13]   *See* Ex. A (proposed Fourth Am. Compl.) ¶ 12a.
[14]   Countrywide Mem. Oppos'g 4th Am. Compl at 8.
[15]   *Id.* at 10.
[16]   *See id.* (quoting third amended complaint's allegations that Countrywide "convinced Hutter" and "assured Hutter").
[17]   *See, e.g.,* Ex. D (Third Am. Compl.) ¶ 57k ("Countrywide . . . assured Hutter that she did not need a lawyer . . . ."); ¶ 57n ("Countrywide told Hutter that Countrywide's refinancing would help her . . . .").
[18]   Countrywide Mem. Oppos'g 4th Am. Compl. at 8 ("Plaintiff's attempt to impose liability on BANA

[Hutter's Reply Memorandum to Countrywide in Supp. of 4th Am. Compl.]

with Countrywide's employing a nationwide network of brokers to place its loans, and with its having cross-claimed against the brokers to obtain reimbursement for any liability that they may cause it in this lawsuit, the bank cannot legitimately claim that the brokers were not its agents, or that it will be prejudiced because it was unaware that it needed to conduct discovery into the brokers' representations to Hutter.[19] But to fully understand why the brokers *were* Hutter's agents and why the amendment will not prejudice Countrywide, we must examine agency by estoppel.

## A. The doctrine of agency by estoppel lets Hutter amend her complaint to allege that Watermark Capital and Evolution Mortgage were Countrywide's agents.

Hutter wants brokers Evolution Mortgage and Watermark Capital to be acknowledged as Countrywide's agents so that Countrywide will bear responsibility for the brokers' untruths. That is, in the course of Hutter's applying for her $1.785 million Countrywide loan, the brokers falsely promised her in writing that her loan would have a 1.5% fixed interest rate,[20] but the promise was false because she was actually given an 8.125% adjustable-rate loan.[21] The brokers also misrepresented Hutter's monthly income as $38,500 in her 11-DEC-2006 loan application when she actually had no income at all[22]; and they told her falsely that she could afford her $1.785 million loan by continuing to refinance her home, because real-estate prices would keep rising.[23]

---

through a brand new claim that the Broker Defendants were Countrywide's agents is futile both because they were not agents as a matter of law and because at this late date the new theory causes substantial prejudice to BANA.").

[19]  *Cf. id.* at 11 ("Plaintiff's proposed agency theory will require depositions of new parties and the re-examination of witnesses previously deposed. Although Plaintiff and her husband maintain they only spoke with or submitted documents to Todd Matthews, he is not a party and Plaintiff did not seek his deposition. However, under an agency theory BANA will certainly look to depose him and may add him as a party.").

[20]  *See* Ex. B (good-faith estimate).

[21]  *See* Ex. C (promissory note).

[22]  *See* Ex. E (loan application).

[23]  *See* Ex. D (Third Am. Compl.) ¶ 57j.

[Hutter's Reply Memorandum to Countrywide in Supp. of 4th Am. Compl.]

Hutter contends that ultimately it was Countrywide who spoke those falsehoods that the brokers uttered, because the brokers were acting for Countrywide as its agents.[24] The doctrine of agency by estoppel supports that conclusion.

In particular, regarding Evolution Mortgage's and Watermark Capital's misrepresenting the terms of Hutter's Countrywide loan, agency by estoppel shows that the brokers were Countrywide's agents because *(1)* the brokers *acted* as though they had Countrywide's authority to offer Hutter a 1.5% fixed-rate Countrywide loan; *(2)* Hutter *relied* on the offer because it appeared to come from Countrywide; and *(c)* Countrywide was *negligent* in allowing its brokers to make the false offer to Hutter.[25]

Cases illustrate how agency by estoppel has been applied. A cemetery that a contractor had sued in order to be paid for installing concrete beams through ranges of graves, could not make the Roman Catholic Diocese of Brooklyn (rather than the cemetery) liable for the work. The Diocese had made "all arrangements for the work at issue and payment therefore," but the Diocese had been the cemetery's *agent*, so the cemetery was liable for the work. The court buttressed its conclusion by noting that the cemetery had seen the construction work being done, and that the Diocese's office that ordered the work had been located on the cemetery's grounds.[26]

In another case, the driver of an automobile that had been damaged in an accident, had signed an "Authorization to Repair" at a repair shop while the car's owner looked on; and

---

[24]  *See* Ex. A (proposed Fourth Am. Compl.) ¶ 12a.

[25]  *See* 2A N.Y. JUR. 2D *Agency* § 25 ("As to third persons, an agency may arise by estoppel. An agency by estoppel is created, however, only by acts or *neglect* of the person sought to be charged as principal, and the person dealing with the *ostensible* agent must have known of and *relied* upon such acts or omissions; this reliance must be in good faith and in the exercise of reasonable prudence. The negligence as to the acts of another who has assumed to act for a person or to deal with the person's property is that of permitting the other to clothe itself or to be clothed with apparent authority to act.") (emphasis added) (footnotes omitted).

[26]  *Durante Bros Constr. Corp. v. St. John's Cemetery*, 285 A.D.2d 578, 579, 729 N.Y.S.2d 40, 41 (2d Dep't 2001).

[Hutter's Reply Memorandum to Countrywide in Supp. of 4th Am. Compl.]

then the owner had read the document. The owner could not repudiate the authorization because "the driver executed the authorization with the full authority of the [owner] based on the principal [sic] of agency by estoppel."[27]

A department store that advertised dental treatment was liable for dental malpractice because, likewise, the dentist had been the store's agent.[28] And a camp that offered horseback riding and had riding stables on its premises, was estopped from avoiding liability for the negligence of a riding instructor who had kicked and whipped a horse, causing a child to be injured. Because the camp advertised riding as one of its major activities, claimed that its horses were safe, and praised the riding instructor, "[s]uch conduct on the part of the [camp owner], coupled with reliance thereon by the infant plaintiff to her detriment, created an apparent or ostensible agency, and, if believed and accepted by the jury, sustains its finding that the [camp's owner] was liable for the negligence of the [riding instructor]."[29]

Those cases apply here, first, because Countrywide and the brokers contend that the brokers cannot have been Countrywide's agents since Countrywide's contracts with the brokers stipulate that the brokers are not its agents.[30] But the foregoing cases ignored the principal and agent's contractual relations. Those cases therefore counsel that this Court should ignore the provisions of Countrywide's contracts with Evolution Mortgage and Watermark Capital in determining whether the brokers were Countrywide's agents. But the fact that Countrywide had written contracts with the brokers *at all* is evidence that the

---

[27]   *Campbell v. WABC Towing Corp.,* 78 Misc. 2d 671, 672, 356 N.Y.S.2d 455, 456 (Sup. Ct. Queens County 1974) (mem.).

[28]   *Hannon v. Siegel-Cooper Co.,* 5 Bedell 244, 246, 167 N.Y. 244, 246, 60 N.E. 597, 598 (1901) (upholding the principle that "a person is estopped from denying his liability for the conduct of one whom he holds out as his agent against persons who contract with him on the faith of the apparent agency . . . .").

[29]   *Getlar v. Rubinstein,* 171 Misc. 40, 40–41, 11 N.Y.S. 943, 944 (Sup. Ct. N.Y. County 1939), *aff'd,* 258 A.D. 795, 16 N.Y.S.2d 527 (1st Dep't 1939).

[30]   Countrywide Mem. Oppos'g 4th Am. Compl. at 8–9.

[Hutter's Reply Memorandum to Countrywide in Supp. of 4th Am. Compl.]

brokers were Countrywide's agents.

Second, the cited cases make Evolution Mortgage and Watermark Capital Countrywide's agents because the cases focus on the customer's *reliance* on the agency and on the principal's taking *responsibility* for the agency. Hutter reasonably believed that the brokers were acting with Countrywide's authority when they provided a good-faith estimate offering her a 1.5% fixed rate Countrywide Loan.[31] She also believed that as Countrywide agents, the brokers would not invent a fictitious monthly income of $38,500 for her.[32] So Hutter relied on the brokers to be acting on the authority of Countrywide.

Hutter's reliance was similar to that of a contractor who reasonably expected a cemetery to pay its bill, and similar to an auto-repair shop's reliance that an automobile owner would bear responsibility for paying his automobile's repair bill. The cited cases also make the brokers Countrywide's agents because each case forced the principal to take *responsibility* for its agent's conduct. Thus, a court prevented a cemetery from shirking its responsibility; a department store profited by offering dental work, but had to be forced to take responsibility for poor dental work; and a camp benefitted from offering horseback riding, but tried to shirk responsibility when the riding activity injured a camper.

In the same way, Countrywide profited by having Evolution Mortgage and Watermark Capital falsely offer Hutter a 1.5% fixed-rate loan to persuade her to take out a Countrywide loan; but now Countrywide seeks to avoid responsibility for the broker misconduct that it found so profitable. The cited cases counsel not letting Countrywide get away with that, so Evolution Mortgage and Watermark Capital should be determined to be Hutter's agents by estoppel in order that Countrywide will bear responsibility for its brokers' falsehoods.

---

[31] *See* Ex. B (good-faith estimate).
[32] *But see* Ex. E (loan application of 11-DEC-2006).

[Hutter's Reply Memorandum to Countrywide in Supp. of 4th Am. Compl.]

As for Countrywide's supposedly being prejudiced if Hutter is allowed to plead that Evolution and Watermark were the bank's agents, prejudice will not occur because Countrywide has brought a cross-claim against the brokers.[33] That shows that it anticipated being held liable for the brokers' misconduct, and that Countywide was aware that it needed to do discovery on how the brokers misrepresented its $1.785 million loan to Hutter, and on other matters. The bank's professed surprise that it could be liable for the brokers' falsehoods ("[Countrywide's] defense strategy has been predicated on the fact it [sic] had no contact with Plaintiff prior to the closing of the Loan and, based on the allegations in the TAC, *it was not liable for the alleged representations of the Broker Defendants*."[34]) therefore rings false.

As does Countrywide's excuse that it "had no incentive to examine the Broker Defendants at their deposition concerning this theory."[35] If a lender brings a cross-claim, it has an incentive to do discovery for the cross-claim. So Countrywide knew that at Evolution Mortgage's and Watermark Capital's depositions it should question the brokers' corporate officers, and if Countrywide declined to do so that is its own fault, not Hutter's.

Fairness provides another reason for allowing Hutter to charge the brokers with being Countrywide's agents. As Albany Law School Professor Raymond H. Brescia has documented, Countrywide lent to thousands of people who could not afford its loans, and then it profitably sold those loans before many of the borrowers eventually defaulted and went into foreclosure.[36] The scheme required Countrywide to have a network of mortgage

---

[33] *See* Ex. F (Countrywide's Answer to Third Am. Compl.) ¶¶ 23–24 ("To the extent that Plaintiff obtains judgment against BANA, BANA is entitled to a judgment over and against Evolution and Watermark, based on Evolution and Watermark's culpable conduct.").

[34] Countrywide Mem. Oppos'g 4th Am. Compl. at 11 (emphasis added).

[35] *Id.*

[36] *See* Ex. G (Brescia Report) ¶¶ 56–59, 67.

[Hutter's Reply Memorandum to Countrywide in Supp. of 4th Am. Compl.]

brokers to place its loans,[37] so it would be unfair for Countrywide to escape liability for the misconduct of the brokers who were an integral part of its system. The brokers should be considered Countrywide's agents so that Countrywide will have to bear responsibility for the brokers' misconduct.

There is precedent for letting Hutter charge now that the brokers were Countrywide's agents. Even when a plaintiff might have moved to amend earlier—and even when a defendant's summary-judgment motion is pending—a court may let a plaintiff add an additional claim for relief.[38] Moreover, amending may be allowed when a defendant is already on notice of the substance of the amendment,[39] as Countrywide showed here by bringing a cross-claim against the brokers, that it was on notice that it could be held liable for Evolution Mortgage's and Watermark Capital's misconduct.

So Hutter should be allowed to allege that the broker-defendants were Countrywide's agents. Agency by estoppel supports the agency's existence; and Countrywide has shown by its cross-claim that it has long been aware that it could be liable for its brokers' misconduct, and that it needed to do discovery into that misconduct. In addition, because the brokers were part of Countrywide's overall scheme to make and securitize a large volume of bad mortgage loans, fairness dictates that Countrywide should not be permitted to insulate itself from liability for its brokers' misconduct.

---

[37] *Id.* ¶ 66.

[38] *See Fershtadt v. Verizon Communications Inc.*, 262 F.R.D. 336, 337–38 (S.D.N.Y. 2009). *Accord, McGuire v. Warren*, 490 F. Supp. 2d 331, 336–37 (S.D.N.Y. 2007) (allowing plaintiff to file amended complaint, though her attorney filed the motion fourteen days late and had no excuse for the lateness).

[39] *See Jones v. Goord*, 435 F. Supp. 2d 221, 232–33 (S.D.N.Y. 2006) (allowing prisoners to amend complaint to assert Eighth Amendment claim challenging practice of double-celling, because prison was on notice that double-celling was being challenged in the litigation).

[Hutter's Reply Memorandum to Countrywide in Supp. of 4th Am. Compl.]

### 3. Hutter's charging that she never told Countrywide what her income was before it closed on her loan is not futile, but shows that for her supposed "stated-income loan" she never stated her income; yet the bank lent to her anyway.

Hutter's proposed fourth amended complaint asserts that she did not submit a loan application prior to the 11-DEC-2006 closing of her $1.785 million Countrywide loan, so Countrywide could not have relied on a false representation by Hutter of her income in a loan application that she submitted, no such loan application existed until the day that the loan was made.[40]

The assertion corrects an erroneous belief that Judge Seibel and Countrywide itself have both held, which is that the bank approved Hutter for a $1.785 million loan because it relied on a pre-closing loan application that Hutter signed which stated that Hutter had a monthly income of $38,500. Thus, Countrywide quotes Judge Seibel as saying, "[O]ffering a no-doc loan is in itself not improper conduct by the lender, *nor is 'just accepting' the representations in plaintiff's application."*[41] That indicates that Judge Seibel believed that Countrywide approved Hutter for a loan because it relied on a pre-closing loan application that she submitted. But there *was no* pre-closing loan application. Nor was there any other pre-closing representation by Hutter to Countrywide, whether oral or written, which said that Hutter had a particular income. So Countrywide relied on nothing at all when it determined that Hutter's income was the false amount of $38,500 a month (false because Hutter was unemployed and had no income at all),[42] and when it then approved her for a Countrywide loan.

Hutter did finally sign a loan application on the day of the closing on 11-DEC-2006, but by then Countrywide had already decided to extend the $1.785 million loan to her, so it did

---

[40]  *See* Ex. A (proposed 4th Am. Compl.) ¶ 20a.
[41]  Countrywide Mem. Oppos'g 4th Am. Compl. at 11 (emphasis added).
[42]  *See* Ex. H (Mrs. Hutter depo.) 40:2–18.

not rely on the 11-DEC-2006 loan application when it approved Hutter for the loan. Indeed, Countrywide has been unable to produce *any* representation of Hutter's income—whether from Hutter, the mortgage brokers, or anybody else—that it received before the 11-DEC-2006 closing, so it is unclear *what* Countrywide relied on in deciding to lend to Hutter.

Countrywide objects to Hutter's correcting her complaint to state that she signed no loan application before the closing,[43] and it supports its objection by claiming vaguely that Hutter had falsely represented to Countrywide by October 2006 that her monthly income was $38,500. "The uncontested facts show that Plaintiff submitted her false assertion of income [i.e., $38,000 a month] to Countrywide well before the December 2006 closing, at least as early as October 2006, as reflected on [sic] documents produced to Plaintiff in this litigation that reflect the processing of the application,"[44] the bank claims. It cites its Exhibit K, which consists of an internal Countrywide loan-processing document that states that Hutter's monthly-income was $38,500. But where did Countrywide get the figure of $38,500? Countrywide provides no pre-closing document which shows that Hutter made any representation to it that she had any particular income.

Nance Hutter's proposed paragraph 20a in her fourth amended complaint is therefore eminently justified, because it reveals Countrywide's Alice in Wonderland loan-approval process. It shows that according to Countrywide's own records, the bank relied on *no representation of income at all,* either oral or written, when it arrived at the absurd conclusion that Hutter, who had no income,[45] was earning $38,500 a month. Surely, after Judge Seibel was mistakenly told that Countrywide relied on a false loan application, and

---

[43]  *See* Countrywide Mem. Oppos'g 4th Am. Compl at 11–12.
[44]  *Id.* at 12.
[45]  *See* Ex. H (Mrs. Hutter depo.) 40:2–18.

[Hutter's Reply Memorandum to Countrywide in Supp. of 4th Am. Compl.]

after Countrywide mistakenly believed that too,[46] amended-complaint paragraph 20a is needed to set the record straight. So nothing about proposed complaint-paragraph 20a is futile, and because the paragraph relies on Countrywide's own records (or lack thereof), the amendment will not prejudice the bank.

## 4. Hutter's claims for consequential damages have evidentiary support.

Nance Hutter seeks to amend her complaint to demand damages for the profit that she lost by not selling her Bedford, New York home in 2006, due to her relying on Countrywide's false offer of a 1.5% fixed-rate loan which induced Hutter to take out Countrywide's $1.785 million loan instead of selling her home.[47] Hutter also seeks damages for the losses that her unaffordable $1.785 million Countrywide loan caused to her husband's business that markets an emergency residence for storm victims called the RescUshelter. The business losses occurred because Mrs. Hutter's defaulting on her Countrywide loan caused her to be denied access to credit that she would have invested in her husband's business.[48] Hutter has submitted an expert's report by a certified public accountant who supports both her consequential-damages claims.[49]

Countrywide labels Hutter's statement that she intended to sell her home a "new

---

[46]   *See* Ex. I (Countrywide Vice President Lanisa Jenkins depo.) 85:9–11, 85:16–19, 86:5–8, 86:13–25, 87:2. ("Q . . . Do you have any evidence that they had a loan application before the 11th of December [2006, the closing date]? , , , , Q. I'm saying that that [sic] he relied on the loan application. So where's this famous loan application that they relied on? . . . . . Q. We were told that they got her income from a loan application, and I'm saying where is it. . . . A. If I'm not mistaken, what we were talking about was stated loans, reduced doc loans, what do we depend on or what do we usually – what do we use when we review a loan file or what do we rely upon for financial information or income information, and what would normally be the loan application. Q. So, normally, But you don't know specifically if you relied on a loan application in this case? A. And like you said, I have not committed 900, as you say, pages of this particular loan file to memory so. ").
[47]   *See* Ex. A (proposed Fourth Am. Compl.) ¶ 46a–46b.
[48]   *See id.* ¶¶ 46c–46e.
[49]   *See* Ex. J (report of Joseph Ammirati without exhibits).

[Hutter's Reply Memorandum to Countrywide in Supp. of 4th Am. Compl.]

---

pleading";[50] but all her consequential-damages claims appear in her Rule 26(a)(1)

disclosures, so they are not new.[51] Countrywide doubts that Hutter intended to sell her home,

or that Mr. Hutter's business would have been profitable[52] even if Hutter had not been

induced by Countrywide's false promise of a 1.5% fixed-rate to take out her $1.785 million

Countrywide loan that she could not afford. But the bank confuses the *weight* of Hutter's

evidence with the evidence's legal sufficiency. Hutter supports her damages claims with an

expert's report and with her[53] and her husband's deposition testimony,[54] as wells as with

hundreds of e-mails in which Mr. Hutter has marketed his RescUshelter.[55] Countrywide finds

the damages claims unconvincing, but then it would. It should be up to the trier of fact to

decide whether Hutter's consequential-damages claims are meritorious.

### 5. Hutter should be allowed to allege that it was Countrywide who brought the New York broker Evolution Mortgage into her Countrywide loan transaction.

Plaintiff Nance M. Hutter's husband, Gerhard P. Hutter, acted as Mrs. Hutter's agent in

negotiating her $1.785 million Countrywide loan, and in those negotiations he dealt with

Todd Matthews, an employee of the California mortgage broker Watermark Capital.

Matthews told Mr. Hutter that it was Countrywide who brought Evolution Mortgage into

Mrs. Hutter's loan transaction, because Watermark Capital was unlicensed in New York

State but Evolution *was* so licensed. Watermark needed a licensed figurehead broker to act as

the broker of record for Hutter's Countrywide loan, while Watermark did the actual

brokerage work for the loan.

---

[50]  Countrywide Mem. Oppos'g 4th Am. Compl. at 12.
[51]  *See* Ex. K (Hutter's R. 26(a)(1) disclosures) ¶ iii.
[52]  Countrywide Mem. Oppos'g 4th Am. Compl. at 12–14.
[53]  *See* Ex. H (Mrs. Hutter depo.) 379:16–383:13.
[54]  *See* Ex. L (Mr. Hutter depo.) 16:3–21:18.
[55]  *See, e.g.* Ex. M (Mr. Hutter's marketing materials for RescUshelter).

[Hutter's Reply Memorandum to Countrywide in Supp. of 4th Am. Compl.]

Mr. Hutter's statement—that Matthews told Mr. Hutter that Countrywide brought Evolution Mortgage into Hutter's loan[56]—should be admissible as an admission by Countrywide, if Mrs. Hutter is allowed to amend her complaint to assert that Watermark Capital was Countrywide's agent. That is, Matthews, speaking as an employee of Watermark Capital who was Countrywide's agent, admitted on Countrywide's behalf that Countrywide introduced the mortgage broker Evolution Mortgage to Watermark Capital, so that Evolution could act as a figurehead broker for Hutter's Countrywide loan.

## 6. A Deceptive Practices Act claim must allege misfeasance that affects consumers generally, not just the plaintiff and defendant, so Hutter's pleading that Countrywide lent to her as part of a scheme to make and securitize thousands of bad loans is necessary for her sec. 349 claim.

Nance Hutter's expert Professor Raymond H. Brescia explains that Countrywide's $1.785 million mortgage loan to Hutter was one of thousands of loans that Countrywide made around 2003–2008 to borrowers who could not afford their loans. But because Countrywide sold the loans to securitization trusts soon after making them, it profited from the bad loans because the borrowers defaulted *after* Countrywide had sold the loans.[57] Hutter seeks to incorporate Brescia's description of Countrywide's system into her fourth amended complaint.[58]

Countrywide objects that the amendment is irrelevant and will prejudice the bank.[59] But in fact, the content that Hutter seeks to add to the complaint is legitimate, because it satisfies

---

[56]   *See* Ex. N (Mr. Hutter Aff. of 23-NOV-2013) ¶¶ 3–4.
[57]   *See* Ex. G (Prof. Brescia's report) ¶¶ 14–22.
[58]   *See* Ex. A (proposed Fourth Am. Compl.) ¶¶ 37a–37b; 58 ("Indeed, Countrywide's and its brokers lending to thousands of borrowers who could not afford their loans—just as they did to Hutter—helped cause a nationwide epidemic of foreclosures and a worldwide financial crisis.").
[59]   Countrywide Mem. Oppos'g 4th Am. Compl. at 15 ("Plaintiff's attempt to plead so-called facts about other loans, to other borrowers who could not afford their loans, is irrelevant to any claim, is designed only prejudice [sic] BANA to a fact finder, and is futile.").

[Hutter's Reply Memorandum to Countrywide in Supp. of 4th Am. Compl.]

a requirement for stating a claim under the Deceptive Practices Act.[60] Such a claim must

arise out of misconduct that is not unique to the parties, but that affects many consumers and

is recurrent. The Deceptive Practices Act "appl[ies] solely to matters *affecting the public*

*interest* and involving transactions *of a recurring nature*. Where these elements are missing

from a pleading, claims have been dismissed," a court has observed.[61] The complained-of

misconduct must be "consumer-oriented" and have "a broader impact on consumers at

large,"[62] while "[p]rivate contract disputes, unique to the parties . . . [do] not fall within the

ambit of the statute."[63]

The requirement that a sec. 349 claim must affect the public interest and have a broad

impact on consumers generally, makes Hutter's proposed amendments explaining

Countrywide's overall lending practices essential to her Deceptive Practices Act claim. That

is because her amendments tell how Countrywide repeated thousands of times with other

borrowers, its act of making an unaffordable loan to Hutter; and the amendments show how

that conduct on Countrywide's part harmed thousands of consumers. The proposed

amendments thus satisfy sec. 349's public-interest requirement, and so Hutter's new material

is not irrelevant and prejudicial as Countrywide charges.

Countrywide also attacks the proposed amendment by criticizing Professor Brescia's

report for not being based on primary research.[64] But it presents no legal authority requiring

---

[60]   N.Y. GEN. BUS. LAW §§ 349–350-e (McKinney 2004).
[61]   *Tinlee Enters., Inc. v. Aetna Cas. & Sur. Co.,* 834 F. Supp. 605, 610 (E.D.N.Y. 1993) (emphasis added) (dismissing insufficient Deceptive Practices Act claim); *see also Exxonmobil Inter-Am., Inc. v. Advanced Info Eng'g Servs., Inc.,* 328 F. Supp. 2d 443, 447 (S.D.N.Y. 2004) (dismissing Deceptive Practices Act claim).
[62]   *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,* 85 N.Y.2d 20, 24-25, 647 N.E.2d 741, 744 (1995).
[63]   *Teller v. Bill Hayes, Ltd.,* 213 A.D.2d 141, 146, 630 N.Y.S.2d 769, 773 (2d Dep't 1995) (internal quotation marks omitted); *see Canario v. Gunn,* 300 A.D.2d 332, 333, 751 N.Y.S.2d 310 (2d Dep't 2002) ("[p]rivate transactions without ramifications for the public at large are not the proper subject of [such] a claim").
[64]   Countrywide Mem. Oppos'g 4th Am. Compl. at 17 ("Mr. Brescia admits that he did no primary research

[Hutter's Reply Memorandum to Countrywide in Supp. of 4th Am. Compl.]

an expert's report to be based on primary research, so the criticism's purpose is unclear. The

bank also faults Brescia for treating Countrywide Bank, N.A., Countrywide Home Loans,

Inc., and other Countrywide affiliates as all being the same entity "Countrywide" for

purposes of his report. [65] "Corporate distinctions matter," the bank admonishes.  But it does

not show that any of Brescia's statements about Countrywide generally are false because

they are inapplicable to the specific entity Countrywide Bank, N.A. that is a defendant in this

case; so the point of that criticism is also unclear. So given that those conclusions help Hutter

fulfill the requirement that a Deceptive Practices Act claim must implicate the public interest,

her proposed amendments that are based on Professor Brescia's report should be allowed.

### 7. Hutter should be permitted to remove the statement from her complaint that Countrywide offered her a variable-rate loan, because a wealth of evidence contradicts that isolated erroneous statement.

Hutter wants to eliminate from her complaint the false statement that the defendants told

Hutter that "an adjustable rate loan was right for her,"[66] because in fact Watermark Capital's

representative Todd Matthews never said that. Countrywide is correct that that false

statement survived in Hutter's prior complaints;[67] then Hutter's deposition called her

attention to the error, and so now she wants to eliminate it.

The false statement that Hutter was counseled to take out a variable-rate loan is

contradicted by documents that Hutter has submitted, and by her and her husband's

testimony. Nothing supports the false statement. When Hutter applied for Countrywide's

$1.785 million loan, she was given documents stating that Countrywide was offering her a

---

into Countrywide's origination and securitization practices, and he does not know if any of the sources
upon which he relied did such research.").
[65]  *Id.*
[66]  *See* Ex. A (proposed Fourth Am. Compl.) ¶ 57c.
[67]  *See* Countrywide Mem. Oppos'g 4th Am. Compl. at 18–19.

Case 7:09-cv-10092-NSR-LMS  Document 123  Filed 02/12/14  Page 22 of 24

[Hutter's Reply Memorandum to Countrywide in Supp. of 4th Am. Compl.]

1.5% fixed-rate loan.[68] And she[69] and her husband[70] testified at deposition that a 1.5% fixed-rate loan was Countrywide's offer to her up until the closing,[71] when Countrywide withdrew the 1.5% fixed-rate loan offer and instead made a 8.125% variable-rate loan to Hutter.[72]

The requested change is neither futile nor should it surprise Countrywide, given that both the Hutters testified that Countrywide offered Hutter a fixed-rate loan, not a variable-rate one. And given that the good-faith estimate that Hutter was given confirms that Countrywide offered her a 1.5% fixed-rate loan. Therefore, the amendment should be allowed.

## 8. Hutter's making Countrywide a defendant in her Licensed Mortgage Bankers Law claim is not futile.

This case has always asserted a claim against Watermark Capital[73] under the Licensed Mortgage Bankers Law,[74] a statute that in 2006 required a party who brokered a loan in New York State to be licensed by New York's banking department.[75] Now Hutter seeks to add Countrywide as a defendant in that claim, because Countrywide violated Banking Regulation 38.7(a)(2)[76] (which is promulgated under the Licensed Mortgage Bankers Law), in that Countrywide had business dealings with an unlicensed entity, namely, Watermark Capital, and the regulation forbids such business dealings. Countrywide *helped* Watermark violate the Licensed Mortgage Bankers Law by working with Watermark so that it could do the

---

[68] *See* Ex. B (good-faith estimate).
[69] *See* Ex. H (Mrs. Hutter depo.) 305:4–9.
[70] *See* Ex. L (Mr. Hutter depo.) 98:11–14.
[71] *See* Ex. B (good-faith estimate).
[72] *See* Ex. C (promissory note).
[73] *See* Ex. D (Third Am. Compl.) ¶¶ 88–139.
[74] N.Y. BANKING LAW §§ 589–99 (McKinney 2008).
[75] *See id.* § 590.2(b) ("No person, partnership, association, corporation or other entity shall engage in the business of soliciting, processing, placing or negotiating a mortgage loan or offering to solicit, process, place or negotiate a mortgage loan in this state without first being registered with the superintendent as a mortgage broker in accordance with the registration procedure provided in this article and by such regulations as may be promulgated by the banking board or prescribed by the superintendent. The registration provisions of this subdivision shall not apply to any exempt organization or mortgage banker.").
[76] N.Y. COMP. CODES R. & REGS. tit. 3, § 38.7(a)(2) (2006).

[Hutter's Reply Memorandum to Countrywide in Supp. of 4th Am. Compl.]

brokerage work for Hutter's Countrywide loan when Watermark was unlicensed as a mortgage broker in New York State. Because Countrywide helped Watermark Capital violate Banking Law sec. 590(2)(b)'s prohibition on an unlicensed entity's brokering a mortgage loan in New York State, Countrywide should also be a defendant in Hutter's Licensed Mortgage Bankers Law claim.

Countrywide opposes the amendment as being time-barred,[77] but that objection does withstand scrutiny. Federal Rule of Civil Procedure 15(c) considers a claim that is brought into a complaint by amendment to have been filed when the original complaint was filed, as long as the amended-in claim arose out of the same transaction, conduct, or occurrence that the original pleading set out.[78] Here the prohibited contacts that Countrywide had with Watermark Capital through Watermark's employee Todd Matthews, arose out of the same transaction, namely, Hutter's $1.785 million Countrywide loan; and it arose out of the same conduct, namely, Watermark's doing unlicensed brokerage work on Hutter's loan—as Hutter's original claim against Watermark Capital under the Licensed Mortgage Bankers Law arose out of. So Rule 15(c), applied to this case's facts, refutes Countrywide's statute-of-limitations argument against the amendment.

Countrywide also claims that it will be prejudiced if it is made a defendant in this lawsuit's Licensed Mortgage Bankers Law claim, because it did not depose Watermark Capital's employee Todd Matthews.[79] But as Hutter has already explained, because Countrywide has interposed a cross-claim against Watermark Capital, it cannot credibly

---

[77] Countrywide Mem. Oppos'g 4th Am. Compl. at 19.

[78] Fed. R. Civ. P. 15(c) ("(1) An amendment to a pleading relates back to the date of the original pleading when: . . . (B) the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading;").

[79] Countrywide Mem. Oppos'g 4th Am. Compl. at 21 ("BANA had no incentive to explore Plaintiff's then non-extant claims at Watermark's deposition. BANA also would have subpoenaed Todd Matthews to explore and refute the "conduct business" allegation.").

[Hutter's Reply Memorandum to Countrywide in Supp. of 4th Am. Compl.]

claim that it was unaware that it needed to depose Watermark's representative Matthews, or that it was unaware that it could be liable for Watermark's misconduct.

Moreover, Hutter's evidence revealing Countrywide's improper dealings with the unlicensed entity Watermark Capital will probably not depend on Mr. Hutter's account of Matthews's statements, but will consist principally of written communications between Watermark and Countrywide.[80] So Countrywide may not need Matthews's deposition to defend itself against Hutter's proposed claim against Countrywide under the Licensed Mortgage Bankers Law.

Countrywide also argues that the Licensed Mortgage Bankers Law does not allow Hutter to bring a private right of action against Countrywide for violating Banking Regulation 38.8(a)(2).[81] But the Court has the power to imply such a private action: Courts have done so under section 10(b) of the Securities and Exchange Act of 1934,[82] and in other cases.[83]

## Conclusion

For the foregoing reasons, plaintiff Nance M. Hutter respectfully requests that the Court:

- grant her Motion to File a Fourth Amended Complaint and Join Parties.

28 January 2014

Respectfully submitted,

_____
Stephen A. Katz, attorney for the
plaintiff, Nance M. Hutter

---

[80] *See* Ex. O (faxes between Watermark Capital's employee Edie Carter and Countrywide's employee Betty Samlal).

[81] Countrywide Mem. Oppos'g 4th Am. Compl. at 20–21.

[82] *See* NAGY, PAINTER, AND SACHS, SECURITIES LITIGATION AND ENFORCEMENT: CASES AND MATERIALS (3d ed. 2008) at 23–24 ("As is apparent, Rule 10b-5 and Section 10(b) say nothing about private enforcement. Beginning with *Kardon v. Nat'l Gypsum Co.*, however, lower federal courts recognized an implied private action for violations of the Rule.") (citation omitted).

[83] *See, e.g., Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971).