UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NANCE M. HUTTER,<br>　　　　　　　　Plaintiff<br><br>　　v.<br><br><br>COUNTRYWIDE BANK, N.A., a subsidiary of<br>　COUNTRYWIDE FINANCIAL<br>　CORPORATION<br>WATERMARK CAPITAL, INC.<br>EVOLUTION MORTGAGE INC.,<br><br>　　　　　　　　Defendants | Case no. 09-CIV-10092 (NSR)<br>(LMS) |


**Hutter's Reply Memorandum to Evolution Mortgage in Support of
Her Motion to File a Fourth Amended Complaint and Join Parties**


Submitted by


Stephen A. Katz, attorney for the plaintiff,
　Nance M. Hutter
Stephen A. Katz, P.C.
111 John Street, Suite 800
New York, NY 10038-3180
(212) 349-6400
(646) 308-1170 (fax)
SAKatz00@AOL.com

# Table of Contents

**Page**

Argument    1

1. Joseph Sciacca's affidavit offers no defense to Hutter's accusations of wrongdoing, so Sciacca should be re-joined as a defendant.    1

    A. Hutter charges Sciacca with using Dragna and Dragna's corporation Watermark Capital to broker Hutter's loan when Dragna and Watermark were unlicensed as mortgage brokers in New York State, and Sciacca does not refute the charge.    1

    B. Mr. Hutter's affidavit faithfully recounts Todd Matthews's saying that Countrywide brought Evolution Mortgage into Hutter's loan transaction because Evolution was licensed as a broker in New York, so the affidavit is truthful.    8

    C. Cases show that Evolution Mortgage was Countrywide's agent.    9

2. Sciacca is not insulated from liability for wrongdoing by his corporation Evolution Mortgage, because he participated in that wrongdoing.    9

    A. Evolution Mortgage is correct that Sciacca's joinder is not required, but it is permissible for Hutter to join him.    11

    B. Hutter's deleting from the complaint the incorrect statement that Countrywide said that a variable-rate loan would be right for her, will not prejudice Evolution Mortgage.    12

    C. Mr. Hutter was Mrs. Hutter's agent when she applied for her Countrywide loan, so her complaint should state that fact.    14

    D. As with the 1.5% fixed-rate loan and with Mr. Hutter's agency, Evolution was told of Hutter's mental disability during discovery, so its claim that the complaint's describing the disability will prejudice it, is groundless.    19

      (1) Mrs. Hutter's psychiatrist testified about Mrs. Hutter's disability in June 2013, Evolution had the opportunity to cross-examine him, and Evolution has received Mrs. Hutter's medical records concerning the condition, so it already knows about Hutter's disability.    19

    E. Hutter's consequential-damages claims are supported by an expert's report, so she should be allowed to assert them.    20

Conclusion                                                                                    20

# Table of Authorities

## Cases

*Amer. Ref-Fuel Co. of Hempstead v. Resource Recycling, Inc.*, 281 A.D.2d 574, 574, 722 N.Y.S.2d 571, 572  (2d Dep't 2001) ........ 11

*American Express Travel Related Serv. Co., Inc. v. North Atlantic Resources, Inc.*, 261 A.D.2d 310, 311, 691 N.Y.S.2d 403, 404 (1st Dep't 1999) (mem.) ........ 10

*Key Bank of New York v. Grossi*, 227 A.D.2d 841, 842–43, 642 N.Y.S.2d 403, 404–05 (3d Dep't 1996) ........ 10

*Nelligan v. Community Gn. Hosp. of Sullivan County*, 240 F.R.D. 123, 125 (S.D.N.Y. 2007) ........ 11

*Rhynders v. Greene*, 255 A.D. 401, 402, 8 N.Y.S.2d 143, 144 (3d Dep't 1938) ........ 11

*Savannah T & T Co., Inc. v. Force One Express Inc.*, 58 A.D.3d 409, at *1–*2, 872 N.Y.S.2d 83, 84 (1st Dep't 2009) ........ 20

*Savoy Record Co. v. Cardinal Export Corp.*, 15 NY2d 1, 4; 254 N.Y.S.2d 521; 203 N.E.2d 206 (1964). ........ 9–10

## Statutes and Rules

Banking Law Article 12-E ........ 5

Fed. R. Civ P. 20 ........ 11

Fed. R. Civ. P. 19 ........ 11

N.Y. Banking Law § 590.2(b) ........ 4, 5

N.Y. Comp. Codes R. & Regs. tit. 3, § 38.3(a)(1)(x) ........ 4, 7

N.Y. Comp. Codes R. & Regs. tit. 3, § 38.7(a)(2) (2006) ........ 4, 6, 7

N.Y. Comp. Codes R. & Regs. tit. 3, § 38.7(b)(2) ........ 3, 4, 5, 6

## Secondary Authority

2A N.Y. Jur. 2d *Agency* § 349 ........ 11

This legal memorandum is plaintiff Nance M. Hutter's reply to defendant Evolution Mortgage Inc.'s opposition to Hutter's motion to file a fourth amended complaint and join parties.

## Argument

### 1. Joseph Sciacca's affidavit offers no defense to Hutter's accusations of wrongdoing, so Sciacca should be re-joined as a defendant.

### A. Hutter charges Sciacca with using Dragna and Dragna's corporation Watermark Capital to broker Hutter's loan when Dragna and Watermark were unlicensed as mortgage brokers in New York State, and Sciacca does not refute the charge.

Plaintiff Nance M. Hutter seeks to re-join as a defendant the president of defendant mortgage broker Evolution Mortgage Inc., Joseph Sciacca, whom Judge Cathy Seibel dismissed from the case without prejudice earlier in the litigation.[1] Hutter's ground for re-joining Sciacca is that he personally participated in his corporation Evolution Mortgage's employing Charles Dragna and Dragna's California corporation Watermark Capital, Inc. to do the mortgage-brokerage work for Hutter's $1.785 million Countrywide loan, at a time when it was illegal for Dragna and Watermark to work on Hutter's loan because they were unlicensed in New York State as mortgage brokers.[2] (Defendant Evolution Mortgage *is* licensed in New York as a mortgage broker.) Sciacca began perpetrating that wrongdoing around 7 September 2006, when Dragna sent Sciacca a fax inviting Evolution Mortgage to act as a licensed figurehead broker for Hutter's Countrywide loan, while Dragna and his California company Watermark Capital who were unlicensed in New York, would do the

---

[1]  *See* Court docket entry no. 39.
[2]  *See* Ex. A (Hutter's proposed Fourth Am. Compl.) at 1 (naming Sciacca as defendant in case's title); *id.* ¶¶ 59(c), 94–94b; Hutter Mem. Supp'g 4th Am. Compl. at 15–18.

[Hutter's Reply Memorandum to Evolution in Supp of Motion to File 4th Am. Compl.]

actual mortgage-brokerage work for the loan.[3] From 07-SEP-2006 until Hutter's Countrywide loan closed on 11-DEC-2006, Sciacca violated New York law by allowing the unlicensed mortgage brokers Dragna and Watermark Capital to work on Hutter's loan.

Although Hutter's Countrywide loan closed on 11-DEC-2006, only on 26-DEC-2006 did Sciacca take the action that was required in order to make Dragna legally licensed to work on Hutter's loan. That is, on 26-DEC-2006, Sciacca filed an undertaking of accountability with New York State's banking department authorizing Dragna to do brokerage work for Hutter's Countrywide loan. However, New York Banking Regulation 38.7(b)(2) required Sciacca to file the undertaking within ten days of his hiring Dragna, so since Sciacca hired Dragna on about 07-SEP-2006 when Dragna faxed Sciacca, Sciacca should have filed the undertaking ten days later, or by 17 September 2006. But instead Sciacca filed the undertaking three months later, on 26-DEC-2006.[4]

Hutter therefore charges Sciacca with having his corporation Evolution Mortgage hire Dragna to work on Hutter's Countrywide loan during the period 07-SEP-2006 to 11-DEC-2006 when Dragna was unlicensed, since only on 26-DEC-2006 when Sciacca finally filed an undertaking of accountability for Dragna, did Dragna become licensed in New York. Sciacca's wrongdoing by employing Dragna when Dragna was unlicensed is one reason that Hutter is entitled to re-join Dragna as a defendant in this case. But Sciacca committed other wrongdoing besides that.

Sciacca improperly used Dragna's unlicensed corporation Watermark Capital to do most of the brokerage work on Hutter's loan. Sciacca did that by working with Watermark's

---

[3]  *See* Ex. B (fax of 07-SEP-2006 from Charles Dragna to Joseph Sciacca).
[4]  *See* Ex. C (undertaking of accountability that Evolution Mortgage filed for Charles Dragna).

[Hutter's Reply Memorandum to Evolution in Supp of Motion to File 4th Am. Compl.]

employee Todd Matthews, on Hutter's Countrywide loan.[5] Sciacca then compounded his wrongdoing of letting Watermark Capital work on the loan by having Evolution Mortgage issue a check that was dated 27-DEC-2006, signed by Sciacca, and made payable to Charles Dragna for $13,398.75, in order to compensate Dragna for the unlicensed brokerage work on Hutter's loan that Dragna had done between 07-SEP-2006 and 11-DEC-2006.[6] (The $13,398.75 payment amounted to about 90% of the broker's fees that Evolution Mortgage had received for acting as the mortgage broker of record for Hutter's Countrywide loan.) But the $13,398.75 payment to Dragna was improper, because Dragna had been unlicensed during the whole period of 07-SEP-2006 to 11-DEC-2006.

To make matters worse, Dragna did not deposit the check in his individual bank account, but endorsed it over to his unlicensed corporation Watermark Capital that had improperly done most of the brokerage work for Hutter's Countrywide loan.[7] So Sciacca's $13,398.75 payment of about 90% of its broker's fees that it had received for being the broker of record for Hutter's loan, ended up illegally paying the unlicensed broker Watermark Capital.

Because of that wrongdoing by Sciacca, Hutter is entitled to re-join him as a defendant in this case. And the reason that Sciacca's actions were wrong is that they violated New York banking regulations.

Sciacca violated Reg. 38.7(b)(2) by filing the undertaking of accountability some three months late. Under the regulation, he should have filed it ten days after he hired Dragna on 07-SEP-2006, or by 17-SEP-2006. But Sciacca actually filed the undertaking on 26-DEC-2006. In that way, Sciacca helped Dragna and Dragna's corporation Watermark Capital flout

---

[5] *See* Ex. D (excerpt from transcript of deposition of Joseph Sciacca) 17:2–3 ("I recall speaking to Todd Matthews once . . . .").

[6] *See* Ex. E ($13,398.75 check).

[7] *See* Ex. D (excerpts from Sciacca deposition).

[Hutter's Reply Memorandum to Evolution in Supp of Motion to File 4th Am. Compl.]

---

Banking Law sec. 590(2)(b),[8] which prohibits an unlicensed party from brokering a mortgage

loan in New York.

Sciacca also violated Banking Regulation 38.7(a)(2), which prohibits a licensed entity

from having business dealings with an unlicensed one, since Sciacca had business dealings

with Dragna and Watermark and they were both unlicensed. And Sciacca violated Banking

Reg. 38.3(a)(1)(x), a provision that required Evolution Mortgage to inform Hutter that it

intended to share its broker's fees with Dragna (if not with Watermark). Sciacca withheld

that information from Hutter, in violation of the regulation.

So Sciacca's wrongdoing consisted of his violating three banking regulations, and of his

assisting Dragna and Watermark Capital in violating sec. 590(2)(b) of the banking law.

Sciacca offers four excuses to rebut Hutter's accusing him of the foregoing wrongdoing.

The first is that Everybody did it: Most mortgage brokers violated Reg. 38.7(b)(2) in 2006

Sciacca claims, because they usually filed a required undertaking of accountability *after* the

closing of the loan that the unlicensed independent contractor had worked on, rather than

within ten days of the licensed mortgage broker's hiring the independent contractor, as Reg.

38.7(b)(2) required.[9] That that banking regulation was widely violated is believable, given

the out-of-control mortgage-lending craze that existed in 2006, but even if it is true, it does

not excuse Sciacca's and Evolution Mortgage's violating Reg. 38.7(b)(2) by filing Dragna's

undertaking three months late.

---

[8]   N.Y. BANKING LAW § 590.2(b) ("No person, partnership, association, corporation or other entity shall engage in the business of soliciting, processing, placing or negotiating a mortgage loan or offering to solicit, process, place or negotiate a mortgage loan in this state without first being registered with the superintendent as a mortgage broker in accordance with the registration procedure provided in this article and by such regulations as may be promulgated by the banking board or prescribed by the superintendent. The registration provisions of this subdivision shall not apply to any exempt organization or mortgage banker.").

[9]   Dragna Aff. ¶ 3 ("[B]ack then, the customary practice among brokers was to file the statement after the close closed.").

[Hutter's Reply Memorandum to Evolution in Supp of Motion to File 4th Am. Compl.]

Next Sciacca claims that Dragna did not have to be licensed to broker a mortgage loan in New York in 2006.[10] In 2009, New York adopted Article 12-E of the banking law, which for the first time required an independent contractor, that a licensed mortgage broker hired, to be licensed. So since Dragna was an independent contractor hired by a licensed mortgage broker mortgage in 2006 before such independent contractors were required to be licensed, Sciacca reasons, it must have been legal for Dragna to work unlicensed for Evolution Mortgage when he brokered Hutter's Countrywide loan.

The argument has two defects. To begin with, it ignores sec. 590(2)(b) of the banking law,[11] which *was* in force in 2006, and which made it illegal for an unlicensed party—like Dragna—to broker a mortgage loan. Second, Sciacca's Article 12-E argument ignores Reg. 38.7(b)(2), which in 2006 as we have seen, required a licensed mortgage broker who hired an unlicensed independent contractor to file an undertaking of accountability in order for the licensed broker to legally employ the unlicensed independent contractor to do brokerage work on a mortgage loan. And since Article 12-E's licensing requirement did not exist in 2006, *it was all the more important in 2006 for a licensed mortgage broker like Evolution Mortgage to obey Reg. 38.7(b)(2) and timely file the required undertaking.* Otherwise, an unlicensed entity could broker a mortgage loan in New York by associating with a licensed figurehead broker, and thereby circumvent sec. 590(2)(b)'s prohibition on unlicensed mortgage brokering. That is exactly what Dragna and Watermark Capital were able to do, due to Evolution's president Sciacca's not timely filing an undertaking for Dragna, and due to Dragna's bringing the unlicensed company Watermark Capital into the deal.

So the fact that Article 12-E's licensing of independent contractors did not exist in 2006

---

[10]    *Id.* ¶¶ 4–5.
[11]    N.Y. BANKING LAW § 590.2(b).

did not permit Sciacca to disobey Reg. 38.7(b)(2)'s requirement that he timely file an undertaking of accountability for Dragna. Indeed, in 2006, with the undertaking's being New York's sole defense against independent contractors' engaging in unlicensed mortgage brokering, it was essential for Sciacca to timely file an undertaking for Dragna. But he did not do so.

Sciacca's third explanation of why he did nothing wrong is that he and Evolution Mortgage hired *Dragna* and shared Evolution's broker's fee's with *Dragna*, not with Watermark Capital; so Sciacca intended to pay $13,398.75 to Dragna only and not to Watermark Capital. The fact that Dragna endorsed over to Watermark the $13,398.75 check that Sciacca gave Dragna, was therefore Dragna's independent act, taken without Sciacca's knowledge or consent.[12]

The problem with that protestation of innocence is that it overlooks Sciacca's violations of New York banking regulations. Had Joseph Sciacca obeyed three of those regulations, Evolution's $13,398.75 would almost surely not have ended up in the bank account of the unlicensed broker Watermark Capital.

To being with, if Sciacca had obeyed Reg. 38.7(a)(2)'s proscription on a licensed mortgage broker's having business dealings with an unlicensed one, he would not have hired Dragna without timely filing an undertaking of accountability for Dragna under Reg. 38.7(b)(2), so that Sciacca was legally permitted to have business dealings with Dragna. Sciacca's complying with Reg. 38.7(a)(2) would then most likely also have made him careful

---

12  *Id.* ¶ 4 ("I never hired or paid Watermark Capital and the only one that worked on the loan that was compensated for the work was Charles Dragna who received a check from Evolution Mortgage and a 1099 for the same to his social security number. . . . Charles Dragna was paid directly for the work performed and issued a 1099. What Mr. Dragna did with the check has nothing to do with me, despite Mr. Katz falsely alleging that I had improperly hired Watermark and Mr. Dragna individually."); *id.* ¶ 7 ("I never had any arrangement with Watermark Capital, whether it be [sic] written or oral.").

not to disobey the regulation and have improper business dealings with the unlicensed entity Watermark Capital. In an effort to stay within the regulation, Sciacca would have refused to work with Watermark's employee Todd Matthews, and would have instructed Dragna not to let Watermark employees work on Hutter's loan. But instead, Sciacca ignored Reg. 38.7(a)(2).

Similarly, had Sciacca taken pains to comply with Reg. 38.3(a)(1)(x) and notified Hutter that Evolution Mortgage intended to share its broker's fees with Charles Dragna, Sciacca would have been likely to make sure that only Dragna and not Watermark Capital, received a share of Evolution's broker's fees, so that Sciacca did not disobey Reg. 38.3(a)(1)(x). And if Sciacca had made sure that Watermark Capital did not do any work on the loan—as Reg. 38.7(a)(2) required him to do, since he was forbidden to have business dealings with the unlicensed entity Watermark—then Watermark would not have asserted a *claim* to Dragna's fees, since Watermark would not have worked on Hutter's loan, and so it would not have had a claim to be paid.

But Sciacca ignored those three banking regulations. So he has no right to profess surprise that some 90% of Evolution Mortgage's broker's fees ended up in Watermark Capital's bank account as payment for the work that Watermark improperly did on Hutter's loan. It is not surprising that Watermark expected to be paid for its work.

Sciacca's fourth excuse for his misconduct is that Hutter has not shown how his using unlicensed entities to do the brokerage work for Hutter's loan has harmed her.[13]  In fact, the unlicensed brokers' falsely offering Hutter a Countrywide loan with a 1.5% fixed interest

---

[13]   *Id* ¶ 3 ("Interesting is that while counsel for the Plaintiff makes this a big deal, he hasn't once showed what penalty or repercussions that [sic] a late filing would have if any and more importantly, how in any way that [sic] it affects Mrs. Hutter or rises to any cognizable cause of action on her behalf.").

[Hutter's Reply Memorandum to Evolution in Supp of Motion to File 4th Am. Compl.]

rate[14] when Countrywide actually gave her an 8.125% variable-rate loan;[15] their producing a loan application that falsely stated Hutter's monthly income as $38,500 when she actually had no income;[16] and the unlicensed brokers' insisting that Hutter close on her Countrywide loan when she was injured—all that misfeasance *harmed* Hutter. And Sciacca's using unlicensed brokers induced Hutter to forego selling her home in 2006 when real-estate prices were at their height, and caused her to take out an unaffordable Countrywide loan that led to her husband's business's being starved for credit.

So Hutter *was* harmed by the unlicensed mortgage brokers' uncontrolled behavior.

## B. Mr. Hutter's affidavit faithfully recounts Todd Matthews's saying that Countrywide brought Evolution Mortgage into Hutter's loan transaction because Evolution was licensed as a broker in New York, so the affidavit is truthful.

The remaining points in Joseph Sciacca's affidavit can be dealt with quickly. Sciacca says that Mr. Hutter's affidavit is false, but Sciacca cannot know that. Mr. Hutter's affidavit states that Watermark Capital employee Todd Matthews told Mr. Hutter that it was Countrywide Bank that brought Evolution Mortgage into Mrs. Hutter's Countrywide loan transaction in order for Evolution to act as the broker of record because Evolution was licensed as a mortgage broker in New York. Mr. Hutter states only that he was *told* that, so unless Sciacca was privy to every conversation that Mr. Hutter had with Matthews, Sciaccca cannot prove that Matthews did not tell Mr. Hutter that. Sciacca therefore has no basis for charging that "[t]he affidavit from Gerhard Hutter is blatantly false."[17] Sciacca may dispute Matthews's account, but he has no ground for disputing Mr. Hutter's account of what

---

[14]   *See* Ex. F (good-faith extimate).
[15]   *See* Ex. G (promissory note for $1.785 million Countrywide loan).
[16]   *See* Ex. H (loan application that the brokers produced falsely saying that Hutter had a monthly income of $38,500).
[17]   Sciacca Aff. ¶ 6.

[Hutter's Reply Memorandum to Evolution in Supp of Motion to File 4th Am. Compl.]

Matthews told Mr. Hutter. And Mrs. Hutter has the right to introduce into evidence Mr.

Hutter's account of what Matthews said, since it is an admission that Countrywide's agent

Watermark Capital made on Countrywide's behalf.

### C.  Cases show that Evolution Mortgage was Countrywide's agent.

The reader is directed Hutter's memorandum replying to defendant Countrywide Bank,

N.A.,[18] in which she explains how the doctrine of agency by estoppel provides that the

broker-defendants Evolution Mortgage and Watermark Capital were Countrywide's agents.

## 2.  Sciacca is not insulated from liability for wrongdoing by his corporation Evolution Mortgage, because he participated in that wrongdoing.

Evolution Mortgage's memorandum opposing Hutter's motion to amend her complaint

argues that Evolution's president Joseph Sciacca should not be re-joined in this case as a

defendant because he did no more than perform his duties as a corporate officer regarding

Hutter's loan.[19] Sciacca is supposedly protected from liability by his corporation Evolution

Mortgage,[20] so he is not personally liable for Evolution's wrongdoing.[21] The memorandum

also argues that since president Sciacca is an *agent* of Evolution Mortgage he is protected,

because an agent is supposedly not personally liable for her principal's conduct.[22]

---

[18]  *See* Hutter Mem. Reply'g to Countrywide in Mot. for 4th Am. Compl. Argument 2.

[19]  Evolution Mortgage Mem. Oppos'g 4th Am. Compl. at 3 ("[A]ny actions [Sciacca] took, were on behalf of his corporation that received payment for this loan and not him individually. A corporate officer and/or shareholder, almost always performs acts on behalf of the corporation, but that does not mean they [sic] should be deemed to be substituting themselves in their individual capacity, as opposed to an agent or representative of their corporation.").

[20]  Sciacca Aff. ¶ 9.

[21]  Evolution Mem. Oppos. 4th Am. Compl. at 3 ("A corporate officer and/or shareholder, almost always performs acts on behalf of the corporation, but that does not mean they [sic] should be deemed to be substituting themselves in their individual capacity, as opposed to an agent or representative for their corporation [sic].").

[22]  *Id.* ("A corporate officer is not subject to personal liability for actions taken in furtherance of the corporate business under the well settled rule that an agent for a disclosed principal will not be personally liable unless there is clear and explicit evidence of the agents intention to substitute or supersede his personal liability for, or to, that of his principal. Savoy Record Co. v. Cardinal Export Corp., 15 NY2d 1, 4; 254

[Hutter's Reply Memorandum to Evolution in Supp of Motion to File 4th Am. Compl.]

The flaw in that reasoning is that a corporate officer is not simply an agent of her corporation but someone with a fiduciary responsibility to the corporation, so apart from the general law of agency, a specific body of law has developed that governs corporate-officer liability. And that body of law holds a corporate officer individually liable if she participated in her corporation's wrongdoing. That point was made in Hutter's moving papers for this motion, which cited federal courts' interpretations of corporate-officer liability concerning the Deceptive Practices Act.[23] But New York caselaw also holds a corporate officer individually liable for participating in her corporation's wrongdoing.

A corporate officer who helped his corporation misrepresent credit-card applicants as the corporation's agents, for example, could be sued individually for fraud.[24] Likewise, corporate officers who used their client's auction-sale proceeds to pay their corporation's debts instead of tendering the proceeds to the client, were personally liable for conversion because the officers helped commit the tort.[25] And a defendant corporation's principal who wrongfully withheld the plaintiff corporation's shipment of yams and coerced the plaintiff's principal into giving the defendant a lien on the yams, was personally liable for misappropriation.[26]

So Evolution Mortgage's argument that Sciacca cannot, legally, be individually liable is refuted by cases from both the Southern District of New York and from New York's state courts, which hold that a corporate officer is liable if she participates in her corporation's wrongdoing. Here Sciacca violated three banking regulations, and in the process of doing so he improperly worked with the unlicensed entity Watermark Capital, improperly worked

---

N.Y.S.2d 521; 203 N.E.2d 206 (1964).") (internal quotation marks removed).

[23] *See* Hutter's Mem. Supp. Mot. File 4th Am. Compl. n. 4.

[24] *American Express Travel Related Serv. Co., Inc. v. North Atlantic Resources, Inc.*, 261 A.D.2d 310, 311, 691 N.Y.S.2d 403, 404 (1st Dep't 1999) (mem.).

[25] *Key Bank of New York v. Grossi*, 227 A.D.2d 841, 842–43, 642 N.Y.S.2d 403, 404–05 (3d Dep't 1996).

[26] *Savannah T & T Co., Inc. v. Force One Express Inc.*, 58 A.D.3d 409, at *1–*2, 872 N.Y.S.2d 83, 84 (1st Dep't 2009).

[Hutter's Reply Memorandum to Evolution in Supp of Motion to File 4th Am. Compl.]

with Dragna before Sciacca filed an undertaking of accountability for Dragna, and improperly paid Dragan and, ultimately, Watermark. Sciacca's wrongdoing helped his corporation Evolution Mortgage illegally employ and pay the unlicensed entities, so Sciacca is personally liable for participating in his corporation's wrongdoing.

And even under the law of agency, which Sciacca relies on, Sciacca should be joined as a defendant, because agents *are* liable for *their own* misfeasance,[27] and Sciacca committed his own misfeasance by violating three banking regulations.

## A. Evolution Mortgage is correct that Sciacca's joinder is not required, but it is permissible for Hutter to join him.

Sciacca argues that he does not qualify for required joinder in this case,[28] and he is right. All joint tortfeasors are not required to be joined in one suit.[29]

But Hutter has moved seeking *either* for required joinder of Scicaa, *or* for permissive joinder of him under Rule 20(a)(2):

> Hutter . . . moves under Rule 19(a) (required joinder) or else under Rule 20(a)(2) (permissive joinder), that she be allowed to join . . . Joseph Sciacca as [a] defendant[].[30]

And Sciacca does qualify for permissive joinder in this case.

---

[27] *See, e.g., Amer. Ref-Fuel Co. of Hempstead v. Resource Recycling, Inc.*, 281 A.D.2d 574, 574, 722 N.Y.S.2d 571, 572 (2d Dep't 2001) ("The fact that an agent acts for a disclosed principal does not relieve the agent of liability for its own negligent acts."). (citations omitted); *Rhynders v. Greene*, 255 A.D. 401, 402, 8 N.Y.S.2d 143, 144 (3d Dep't 1938) ("The wrong doer, even when an agent, must respond, whether the principal may be held or not.") (citations omitted). *See generally* 2A N.Y. Jur. 2D *Agency* § 349 ("The principal–agent relationship may insulate an agent from liability for its contract or agency actions but not for the agent's tortious conduct. . . . [E]ven an ordinary agent is personally liable for his or her own wrongs.") (footnotes omitted).

[28] Evolution Mem. Oppos. 4th Am. Compl. at 2–4.

[29] *Nelligan v. Community Gn. Hosp. of Sullivan County*, 240 F.R.D. 123, 125 (S.D.N.Y. 2007) ("[A] plaintiff does not need to include all joint tortfeasors as defendants in a single lawsuit.") (citations omitted).

[30] *See* Nance M. Hutter's Motion to File a Fourth Amended Complaint and Join Parties.

[Hutter's Reply Memorandum to Evolution in Supp of Motion to File 4th Am. Compl.]

**B. Hutter's deleting from the complaint the incorrect statement that Countrywide said that a variable-rate loan would be right for her, will not prejudice Evolution Mortgage.**

Hutter's present complaint contains two contradictory statements, and she seeks to remove the one of the two the statements that is false. On the one hand the complaint avers that Countrywide Bank offered Hutter a $1.785 million loan with a 1.5% interest rate, a statement that the pre-closing loan documents confirm; and the pre-closing documents also show that Hutter was offered a loan with a fixed rate.[31] (Then at the loan's closing, Countrywide substituted a Pay Option adjustable-rate mortgage with an 8.125%[32] interest rate for the 1.5% fixed-rate loan that it had promised Hutter.[33])

On the other hand, Hutter's present complaint says that the brokers and Countrywide told her that an adjustable-rate loan was right for her.[34] That second passage contradicts Hutter's statement that she was promised a fixed-rate loan, and the second passage is false. So Hutter wants to eliminate it.

Evolution Mortgage asks the Court to deny Hutter's request to remove the erroneous passage that is in her third amended complaint, because it is "extremely suspect" that "on the eve of summary judgment motions" Hutter seeks the change.[35] Hutter's attorney should have spotted the error in "FOUR prior complaints,"[36] and Hutter is trying to change her theory of recovery after

---

[31] See Ex. F (good-faith estimate).
[32] See Ex. G (promissory note for Hutter's $1.785 million Countrywide loan).
[33] See Ex. F (good-faith estimate).
[34] See Ex. I (3d Am. Compl.) ¶ 57c.
[35] Evolution Mem. Oppos'g 4th Am. Compl. at 4.
[36] Id. at 5.

[Hutter's Reply Memorandum to Evolution in Supp of Motion to File 4th Am. Compl.]

discovery is closed and after Evolution "conducted discovery based on the pleadings."[37]

That moral outrage fails to show that the proposed amendment will *prejudice* Evolution Mortgage, or that Evolution *relied* on the erroneous statement that Hutter wants to remove from the complaint. That is because in Hutter's[38] and her husband's[39] depositions, they stated repeatedly that Hutter was promised a 1.5% fixed-rate loan, and documentary evidence corroborates their testimony.[40] Whereas, the lone, erroneous statement in the complaint that Hutter was promised a variable-rate loan is not supported by any evidence.

There is no evidence that Evolution Mortgage *relied* on the erroneous statement that a variable rate loan was right for Hutter, because Evolution repeatedly learned in discovery that Hutter had been told that she would get a fixed-rate loan. Nor does Evolution show that it wasted money because it conducted discovery in the belief that the erroneous statement was true. And Evolution Mortgage also fails to substantiate its representation that its discovery was "based upon the pleadings." At deposition, it asked Mrs. Hutter repeatedly what the brokers had told her about the Countrywide loan that she had applied for, and she responded that they promised her a 1.5% fixed-rate loan. There is no evidence that the erroneous statement in the complaint that

---

[37]   *Id.* ("Mrs. Hutter . . . should not be able to change her theory at the close of discovery. The Defendants have *conducted discovery based upon the pleadings.* This allegation was critical in that it was an acknowledgment that she knew the type of loan she took out, despite her testimony to the contrary.") (emphasis added).

[38]   *See* Ex. J (excerpt from transcript of Mrs. Hutter's deposition) 305:4–6.
[39]   *See* Ex. K (excerpt from transcript of Mr. Hutter's deposition) 98:11–14.
[40]   *See* Ex. F (good-faith estimate).

[Hutter's Reply Memorandum to Evolution in Supp of Motion to File 4th Am. Compl.]

Hutter seeks to remove, affected that way in which Evolution conducted discovery, or that the erroneous statement prevented Evolution from questioning Hutter fully in her deposition.

One reason for a plaintiff to amend her complaint is to remove an error. Hutter should therefore be allowed to remove this lone, untrue statement that conflicts with the rest of her complaint, that conflicts with her and her husband's deposition testimony, and that conflicts with the documents that she received from Watermark Capital before the Countrywide loan closed. And Evolution Mortgage has not shown that the amendment removing the false statement from the complaint will prejudice Evolution, or that it ever believed the false statement.

**C. Mr. Hutter was Mrs. Hutter's agent when she applied for her Countrywide loan, so her complaint should state that fact.**

Nance M. Hutter's proposed amendment that her husband was her agent because he applied on her behalf for her $1.785 million Countrywide loan that she received on 11-DEC-2006, does not just assert a legal theory,  but accurately describes what happened. Mr. Hutter had scores of conversations with Watermark Capital's employee Todd Matthews concerning Hutter's Countrywide loan, while Mrs. Hutter spoke to Matthews seldom.[41] So it was Mr. Hutter who arranged the loan on his wife's behalf.

Evolution Mortgage faults Mrs. Hutter's citing older cases to show that her

---

[41] *See* Ex. K (excerpt from transcript of Mr. Hutter's deposition).

[Hutter's Reply Memorandum to Evolution in Supp of Motion to File 4th Am. Compl.]

husband was her agent,[42] but the cases are apposite. Mrs. Hutter and her husband were married in the 1970s, when women participated less in the workforce than they do today; Mrs. Hutter lived in Italy for many years; and Mr. Hutter is originally Austrian. Their marital relations have been traditional in comparison those of modern couples, so it is appropriate to cite cases from the early twentieth century to describe how Mr. Hutter acted as his wife's agent.

Evolution Mortgage also faults Mrs. Hutter for supposedly not notifying the defendants of her husband's agency until now, complaining that "it has been conceded that this alleged agency was never relayed to any of the Defendants."[43] But Hutter told the defendants in June 2013 during her deposition, that her husband had been her agent.[44] Indeed, *Magistrate Judge Smith allowed the defendants extra time to depose Mrs. Hutter for the express purpose of either questioning her about her husband's agency for her, or to provide the defendants time to question Mrs. Hutter on other topics because the defendants had used up so much deposition time questioning Mrs. Hutter about her husband's being her agent.*[45] So Evolution Mortgage cannot truthfully claim that Hutter's amending her complaint to state that her husband was her agent will convey new

---

[42]   *See* Evolution Mem. Oppos'g 4th Am. Compl. at 6 ("[T]he cases cited by Counsel do not support their agency theory, nor are they within the last 100 years . . . .").
[43]   Evolution Mem. Oppos'g 4th Am. Compl. at 6.
[44]   *See* Ex. J (excerpt from transcript of Mrs. Hutter's deposition).
[45]   *See* Ex. L (transcript of 28-JUN-2013 Status Conference before Magistrate Judge Smith) 3:16–19, 3:24–25, 4:1 (with the defendants' requesting more time to depose Mrs. Hutter, because she had introduced the theory in her deposition that her husband had been her agent for her $1.785 million Countrywide loan: "Mr. Finneran [Countrywide's counsel]: . . . . Part of the reason for the reason why we were not able to finish [Mrs. Hutter's deposition], your Honor was that the theory of the case from plaintiff's angle appeared to change on the last day regarding now that there is an agency theory . . . . And then that resulted in the introduction of an agency theory, which took a lot of questioning on that third day.").

[Hutter's Reply Memorandum to Evolution in Supp of Motion to File 4th Am. Compl.]

information. Nor has Evolution any ground for claiming that the amendment will prejudice it, because Evolution has known about the agency for since June 2013, and been afforded the opportunity to conduct discovery into it.

Evolution Mortgage also disputes that Mr. Hutter *was* his wife's agent, charging that she only asserts the agency so that the brokers' misrepresentations about her loan will be considered to have been communicated to her through her husband. Because it was Mrs. Hutter who signed the loan documents and took out the loan, Evolution Mortgage argues that Mr. Hutter was not her agent.[46]

But a husband can be his wife's agent solely for the purpose of negotiating a mortgage loan, and not for signing the loan documents. And it is true that all communications that are made to the agent are legally considered to have been made to and received by, the principal. So because Mr. Hutter was Mrs. Hutter's agent, every misrepresentation that the brokers made to Mr. Hutter concerning the Countrywide loan was, in a legal sense, communicated to Mrs. Hutter, since a communication to an agent amounts to a communication to the agent's principal.

The fact is that Mr. Hutter was his wife's agent because Watermark Capital's employee Todd Matthews dealt with Mr. Hutter knowing that Mr. Hutter was

---

[46] Evolution Mem. Oppos'g 4th Am. Compl. at 7 ("Mrs. Hutter signed all of the documents and it seems the only reason the Plaintiff wants and needs GERHARD to be her agent, is for all of the allegations made relating to how Mrs. Hutter was deceived, misled, etc. can [sic] now be made by him in an attempt to defeat the summary judgment motions. In the matter at hand, whether Mr. Hutter handled all of the negotiations or not, Mrs. Hutter is the one who came to the closing. Mrs. Hutter is the one who voluntarily signed the loan documents. Mrs. Hutter was the one financially responsible for the loan. Mrs. Hutter was the one whom [sic] received the cashout proceeds from this loan.").

[Hutter's Reply Memorandum to Evolution in Supp of Motion to File 4th Am. Compl.]

authorized by his wife to arrange the Countrywide loan for her, and Mr. Hutter *did* arrange that loan for his wife. She then did appear at the closing and took out the loan, just as Mr. Hutter had arranged for her to do. Authority that Mrs. Hutter cited in her memorandum in support of her present motion to file a fourth amended complaint, shows that the way that Mr. and Mrs. Hutter conducted themselves—in which Mrs. Hutter allowed her husband to arrange the Countrywide loan for her—made Mr. Hutter his wife's agent.[47]

Evolution Mortgage acknowledges that it did not take Mr. Hutter's deposition when it had the opportunity to do so, since Countrywide Bank deposed Mr. Hutter on 15 October 2013 but Evolution Mortgage's counsel chose not to attend the deposition.[48] Evolution tries to justify its failure to depose Mr. Hutter by saying that it relied on the pleadings, which do not say that Mr. Hutter was Mrs. Hutter's agent ("nor did I take his testimony previously because he was not a party and *not an agent in the pleadings* which were based on how Mrs. Hutter (and not him as her agent) was defrauded, misled, etc.").[49]

But Evolution Mortgage's claim to have relied on the pleadings does not excuse it for not deposing Mr. Hutter, since Mrs. Hutter told the defendants in her June 2013 deposition testimony that Mr. Hutter was her agent, and since Magistrate Judge Smith granted the defendants more time to depose Mrs.

---

[47]   *See* Hutter Mem. Supp'g 4th Am. Compl. nn.26–27 and accompanying text.
[48]   Evolution Mem. Oppos'g 4th Am. Compl. at 7 ("[Mr. Hutter] . . . had been involved in several prior litigation matters . . . . These were not explored, *nor did I take his testimony previously* because he was not a party and not an agent in the pleadings which were based on how Mrs. Hutter (and not him as her agent) was defrauded, misled, etc.") (emphasis added).
[49]   *Id.* (emphasis added).

[Hutter's Reply Memorandum to Evolution in Supp of Motion to File 4th Am. Compl.]

Hutter for the express purpose of inquiring into Mr. Hutter's agency for his wife, or because they had already used up much time question Mrs. Hutter about her agency.[50] From then on, Evolution Mortgage had no right to rely on the pleadings and ignore Mrs. Hutter's statement that her husband had been her agent. So Evolution has only itself to blame, and cannot blame Mrs. Hutter, for its not participating in the deposition of Mr. Hutter when it had the chance to do so, and for not asking Mr. Hutter at his deposition about his agency for his wife.

Evolution Mortgage's protest that "[t]his material change in the theory of the case and pleadings should not be permitted at this late juncture,"[51] is similarly unjustified by the facts of when it actually learned about Mr. Hutter's agency. Again, Evolution was told at an earlier juncture that Mr. Hutter was Mrs. Hutter's agent, and it had the opportunity to depose both spouses on the subject. The amendment will only add to the complaint a fact that Hutter announced six months ago in June 2013, so Evolution's ground for objecting to the amendment ("this late juncture") is spurious.

Finally, Evolution Mortgage also charges that if Mr. Hutter was Mrs. Hutter's agent, then *he* should have read the loan documents at the 11-DEC-2006 closing that Mrs. Hutter attended when she was too ill to comprehend the proceedings.[52] That may or may not be true, but it has no bearing on whether Hutter has the right to amend her complaint to state that her husband was her

---

[50] *See supra* note 46.
[51] Evolution Mem. Oppos'g 4th Am. Compl. at 7.
[52] *Id.* at 8 ("What is fascinating, is her alleged agent, GERHARD, brought her to the closing and didn't review the documents before she signed them, despite being aware of her claimed 'incapacitated' position.").

[Hutter's Reply Memorandum to Evolution in Supp of Motion to File 4th Am. Compl.]

agent. At trial or in its summary-judgment motion, Evolution Mortgage will be free to argue that Mr. Hutter should have acted on his wife's behalf at the closing. But that argument should not prevent Mrs. Hutter's proposed amendment of the complaint.

### D. As with the 1.5% fixed-rate loan and with Mr. Hutter's agency, Evolution was told of Hutter's mental disability during discovery, so its claim that the complaint's describing the disability will prejudice it, is groundless.

### (1) Mrs. Hutter's psychiatrist testified about Mrs. Hutter's disability in June 2013, Evolution had the opportunity to cross-examine him, and Evolution has received Mrs. Hutter's medical records concerning the condition, so it already knows about Hutter's disability.

As with Hutter's proposed amendment that she eliminate the falsehood that she was told that a variable-rate loan was right for her, and as with her proposed amendment that Mr. Hutter was her agent, Hutter's request to assert in her complaint that she was disabled at the 11-DEC-2006 closing of her Countrywide loan—because of a traumatic brain injury that she had sustained in a recent automobile accident—was communicated to Evolution Mortgage in June 2013. Evolution was told about Hutter's medical condition then, and it had an opportunity to conduct discovery into the condition.

Specifically, Mrs. Hutter's treating psychiatrist Dr. F. Carl Mueller appeared at a hearing before Magistrate Judge Smith on 5 June 2013, and testified about Hutter's traumatic brain injury and the 21% disability that it caused her. Evolution Mortgage cross-examined Dr. Mueller then, and Evolution has Hutter's medical records concerning her brain injury. Moreover, Hutter's deposition was held *after* Dr. Mueller testified, so Evolution Mortgage had an opportunity to question Hutter about her injury and disability after Evolution had been informed by an expert about those conditions. And Evolution could have questioned Mr.

[Hutter's Reply Memorandum to Evolution in Supp of Motion to File 4th Am. Compl.]

Hutter about how his wife's disability affects her at Mr. Hutter's deposition that Countrywide conducted, had Evolution attended the deposition.

So Evolution Mortgage's statement that "the discovery was performed based upon the pleadings,"[53] which it proffers to explain how it will supposedly be prejudiced by this amendment because Hutter's pleadings did not previously explain that she suffers from a mental disability, is untrue. Evolution Mortgage's discovery was *not* based on the pleadings but on Hutter's, Dr. Mueller's, and the medical records' thorough description of Hutter's brain injury and disability. And if Evolution Mortgage did not inquire into Hutter's condition after she informed Evolution in June 2013 about her injury, that is Evolution's problem. It cannot blame the pleadings.

### E. Hutter's consequential-damages claims are supported by an expert's report, so she should be allowed to assert them.

The reader is directed to Hutter's memorandum replying to defendant Countrywide Bank, N.A.,[54] for a defense of her consequential-damages claims.

## Conclusion

For the foregoing reasons, plaintiff Nance M. Hutter respectfully requests that the Court:

- grant her Motion to File a Fourth Amended Complaint and Join Parties.

28 January 2014

Respectfully presented,

_____ /s/ _____
Stephen A. Katz, attorney for the
  plaintiff, Nance M. Hutter
Stephen A. Katz, P.C.
111 John Street, Suite 800
New York, NY 10038-3180
(212) 349-6400

---

[53] Evolution Mem. Oppos'g 4th Am. Compl. at 8.
[54] *See* Hutter Mem. Reply'g to Countrywide in Mot. for 4th Am. Compl. Argument 4.