UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
NANCE HUTTER,                                               :
                                                           :
                              Plaintiff,                    :          09-cv-10092 (NSR)
             -against-                                      :
                                                           :          MEMORANDUM OPINION
COUNTRYWIDE BANK, N.A., a subsidiary of                     :          AND ORDER
COUNTRYWIDE FINANCIAL COPRORATION; :
WATERMARK CAPITAL, INC.; and                                :
EVOLUTION MORTGATE, INC.,                                   :
                                                           :
                              Defendants.                   :
------------------------------------------------------------X

NELSON S. ROMÁN, United States District Judge:

On October 22, 2009, Plaintiff Nance Hutter ("Plaintiff") commenced the instant action

against, *inter alia*, Watermark Capital, Inc., a California mortgage broker ("Watermark"),

Evolution Mortgage, Inc., a New York mortgage broker ("Evolution") (together "Brokers"), and

Countrywide Bank, N.A., which has been acquired by Bank of America, N.A. ("Countrywide"),

(collectively "Defendants"), seeking monetary damages and rescission of a $1.785 million

mortgage loan provided to her by Countrywide on December 11, 2006. Plaintiff's Third

Amended Complaint ("TAC") alleges that (1) Countrywide violated the Truth in Lending Act,

15 §§ 1601–1607f ("TILA"), by failing to give her proper notice of her right to cancel the loan;

(2) Defendants violated the New York Deceptive Practices Act, N.Y. Gen. Bus. Law §§ 349 to

350-e, ("GBL" or "GBL § 349"), by engaging in unfair and deceptive conduct aimed at

consumers that was misleading in a material way; (3) Countrywide and Evolution violated the

Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601–2617 ("RESPA"), because

Countrywide paid Evolution kickbacks and unearned fees; (4) and Watermark violated the New

York Licensed Mortgage Bankers Law, N.Y. Banking Law §§ 589–599 ("Banking Law"), by

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 8/22/2014

brokering Plaintiff's mortgage loan even though it was neither licensed by the State of New York nor exempt from the licensing requirement.

Now pending before the Court is Plaintiff's motion for leave to amend the TAC.  Her Proposed Fourth Amended Complaint ("PFAC") supplements factual allegations, alters factual allegations, adds new and previously dismissed parties, and apparently adds a new claim.  As to joinder of parties, Plaintiff seeks to add former defendant Joseph Sciacca ("Sciacca"), President of Evolution, to Claims 2, 3, and 4; former defendant Nicholas Joutz ("Joutz"), President of Watermark, to Claims 2 and 4; and Charles Dragna ("Dragna"), Secretary and alleged principal of Watermark—who was not previously a named defendant—to Claims 2 and 4.  Plaintiff also seeks to include Countrywide and Evolution as defendants on Claim 4.

In opposition, Defendants, Sciacca, Joutz, and Dragna assert that Plaintiff's proposed amendments are prejudicial at this late stage in the proceedings and that the proposed amendments would be futile.  They also suggest Plaintiff's motion is brought in bad faith only in order to delay the inevitable resolution of the action.  Additionally, Countrywide moves for sanctions (1) against Plaintiff's counsel pursuant to 28 U.S.C. § 1927 for unreasonably and vexatiously multiplying the proceedings, and (2) against Plaintiff and Plaintiff's counsel pursuant to Rule 11(c) for filing pleadings containing factually and legally unsupportable contentions.

For the following reasons, Plaintiff's motion to amend is denied, Countrywide's § 1927 motion for sanctions is denied, and Countrywide's Rule 11 motion for sanctions is granted. Knowledge of the factual background and procedural history is presumed.

## I. LEGAL STANDARD FOR MOTION TO AMEND PLEADINGS

A party may amend a pleading once as a matter of course or at any time before trial with leave of the court.  Fed. R. Civ. P. 15(a)(1)–(2).  If a party seeks leave to amend a pleading, "[t]he court should freely give leave when justice so requires."  Fed. R. Civ. P. 15(a)(2).  Nonetheless, "[r]easons for a proper denial of leave to amend include undue delay, bad faith, futility of amendment, and perhaps most important, the resulting prejudice to the opposing party."  *State Teachers Ret. Bd. v. Fluor Corp*, 654 F.2d 843, 856 (2d Cir. 1981) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962) ("In the absence of any apparent or declared reason—such as undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.—the leave sought should, as the rules require, be 'freely given.'")).

### A. Undue Delay and Prejudice

"The rule in this Circuit has been to allow a party to amend its pleadings in the absence of a showing by the non[-]movant of prejudice or bad faith."  *AEP Energy Servs. Gas Holding Co. v. Bank of Am., N.A.*, 626 F.3d 699, 725 (2d Cir. 2010) (quoting *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993)).  "Mere delay, . . . absent a showing of bad faith or undue prejudice, does not provide a basis for the district court to deny the right to amend."  *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (quoting *State Teachers Ret. Bd. v. Fluor Corp.*, 654 F.2d 843, 856 (2d Cir. 1981)); *accord Block*, 988 F.2d at 350.  Thus, if the underlying facts and circumstances upon which the moving party relies support a claim or defense sought to be added, the party should generally be allowed to test that claim or defense on the merits.  *United States ex rel. Maritime Admin. v. Cont'l Ill. Nat'l Bank & Trust Co. of Chicago*, 889 F.2d

1248, 1254 (2d Cir. 1989) (quoting *Foman*, 371 U.S. at 182); *accord EEOC v. Nichols Gas & Oil, Inc.*, 518 F. Supp. 2d 505, 508 (W.D.N.Y. 2007).

On the other hand, a district court may "deny leave to amend where the motion has been made after an inordinate delay, no satisfactory explanation is offered for the delay, and the amendment would prejudice the defendant." *Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72 (2d Cir. 1990). Moving to amend pleadings after the close of discovery may constitute an inordinate delay even if certain testimony adduced during discovery purportedly gives the opposing party "full and fair notice" of a new theory not alleged in the operative complaint. *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 201–02 (2d Cir. 2007). This is because a defendant that received notice in the complaint of the asserted claims and the grounds on which they rest "may conduct . . . trial preparation accordingly and is not required, based on the plaintiff's subsequent conduct in litigation, to anticipate future claims that a plaintiff might intend to pursue." *Id.* at 202; *cf. Berman v. Parco*, 986 F. Supp. 195, 217 (S.D.N.Y. 1997) (Peck, M.J.) (report and recommendation) (noting that a court "may deny a motion to amend when the movant knew or should have known of the facts upon which the amendment is based when the original pleading was filed, particularly when the movant offers no excuse for the delay").

In determining whether the opposing party would be prejudiced, courts within the Second Circuit generally consider "whether the assertion of the new claim or defense would '(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction.'" *Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000) (quoting *Block*, 988 F.2d at 350). "[T]he longer the period of an

4

unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice." *Block*, 988 F.2d at 350 (quoting *Evans v. Syracuse City Sch. Dist.*, 704 F.2d 44, 47 (2d Cir. 1983)).

### B. Futility

Leave to amend may alternatively be denied "on grounds of futility if the proposed amendment fails to state a legally cognizable claim or fails to raise triable issues of fact." *AEP Energy*, 626 F.3d at 725–26 (quoting *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110–11 (2d Cir. 2001)); *accord Ruotolo*, 514 F.3d at 191 (quoting *Foman*, 371 U.S. at 182). To determine futility, courts apply the summary judgment standard "when the motion to amend is filed after the close of discovery and the relevant evidence is before the court." *Summit Health, Inc. v. APS Healthcare Bethesda, Inc.*, No. 11-cv-9718 (ER) (LMS), 2014 WL 288050, at *18 (S.D.N.Y. Jan. 24, 2014) (citing *Milanese*, 244 F.3d at 110). Thus, courts may deny motions to amend where the "evidence in support of the plaintiff's proposed new claim creates no triable issue of fact and the defendant would be entitled to judgment as a matter of law" under Rule 56(a). *Milanese*, 244 F.3d at 110. A triable issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the [party moving to amend her pleadings]." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient" to create triable issues of fact. *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (plaintiffs "must do more than simply show that there is some metaphysical doubt as to the material facts"); *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (plaintiffs "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998))).

**II. PLAINTIFF'S PROPOSED AMENDMENTS**

In considering the following proposed amendments, the Court is mindful of the circumstances in which Plaintiff expressed her desire to amend the complaint. The TAC was filed November 15, 2011. According to the Discovery Plan and Scheduling order entered May 24, 2012, the deadline to join parties was November 28, 2012, with amended pleadings allowed on consent or by court order. The deadline for expert discovery was extended a number of times from January 30, 2013, as was the December 5, 2012, deadline for conducting fact depositions.

On November 7, 2013, after the close of discovery, the parties appeared before the Court at a conference to discuss the progression of the action. The parties represented that discovery was compete. Plaintiff expressed that she hoped to depose another witness proffered by Countrywide.[1] Defendants each expressed their intentions to file motions for summary judgment, and Countrywide noted its desire to file a *Daubert* motion to preclude expert testimony should summary judgment not dispose of the case. After a lengthy discussion, Plaintiff notified the Court of her desire to file a Fourth Amended Complaint to assert that Defendants had conspired to violate the Banking Law, that Hutter's husband acted as her agent, and that Dragna and Joutz should be joined as parties. Plaintiff also asserted her desire to remove the allegation that she was told an adjustable rate loan was right for her. The Court set a briefing schedule for the motion to amend.

On November 11, 2013, Plaintiff wrote to the Court requesting permission to propose additional changes in her motion to amend the complaint. These changes would include assertions that Countrywide failed to ensure Plaintiff could repay her loan due to its business model of selling loans to securitization trusts, that Plaintiff suffered from duress and incapacity

---

[1] Magistrate Judge Smith subsequently denied Plaintiff's request to do so.

on the day of her loan closing, that she suffered certain consequential damages for which she would seek recovery, that Evolution's president Sciacca should be rejoined as a defendant, that Countrywide violated Banking regulations by doing business with Watermark, and that Watermark and Evolution were Countrywide's agents.

Given the lengthy nature of this action commenced in 2009, the numerous extensions of discovery deadlines, and Plaintiff's delay in seeking to amend, "dilatory motive on the part of the movant" seems "apparent" to the Court.  *Foman v. Davis*, 371 U.S. 178, 182 (1962). Nonetheless, the Court considers each proposed amendment in turn.

**A. Joinder of Non-Parties**

**1. Dragna and Joutz**

Plaintiff asserts that based on information gathered during discovery, Dragna and Joutz, who are officers of Watermark, may be held personally liable for Watermark's wrongful acts under the GBL and Banking Law because they personally participated therein or they had the authority to control Watermark and knew of its wrongful acts.  (Pl.'s Br. 3 n.4 (citing *FTC v. Crescent Publ'g Grp., Inc.*, 129 F. Supp. 2d 311, 324 (S.D.N.Y. 2001)).)  According to Plaintiff, Dragna did brokerage work for Plaintiff's loan and accepted payment from Evolution for this work although he was unlicensed in New York, in violation of the Banking Law.  She also avers that Joutz, as Watermark's president, knew or should have known of Dragna's conduct.  Dragna asserts the action as against him is barred by a six-year statute of limitations.  *See* N.Y. C.P.L.R. § 213.  Joutz asserts that there is no evidence of his personal involvement in or knowledge of mortgage brokerage services performed by Dragna.

As to Dragna's statute of limitations argument, GBL § 349 is actually governed by a three-year statute of limitations, N.Y. C.P.L.R. § 214(2); *Pike v. N.Y. Life Ins. Co.*, 72 A.D.3d

7

1043 (2d Dep't 2010), which applies to liabilities created or imposed by statute.  Liability under

the Banking Law is likewise created or imposed by statute, *see* N.Y. Banking Law § 598(5) ("If

any non-exempt unlicensed or unregistered person or entity engages in activities encompassed by

this article, he shall be liable to any person or entity affected by such activities . . . ."), such that

the same three-year statute of limitations applies, N.Y. C.P.L.R. § 214(2).  Thus, as Plaintiff's

claim accrued in December 2006, the PFAC would be futile as against Dragna.  Although

Plaintiff asserts that the statute of limitations should be equitably tolled, based on Watermark's

alleged concealment of a check, this contention is unavailing.  "Equitable tolling is generally

considered appropriate . . . where plaintiff was unaware of his or her cause of action due to

misleading conduct of the defendant . . . ."  *Zerilli-Edelglass v. N.Y.C. Transit Auth.*, 333 F.3d

74, 80 (2d Cir. 2003) (citing *Miller v. Int'l Tel. &Tel. Corp.*, 755 F.2d 20, 24 (2d Cir. 1985)).

Here, Plaintiff has made no such showing.

As to former defendant Joutz, Plaintiff was previously allowed to re-plead allegations

against him "to better articulate a basis of this Court's personal jurisdiction over Joutz, if she can

do so in compliance with Rule 11."  (Doc. 39, Order of May 23, 2011 (Seibel, J.) ¶ 10, at 5.)  In

the First Amended Complaint ("AC"), Plaintiff alleged that Joutz "created the company policies,

and participated in making the decisions" leading to Watermark becoming associated with

Plaintiff's loan, bringing Evolution into the deal, and illegally accepting a commission.  (Doc. 7,

AC ¶ 42.)  The PFAC now alleges that Joutz "knew, or should have known" that Watermark

illegally brokered Plaintiff's loan and that Dragna deposited a check from Evolution, written out

to Dragna, into the Watermark corporate account.  (PFAC ¶¶ 59(b), 95a(b).)  In light of Judge

Seibel's earlier ruling, the Court fails to see how the PFAC sufficiently alleges personal

jurisdiction over Joutz.  *See generally Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945).

Moreover, although "a corporate officer who participates in the commission of a tort, even if he acts on behalf of the corporation and in the course of his corporate duties, may ordinarily be held individually responsible," *Nat'l Survival Game, Inc. v. Skirmish, U.S.A., Inc.*, 603 F. Supp. 339, 341 (S.D.N.Y. 1985) (citing *Bailey v. Baker's Air Force Gas Corp.*, 50 A.D. 129, 133 (3d Dep't 1975) (affirming trial court determination of individual liability for corporate officer who failed to warn car dealership of fire risk while dealership employees repaired tanker truck)), here Plaintiff cites to no evidence demonstrating that Joutz participated in the alleged misconduct. Plaintiff merely speculates, based on the existence of the check Evolution wrote to Dragna and which Dragna endorsed over to Watermark, that Joutz "knew about Dragna's wrongdoing and acquiesced in it." (Pl.'s Br. 7.) Plaintiff's reliance on *FTC v. Crescent Publishing Group* is misplaced, as the portion of that decision which she quotes deals with the Federal Trade Commission Act and otherwise relies on New York case law dealing with liability to the State of New York for repeated fraudulent or illegal acts. 129 F. Supp. 2d at 324 & n.86; *see also* N.Y. Exec. Law § 63(12). In any event this case is distinguishable from *Crescent Publishing Group*, as Plaintiff points to absolutely no evidence of Joutz's active involvement in the purported scheme. 129 F. Supp. 2d at 324 (noting existence of "ample evidence" of individual defendant's communications about customer disputes). Thus, the new allegations asserted in the PFAC would be futile as against Joutz. *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001). Accordingly, Plaintiff's motion seeking to assert claims as against Dragna and Joutz must be denied.

### 2. Sciacca

Plaintiff seeks to add Sciacca, Evolution's president and CEO, as a defendant on Claims 2 through 4 alleging violations of the GBL, RESPA, and Banking Law, respectively. Sciacca was previously named as a co-defendant on these claims in the AC. In granting Sciacca's motion to dismiss the AC, Judge Seibel simultaneously granted Plaintiff "leave to plead additional facts [in the Second Amended Complaint] demonstrating that Sciacca was personally involved in the allegedly actionable conduct under New York General Business Law §[]349 and RESPA, [provided] she c[ould] do so in compliance with Rule 11 of the Federal Rules of Civil Procedure." (Doc. 39, Order of May 23, 2011 (Seibel, J.) ¶ 11, at 5.) Here, Plaintiff's arguments center primarily on Sciacca's violation of Banking Regulations, which are promulgated under the Banking Law. However, Judge Seibel did not give Plaintiff leave to re-plead her Banking Law claim against Sciacca. Thus, the Court cannot allow this particular amendment. *See Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992) ("[W]here litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again." (quoting *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964))). Additionally, as Plaintiff fails to assert any facts tending to demonstrate that Sciacca violated RESPA but merely inserts his name in the heading of this claim, (PFAC ¶¶ 65–87), such amendment would be futile.

As to personal involvement in the GBL violations, Plaintiff asserts that Evolution and Sciacca: (i) "wrongfully shared Evolution's $1,500 processing fee and its $13,387.50 yield-spread premium with . . . Watermark . . . and . . . Dragna, in violation of Banking Law sec. 590.2(b) [sic] and Banking Reg. 38.7(a)(2)," (PFAC ¶ 57(r); *accord id.* ¶ 59(c)(2)); (ii) "violated Banking Reg. 39.3(x) by not disclosing to [Plaintiff] that Evolution would share its brokerage

10

fees," (*id.* ¶ 57(s)); and (iii) "nominally hired Watermark's president [sic] . . . Dragna on or about 7 September 2006 to do the mortgage-brokerage work . . . but failed to file an undertaking of accountability . . . with New York State's banking department within ten days of their hiring Dragna, in violation of Banking Reg. 38.7(b)(2)," thus "help[ing] Dragna and Watermark . . . illegally broker a mortgage loan . . . in violation of Banking Law sec. 590.2(b) [sic]," (*id.* ¶ 57(t); *accord id.* ¶ 59(c)(1)).  These allegations contained in the PFAC and Plaintiff's briefs curiously fail to mention any violation of GBL § 349.

In opposition, Sciacca asserts he cannot be held liable because corporate officers acting in furtherance of the corporate business cannot be held liable on the basis that "an agent for a disclosed principal will not be personally bound unless there is clear and explicit evidence of the agent's intention to substitute or superadd his personal liability for, or to, that of his principal." *Savoy Record Co. v. Cardinal Export Corp.*, 15 N.Y.2d 1, 4 (1964); *accord Nat'l Union Fire Ins. Co. of Pittsburgh, PA v. Chukchansi Econ. Dev. Auth.*, 104 A.D.3d 467, 468 (1st Dep't 2013); *see also Yellow Book of NY, LP v. DePante*, 309 A.D.2d 859, 860 (2d Dep't 2003) (finding triable issue of fact on corporate officer's individual liability for breach of contract which he signed on company's behalf included clause on reverse side providing that the signer "personally undertake[s] and assume[s] the full performance hereof").  The Court notes that Sciacca proffered the same argument in his motion to dismiss the AC.  (*See* Doc. 14-2 ¶¶ 11, 15.)

The Court need not address Sciacca's argument, since it is abundantly clear that Plaintiff has wholly failed to allege facts—much less identify evidence in the record—tending to demonstrate Sciacca's personal involvement in any deceptive acts directed at consumers which were misleading in a material way.  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995); *accord Spagnola v. Chubb Corp.*, 574 F.3d 64, 74

11

(2d Cir. 2009); *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000); *City of New York v. Smokes-Spirits.com, Inc.*, 12 N.Y.3d 616, 621 (2009); *Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314, 324 (2002).  Accordingly, the allegations in the PFAC against Sciacca would be futile.  Plaintiff's application seeking to assert or reassert claims as against him must be denied.

### B. Facts Known to Plaintiff Before Filing Suit

Plaintiff wishes to alter the theory of certain portions of the TAC.  First, she seeks to remove an allegation which has been asserted since 2009, but is now admitted to be an untrue statement, that Defendants "told [Plaintiff] an adjustable-rate loan was right for her, when they knew that the loan was unsuitable because [Plaintiff]'s income was unlikely to increase."  (TAC ¶ 57(c).)  Second, Plaintiff seeks to assert that her husband, rather than she, negotiated the loan as her agent.  (*See* PFAC ¶¶ 16a, 16b, 57(e).)  Third, Plaintiff seeks to assert that on the day of the loan closing, December 11, 2006, she "was placed under duress and coerced into signing loan documents that she was incapable of reading or comprehending" due to having suffered "a traumatic brain injury . . . in an automobile accident on 21 November 2006."  (*Id.* ¶ 10a.)  Fourth, Plaintiff seeks to add a prayer for relief for consequential damages suffered (a) by losing the opportunity to sell her home in 2006 and (b) by losing out on potential stock dividends and appreciation of her stock in a business she partially owned because her lower credit score, which resulted from her default on the mortgage, caused her to be denied other loans, the proceeds of which she would have contributed to the business.  (*See id.* ¶ c1 (Request for Damages).)  Fifth, Plaintiff seeks to assert that Countrywide violated GBL § 349 because it violated Banking Regulation 38.7(a)(2) by improperly conducting business with Watermark.  (*See id.* ¶ 94b.)

### 1. Removal of False Allegation and Assertion of Husband's Agency

A review of the court file reveals that Plaintiff has consistently alleged that Defendants told her the adjustable rate mortgage was right for her.  (*See* Doc. 1, Verified Compl. ¶ 143(c); Doc. 7, AC ¶ 57(c); Doc. 37, SAC ¶ 57(c); Doc. 49, TAC ¶ 57(c)).  Evolution thus questions Plaintiff's good faith in proposing to remove it, as an untrue statement, after the close of discovery and immediately after Defendants informed the Court of their intentions to file summary judgment motions.  Evolution also asserts that the new agency theory will require it to conduct further depositions, as it did not pursue this line of questioning in this case or any of the other cases Plaintiff has brought against it in connection with other adjustable rate mortgages because Plaintiff's husband was never alleged to be her agent.  Watermark likewise asserts it did not depose Plaintiff's husband on the issue of agency, as its defense strategy was based on challenging the allegations in the TAC, the operative complaint since November 2011.  Watermark thus requests the opportunity to depose Plaintiff's husband if the Court should allow Plaintiff to amend the complaint.  Countrywide asserts that Plaintiff's effort to remove the admittedly false allegation concerning the adjustable rate mortgage, while leaving in the assertion that the promised 1.5% interest rate turned out to be 8.125%, would be futile because Countrywide would be able to present the original allegation to a jury.  Countrywide also asserts that changing this allegation would be prejudicial post-discovery.

The Court finds that both proposed changes would be prejudicial to Defendants, because knowledge of the facts to support these newly asserted allegations were within Plaintiff's grasp prior to commencing this action yet she failed to timely assert them. *See Berman v. Parco*, 986 F. Supp. 195, 217 (S.D.N.Y. 1997).  The more than four years' delay in seeking to assert these allegations, with no explanation given, *see Cresswell v. Sullivan & Cromwell*, 922 F.2d 60, 72

(2d Cir. 1990), has already caused significant delay in resolving this action, *see Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d Cir. 2000).  Moreover, Defendants conducted discovery based on the four previously pleaded complaints and were not required to anticipate the above changes based on Plaintiff's conduct during litigation.  *See McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 202 (2d Cir. 2007).  Thus, the inordinate delay in seeking to amend, the lack of an explanation for the delay, and the prejudicial effect on Defendants warrant denial of Plaintiff's application.

Moreover, removal of the purported falsehood would be futility.  Plaintiff's contention in reply that she was offered a fixed rate instead of an adjustable rate is not supported by the evidence on which she relies.  Although the Good Faith Estimate indicates Plaintiff's loan would have a 1.5% interest rate, the "Loan Program" appearing at the top right of the page identifies the loan as an "MTA Option Arm," (Pl.'s Ex. Q), an ARM being an adjustable rate mortgage, *see* Bd. of Governors of the Fed. Reserve Sys., *Interest-Only Mortgage Payments & Option-Payment ARMs—Are They for You?* 1, 3–4, 12 (2006), *available at* http://www.fdic.gov/consumers/consumer/interest-only/mortgage_interestonly.pdf.  Moreover, the Good Faith Estimate requires the loan applicant to sign and thereby acknowledge "receipt of the booklet 'Settlement Costs' and if applicable the Consumer Handbook on ARM Mortgages." (Pl.'s Ex. Q.)  Plaintiff and her husband's 2013 testimony that she was promised a fixed-rate loan does not create a genuine dispute of material fact by contradicting her own 2009 allegation, repeated three more times in subsequent amended complaints, that Plaintiff was promised an adjustable rate loan.

Accordingly, permission to remove ¶ 57(c) and to allege Plaintiff's husband was her agent must be denied.

### 2. Duress and Capacity to Contract

As to duress, Plaintiff seeks to allege that her husband requested that the closing be delayed due to Plaintiff's condition after the automobile accident, but that Watermark "insisted that if the closing did not take place on 11-DEC-2006, [Plaintiff] would lose the opportunity to take out a $1.875 million Countrywide loan at a rate of 1.5% interest." (PFAC ¶ 10b.)  As to incapacity, Plaintiff alleges the accident left her "with a permanent 21% disability rating for cognitive impairment." (*Id.* ¶ 10a.)  Plaintiff also seeks to add a new prayer for relief to void the loan based on her incapacity. (*Id.* Request for Damages ¶ b (first of two).)  Watermark asserts that Plaintiff's new allegations of duress and incapacity are facts which Plaintiff should have known before the commencement of this lawsuit, and that their assertion at this stage is "a desperate attempt to save a sinking ship." (Watermark Opp'n Br. 10.)  Evolution likewise asserts the duress and incapacity allegations should have been ascertained before the initial complaint was filed.  Evolution adds that Plaintiff attended the closing voluntarily.  Countrywide concurs that Plaintiff was aware of her purported disability before filing the instant action, and argues that Plaintiff can show neither duress nor her incompetence.

As with the false statement and the husband-agency theory, the Court finds that Defendants would be prejudiced if Plaintiff were allowed to add facts to the complaint of her purported duress and her alleged incapacity more than four years after bringing the instant action. *Cf. Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) ("[T]he longer the period of an unexplained delay, the less will be required of the nonmoving party in terms of a showing of prejudice.").  Plaintiff knew or should have known of these facts before bringing this action, *Berman*, 986 F. Supp. at 217, has given no explanation for the delay in asserting these

facts, *Cresswell*, 922 F.2d at 72, and has caused significant delay in this action's resolution by

seeking to assert these new facts at this time, *Monahan*, 214 F.3d at 284.

      Allowing the duress allegation would also be futile.  "To void a contract on the ground of

duress, a party must establish that he or she was forced to agree to it by means of a wrongful

threat which precluded the exercise of his [or her] free will . . . ."  *Family Tree Adoption Agency,*

*Inc. v. Comm'r of Soc. Servs. (In re Baby Boy O.)*, 289 A.D.2d 631, 633 (3d Dep't 2001)

(internal quotation marks and citation omitted).  "In general, repudiation of an agreement on the

ground that it was procured by duress requires a showing of both a wrongful threat and the effect

of precluding the exercise of free will."  *In re Guttenplan*, 222 A.D.2d 255, 257 (1st Dep't 1995).

Here, however, Plaintiff does not cite to any evidence that would tend to demonstrate a wrongful

threat was made, but instead identifies her husband's deposition testimony wherein he attributes

to a purported Watermark employee statements to the effect that the loan needed to close

because everyone worked very hard to make it happen and it was a very special deal.  (Pl.'s Ex.

J, G. Hutter Dep. at 75:12-14.)  Furthermore, as Plaintiff waited roughly seven years after the

loan closing and four years after filing the instant action to allege she was under duress, allowing

the PFAC to assert the allegation would be futile.  *See Guttenplan*, 222 A.D.2d at 257 (holding

that an agreement made under duress "must be promptly disaffirmed or otherwise be deemed to

have been ratified"), *cited in Wujin Nanxiashu Secant Factory v. Ti-Well Int'l Corp.*, 14 A.D.3d

352, 353 (1st Dep't 2005).

      Finally, both duress and incapacity assertions are futile for another reason.  Despite

Plaintiff's assertions to the contrary, the duress and incapacity assertions and the prayer to void

the loan contract add a new claim for rescission under state contract law.  As contract claims are

subject to a six-year statute of limitations, N.Y. C.P.L.R. § 213(2), the time period to add this

16

new claim expired on December 11, 2012.  Plaintiff attempts to incorporate this claim into her

GBL claim, which requires a showing of conduct aimed at consumers generally that is also

materially misleading.  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank,*

*N.A.*, 85 N.Y.2d 20, 25 (1995).  However, nothing in the new allegations is sufficient to meet the

requisite showing. Accordingly, Plaintiff's application to assert lack of capacity and execution of

the contract under duress must be denied.

### 3. Consequential Damages

Plaintiff's first new theory of damages relies on the assertion that she passed up the

opportunity to sell her home in 2006, when housing prices peaked and her home was valued at

more than $2.5 million, because she was promised the 1.5% fixed rate loan.  Evolution asserts

that since Plaintiff's interest rate was actually 1.5% during the first few years of the loan, she still

could have sold her home, and thus any purported losses are speculative.  Evolution also avers,

without citation, that the Countrywide loan paid off previous loans and allowed Plaintiff to cash

out significant sums of home equity.  Countrywide asserts Plaintiff's losses due to her decision

not to sell the home are speculative.  Countrywide notes that the PFAC asserts for the first time

that "[e]ver since [she] bought her home . . . , she had planned to improve the property and then

sell it," (PFAC ¶ 46a), but that Plaintiff testified she had not retained a broker to assist her in

selling the house, (*see* Countrywide Ex. M, Pl.'s Dep. at 426:19-23).

Plaintiff's second new theory of damages asserts loss of dividend income from and

unrealized capital appreciation in stock of a family-owned company, Industrial Distribution

Corp., that was going to manufacture temporary housing for victims of natural disasters.  She

seeks to allege the losses occurred because she was unable to secure a separate loan after she

defaulted on the Countrywide loan and her credit score was harmed.  Evolution asserts that this

17

theory of damages is also speculative, and that Plaintiff did not provide a marketing plan or any names of possible investors or buyers of the company's product.  Countrywide agrees that these damages are speculative, relying on the deposition testimony of Plaintiff's husband wherein he admitted the corporation went inactive before Hurricane Katrina, in 2004 or 2005, (Countrywide Ex. N, G. Hutter Dep. at 11:15–12:7), and he had not yet sold any shelters as of October 15, 2013, because, among other reasons, the patent was pending, (*id.* at 17:3-18).  Countrywide then identifies other documents in the record showing Plaintiff took out other adjustable rate mortgage loans in 2004 and 2005 from which she received cash proceeds, (*see* Docs. 12-2, 12-6), and argues that blaming Countrywide for her inability to borrow even more money when she admits she had no income makes the dividend damage theory especially specious.

The Court finds that asserting these consequential damages into the PFAC at this stage in the litigation would prejudice Defendants.  Plaintiff contends that Defendants would not be surprised or prejudiced because they knew about her purported plan to sell the home and her purported losses of dividend income after her damages expert submitted his report in April 2013.  In reply, Plaintiff also asserts the consequential damages theories were disclosed in her Rule 26(a)(1) initial disclosures of June 25, 2012.  (*See* Pl.'s Countrywide Reply Ex. K ¶ iii, at 4–5.)  However, as with the other allegations, Plaintiff knew or should have known about these facts before bringing the action in 2009, *Berman*, 986 F. Supp. at 217, has not explained why she delayed so long in bringing these new theories of damages, *Cresswell*, 922 F.2d at 72, and has significantly delayed resolution of this action by seeking to assert them, *Monahan*, 214 F.3d at 284.  At the very least, Plaintiff should have asserted these facts and prayers for relief in the TAC filed November 15, 2011.

The dividend damages amendment is also futile. *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (plaintiffs "may not rely on conclusory allegations or unsubstantiated speculation" (quoting *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998)). Plaintiff bases her damage calculations on her damages expert's report. (Pl.'s Ex. L.) However, the expert report itself bases its calculations on Plaintiff's husband's supposed business plan which, *inter alia*, is not dated, bears the title "Hutters and IDC losses due to Countrywide, et. [sic] al. scheme," and lists 2009 production costs and a list price without any substantiation whatsoever. (Ex. H to Pl.'s Ex. L.) The profit calculation is also based on the premise that Plaintiff could have sold her home in 2006. (*Id.*) To the extent Plaintiff includes her husband's marketing material as an exhibit to her reply papers, Plaintiff does not assert these materials were ever disclosed during discovery, nor is this clear from the documents. (Pl's Countrywide Reply Ex. M.) Plaintiff also fails to explain how her husband's marketing material corroborates her measure of damages. Accordingly, leave to add the new consequential damages theories must be denied.

### 4. Inclusion of Countrywide's Alleged Banking Law Violation in GBL Claim

Plaintiff seeks to add, in the GBL allegations of Claim 2, that Countrywide violated the Banking Law. (PFAC ¶ 57(u)–(v).) Plaintiff asserts that a fax demonstrates Countrywide dealt with Watermark, (Pl.'s Ex. P), and that Watermark's purported employee Todd Matthews ("Matthews") told Plaintiff's husband in 2006 that Countrywide brought Evolution into the deal because Watermark was not licensed in New York, (*see* Doc. 129, G. Hutter Aff. of Nov. 23, 2013 (submitted in support of Pl.'s instant Mot. to Amend) ¶ 4 ("Matthews told me th[a]t *Countrywide was responsible for bringing Evolution Mortgage into the transaction*.")). Plaintiff acknowledges that Dragna and Sciacca both testified to having met at a mortgage broker's training session in Florida roughly nine months to a year before Plaintiff took out the loan. (*See*

19

Pl.'s Ex. M, Sciacca Dep. at 13:16-22; Pl.'s Ex. B, Dragna Dep. at 47:6-19.)  She argues, however, that because Dragna and Sciacca could not in 2013 recall many details of the 2006 conference, it suggests they did not really meet there.  (Pl.'s Br. 19.)

Countrywide asserts this new allegation would be futile because the record developed in discovery does not support Plaintiff's assertion.  Countrywide notes that Plaintiff's story has changed since 2010, when her husband averred that "Matthews told me that his company was not licensed as a mortgage broker in New York State, so *he would get a local mortgage broker* to handle our loan."  (Doc. 20-3, G. Hutter Aff. of June 3, 2010 (submitted in opposition to Defs.' Mots. to Dismiss) ¶ 7.)

The Court finds this amendment would be futile.  The facts underlying Plaintiff's new allegations do not tend to demonstrate any deceptive acts directed at consumers which were misleading in a material way, as required to prove a violation of GBL § 349.  *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 25 (1995).  Nor do these facts support Plaintiff's contention that Countrywide violated the Banking Law.  Plaintiff cites to no evidence in the record—other than her husband's new affidavit which directly conflicts with his 2010 affidavit—showing that Matthews told Plaintiff's husband that Countrywide brought Evolution into the deal.  Plaintiff otherwise merely speculates that her husband's version is accurate because Dragna and Sciacca cannot remember every detail of the training session where they purportedly met.  *FDIC v. Great Am. Ins. Co.*, 607 F.3d at 292.

Furthermore, this amendment would prejudice Countrywide, as Plaintiff's husband knew or should have known when the original complaint was filed that in 2006 Matthews told him Countrywide brought Evolution into the deal.  *Berman*, 986 F. Supp. at 217.  Accordingly, Plaintiff's application seeking this amendment must be denied.

20

**C. Addition of Countrywide and Evolution on Banking Law Claim**

In addition to Joutz, Dragna, and Sciacca, Plaintiff seeks to add Evolution and Countrywide as defendants on her Banking Law claim based on their purported violations of state banking regulations.  As explained above, there is insufficient evidence to support Plaintiff's contention that Countrywide violated the Banking Law and regulations.  *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (plaintiffs "may not rely on conclusory allegations or unsubstantiated speculation").  Countrywide also properly notes that the Banking Law only grants a private right of action in certain situations, which include (a) recovery of liquidated damages in an action "against a licensee, registrant or exempt organization for breach of contract or agreement to make a mortgage loan," N.Y. Banking Law § 598(3), and (b) recovery from a "non-exempt unlicensed or unregistered person or entity [which] engage[d] in activities encompassed by this article" of up to four times the amount a loan applicant paid to that person or entity, *id.* § 598(5).  Countrywide is an "exempt organization" under the regulations.  N.Y. Comp. Codes R. & Regs. tit. 3, §§ 38.1(m), 39.2(a).  Violations of the Banking Regulations are otherwise enforced by the state Department of Financial Services.  *Id.* § 38.8.

Under the plain language of the statute, Plaintiff would have a private right of action against Countrywide only if it had breached its agreement to make the loan to Plaintiff.  However, this did not happen.  Thus, Plaintiff has no cognizable claim pursuant to the statute as against Countrywide.  The Court declines to imply such a private right of action in a state statute, as Plaintiff requests, since Plaintiff cites no New York law suggesting such a right is implicit.

As to reasserting this claim against Evolution, Judge Seibel previously granted Evolution's motion to dismiss the Banking Law claim for failure to state a claim.  (Doc. 39,

21

Order of May 23, 2011 (Seibel, J.) ¶ 7, at 4.)  Although Judge Seibel granted Plaintiff's motion

for leave to file a Second Amended Complaint ("SAC") on this claim, the order gave Plaintiff

such leave "only as against Watermark."  (*Id.*)  Thus, as with Sciacca, there is no legal basis to

permit this particular amendment.  *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d

1245, 1255 (2d Cir. 1992) (quoting *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964)).

Accordingly, adding Countrywide and Evolution to the Banking Law claim would be

futile, and leave to amend must be denied.

### D. Expert Testimony Concerning Thousands of Countrywide Loans

Plaintiff seeks to add certain facts as asserted in the report of her expert, Professor

Raymond H. Brescia ("Brescia").  Specifically, Plaintiff wishes to allege that her loan was one of

thousands Countrywide made to borrowers from 2003 through 2008 with the intention of

securitizing and selling the mortgages to securitization trusts, thus profiting from the loans' value

while no longer retaining the risk of borrower default.  (PFAC ¶¶ 37a, 37b, 57(g)(1).)  Plaintiff

avers that the new allegations explain Countrywide's treatment of her, as it "lackadaisically

accepted and sought no documentary confirmation of . . . [the] false statement that [Plaintiff]

earned $38,500 a month."  (Pl.'s Br. 12.)

Countrywide asserts it did not violate the GBL by accepting Plaintiff's assertions of her

income, as Judge Seibel already determined.  (*See* Hr'g Tr. of Sept. 23, 2011 (Seibel, J.) at

10:19-23 ("I agree that offering a no-doc loan is in itself not improper conduct by the lender nor

is 'just accepting' the representations in [P]laintiff's application.'"); *cf. Giordano v.*

*Giammarino*, No. 0102961/2006, 2008 N.Y. Misc. LEXIS 7753, at *13 (Sup. Ct. Richmond

Cnty. Jan. 8, 2008) ("[I]t is not a deceptive act or practice to proceed with an arms-length

transaction without attempting to ascertain the extent of every consumer's appreciation of the

22

ramifications of his or her decision, and whether that decision is in his or her overall best

interest." (citing *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85

N.Y.2d 20, 26 (1995))).  Countrywide thus argues that the new allegations would suggest

otherwise, contrary to the law of the case.  (*See* Hr'g Tr. of Sept. 23, 2011 (Seibel, J.) at 11:8-11

(granting Countrywide's motion to strike paragraph 21 of the SAC "to the extent that [it]

suggest[ed] there was anything improper about Countrywide offering a no-doc loan or accepting

the representations on the mortgage application.").)  Countrywide argues further that Brescia's

assertions are irrelevant to Plaintiff's loan and overly prejudicial.  It also contends that Brescia's

failure to distinguish it from the separate corporate entities Countrywide Financial Corporation

and Countrywide Home Loans, Inc., instead lumping them all together, is unfair.  Additionally,

Countrywide notes the paragraph of Brescia's report which forms the basis for a proposed new

allegation is itself based on a report by the Federal Reserve, the methodology of which Brescia

was ignorant.

The Court finds that only a portion of the new allegations run afoul of the law of the case

doctrine.  The doctrine "posits that when a court decides upon a rule of law, that decision should

continue to govern the same issues in subsequent stages of the same case." *Arizona v.

California*, 460 U.S.605, 618 (1983); *see also Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,

956 F.2d 1245, 1255 (2d Cir. 1992) ("[W]here litigants have once battled for the court's

decision, they should neither be required, nor without good reason permitted, to battle for it

again." (quoting *Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964))).  Courts generally do

not revisit previous decisions unless there has been "an intervening change in law, availability of

new evidence, or the need to correct a clear error or prevent a manifest injustice." *Johnson v.

Holder*, 564 F.3d 95, 99–100 (2d Cir. 2009) (internal quotation marks and citation omitted);

*accord FTC v. Consumer Health Benefits Ass'n*, No. 10 Civ. 3551 (ILG) (RML), 2012 WL 1890242, at *4 (S.D.N.Y. May 23, 2012).  Here, only paragraph 57(g)(1) of the PFAC implies that accepting the representations on Plaintiff's mortgage application was improper, insofar as it states that Countrywide "made no effort to learn whether Hutter could afford its $1.785 million loan to her . . . ."  The remainder of this paragraph, as well as paragraphs 37a and 37b, do not attempt to allege matters previously stricken from the record, and appear relevant to the issue under GBL § 349 whether Countrywide's actions were consumer oriented.

Nevertheless, in light of the circumstances in which Plaintiff seeks to make these amendments—over six months after Brescia provided his report and after Defendants' declared their intention to file motions for summary judgment—it is apparent to the Court that Plaintiff seeks this amendment merely to delay the proceedings.  *Cf. Foman v. Davis*, 371 U.S. 178, 182 (1962) (noting motions to amend pleadings may be denied where there is an "*apparent* or declared reason" for denial, "such as . . . *dilatory motive*").  Accordingly, this portion of Plaintiff's motion to amend the complaint must also be denied.

### E. Watermark and Evolution as Countrywide's Agents

Plaintiff seeks to allege, in the Statement of Facts and the GBL claim, that Watermark and Evolution acted as Countrywide's agents only.  (PFAC ¶¶ 12, 57(a), 57(b), 57(d), 57(g), 57(*l*).)  For the proposition that Watermark and Evolution were acting as Countrywide's agents, Plaintiff relies on (a) the existence of contracts between Countrywide and its Brokers, Evolution and Watermark, and (b) the "totality of the circumstances" at the time Plaintiff was negotiating her loan—including that "Countrywide used its network of brokers to lend to thousands of

borrowers who could not afford its loans."[2]  (Pl.'s Br. 22–23.)  Plaintiff relies both on an implied agency and apparent agency theory.

In New York, "an agency relationship 'results from a manifestation of consent by one person to another that the other shall act on his behalf and subject to his control, and the consent by the other to act.'"  *N.Y. Marine & Gen. Ins. Co. v. Tradeline (L.L.C.)*, 266 F.3d 112, 122 (2d Cir. 2001) (citation omitted).  An agency relationship may be established by express language, *see, e.g.*, *Pensee Assocs., Ltd. v. Quon Indus., Ltd.*, 241 A.D.2d 354, 355 (1st Dep't 1997) (plaintiff owner of telephones agreed to allow defendant to sell them on commission basis), or may be implied by conduct of the principal.  Alternatively, "[a]pparent authority may exist in the absence of authority in fact, and, if established, may bind one to a third party with whom the purported agent had contracted even if . . . the third party is unable to carry the burden of proving that the agent actually had authority."  *Greene v. Hellman*, 51 N.Y.2d 197, 204 (1980).  Where an agency relationship is established, knowledge of the agent in all matters within the scope of the agency is imputed to the principal.  *See Gulf Ins. Co. v. Transatlantic Reinsurance Co.*, 69 A.D.3d 71, 97 (1st Dep't 2009) (quoting *Farr v. Newman*, 14 N.Y.2d 183, 187 (1964)).

Both implied actual authority and apparent authority are "dependent on verbal or other acts by a principal which reasonably give an appearance of authority to conduct the transaction." *Greene v. Hellman*, 51 N.Y.2d 197, 204 (1980).  "[I]n the case of implied actual authority, these [acts] must be brought home to the agent, while in the apparent authority situation, it is the third party who must be aware of them."  *Id.*; *see also Pyramid Champlain Co. v. R.P. Brosseau & Co.*, 267 A.D.2d 539, 544 (3d Dep't 1999) ("An agency relationship by conduct may be

---

[2] This statement is strikingly similar to an allegation in the original complaint that Countrywide had "a network of brokers across the country pushing borrowers into as many subprime mortgages as they could."  (Doc. 1, Verified Compl. ¶ 14, at 8; *accord id.* ¶¶ 54–62.)

established by words or conduct of a principal, communicated to a third party, that gives rise to an appearance and reasonable belief that an agency has been created and the agent possesses the authority to enter into a transaction." (internal quotation marks and citation omitted)).  In the case of apparent authority, "the third party's reasonable reliance upon the appearance of authority binds the principal." *Standard Funding Corp. v. Lewitt*, 89 N.Y.2d 546, 551 (1997).

As to implied agency, the contracts between Countrywide and the Brokers are insufficient to demonstrate the existence of an agency relationship.  The Wholesale Brokers Agreement, to which Plaintiff refers, expressly forbids Watermark and Evolution from holding themselves out as Countrywide's agents.  (*See* Pl.'s Ex. R ¶ 9.2, at 14 ("[N]either party shall at any time hold itself out to any third party to be an agent or employee of the other.").) Countrywide also identifies the contractual provision stating the Brokers "shall not be obligated to submit any or all loan funding requests that [they] broker[] to Countrywide," as the arrangement "is a non-exclusive agreement." (*Id.* ¶ 9.4, at 14.)  Plaintiff argues that courts are "not bound by the disclaimer of . . . agency between the parties in determining their true relationship." *Rubenstein v. Small*, 273 A.D. 102, 104 (1st Dep't 1947).  *Rubenstein* is distinguishable, however, as it involved a dispute between contracting parties who stipulated in the contract that no agency relationship existed.  273 A.D.2d at 103.

Plaintiff's reliance on her liability expert, Brescia, is equally unavailing.  Brescia reports without citation that Countrywide "worked with a network of mortgage brokers that helped to steer prospective borrowers towards" it, often compensating brokers through yield spread premiums.  (Pl.'s Ex. K ¶ 66, at 21.)  There is otherwise no testimony showing that Watermark or Evolution believed from Countrywide's conduct that they were agents owing Countrywide a fiduciary duty.  Thus, the implied agency theory fails.

26

As to apparent agency, or agency by estoppel, Plaintiff's contention that Watermark made promises on behalf of Countrywide is not borne out by the Good Faith Estimate upon which Plaintiff relies.  The estimate states explicitly that it "is being provided by Watermark Capital[,] a mortgage broker[,] and no lender has been obtained."  (Pl.'s Ex. Q.)  Plaintiff's reliance on her husband's deposition of October 15, 2013, where he testified that Watermark's purported employee Matthews was promoting a 1.5% interest rate but did not say who the lender was until one or two months before the closing, (Pl.'s Ex. J, at 40:18-25), is also unavailing, as he never expresses that Countrywide itself performed verbal or other acts showing Watermark or Evolution were apparently authorized to act on its behalf, *see Greene*, 51 N.Y.2d at 204.  As Countrywide points out, Plaintiff previously alleged, *inter alia*, that "the bank . . . told Hutter that she could afford the monthly payments," (TAC ¶ 57(a)), "Countrywide . . . assured Hutter that refinancing would help her," (*Id.* ¶ 57(b)), "[D]efendants told Hutter than an adjustable-rate loan was right for her," (*Id.* ¶ 57(c)), "the lender Countrywide . . . falsely assured her that housing prices would keep rising," (*Id.* ¶ 57(j)), "Countrywide . . . assured Hutter that she did not need a lawyer at her loan's closing ceremony," (*Id.* ¶ 57(k)), and "Countrywide . . . told Hutter that Countrywide's refinancing would help her," (*Id.* ¶ 57(n)).  However, both Plaintiff and her husband denied ever having contact with Countrywide prior to closing.  (Countrywide Ex. M, Pl.'s Dep. at 24:21-24; Countrywide Ex. N., G. Hutter Dep. at 25:11-15.)  Thus, the apparent authority theory of agency also fails, and the amendment would be futile.

Countrywide asserts the amendment would also be prejudicial.  It asserts that based on the allegations, it had no incentive to examine Watermark or Evolution witnesses on the implied agency theory.  Thus, Countrywide avers it would be required to expend significant additional resources to depose Watermark and Evolution witnesses on whether the Brokers believed from

Countrywide's conduct that they were agents under this theory.  Countrywide additionally

asserts that "Plaintiff could have, but did not, make this allegation from the start," (Countrywide

Opp'n Br. 10), especially since the initial complaint referenced the broker agreements

Countrywide had with Evolution and Watermark, (*see* Doc. 1, Verified Compl. ¶ 14, at 9).

Plaintiff argues in reply that Countrywide anticipated an agency theory by asserting cross-claims

against Watermark and Evolution, and thus should have already conducted discovery on the

cross-claims.  However, Countrywide merely alleged against the Brokers:

> To the extent that Plaintiff obtains a judgment against [Countrywide on the GBL
> and RESPA claims], [Countrywide] is entitled to a judgment over and against
> Evolution and Watermark, based on Evolution and Watermark's culpable
> conduct.

(Doc. 50, Countrywide Answer with Cross Claims ¶ 24.)  This is insufficient to demonstrate

Countrywide anticipated this agency theory.  Thus, Defendants would likely need to conduct

further discovery to determine whether Evolution or Countrywide had implied actual authority to

be Countrywide's agent, and this additional discovery would add significant delay to the

resolution of the instant action.  *See Monahan v. N.Y.C. Dep't of Corr.*, 214 F.3d 275, 284 (2d

Cir. 2000).  Accordingly, the amendment would be prejudicial to Defendants, and the motion to

amend must be denied as to this new agency theory.

### F. Countrywide's Purported Non-Reliance on Plaintiff's Stated Income

Plaintiff seeks to add allegations to paragraph 19, and to add a new paragraph 20a, to

expound on previously alleged facts.  In particular, Plaintiff seeks to allege that either Evolution

or Watermark invented a false monthly income figure of $38,500 on her loan application, that

the application did not exist until the loan closing date, and that Countrywide thus could not have

relied on her reported monthly income in deciding to extend her the loan.  Plaintiff relies on the

following portion of her deposition testimony for the contention that Countrywide did not have

the purported income figure before the closing date:

> Q.  Now, Paragraph 19 [of the TAC] says that in 2006 or at the time that the loan
> was closing, that you and your husband had no income at all; is that accurate?
>
> A.  Yes.
>
> Q.  And when you say "income," . . . what are you referring to; are you referring
> to just salary or any source of financial support?  What is meant by that statement,
> no income at all?
>
> A.  I believe it means that there was no income during that period.
>
> Q.  And what is meant by "no income"?  You had no money coming in; is that
> right?
>
> A.  No money coming in from earnings or from the corporation?
>
> Q.  I don't know.  This is your statement.  I'm asking what is meant by "no
> income at all."
>
> A.  It means what it says.
>
> Q.  Well, . . . back in December of 2006, how did you and your husband support
> yourselves?
>
> A.  You have to ask my husband.

(Pl.'s Countrywide Reply Ex. H, Pl's Dep. at 40:2-21.)  Plaintiff also cites the deposition of

Countrywide's purported Vice President Lanisa Jenkins ("Jenkins") for support.  (Pl.'s

Countrywide Reply Ex. I, Jenkins Dep. at 85:9–87:2.)  There, Jenkins testified that Countrywide

normally relied upon financial and income information in loan applications.  However, she could

not remember specifically whether she relied on the loan application in Plaintiff's case.

Countrywide in opposition cites to internal documents produced in discovery which were last

updated on October 2, 2006—more than two months before the closing—indicating Plaintiff's

monthly income was $38,500, the exact figure indicated on the loan application.  (Countrywide Ex. K.)

Whether or not the additional allegations are based on evidence in the record, they simply reiterate facts already alleged.  (*See* TAC ¶¶ 18–21, 57(e), 57(g).)  As the new allegations add nothing of substance, they do not create a triable issue of fact.  *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001).  Moreover, as Plaintiff informed the Court of her intention to amend the TAC only after Defendants declared their intention to file motions for summary judgment, the Court finds no good reason for Plaintiff to seek this amendment other than to delay the proceedings.  *Cf. Foman v. Davis*, 371 U.S. 178, 182 (1962) (noting motions to amend pleadings may be denied where there is an "*apparent* or declared reason" for denial, "such as . . . *dilatory motive*").  Accordingly, leave to amend must be denied.[3]

## III. SANCTIONS UNDER 28 U.S.C. § 1927

Countrywide seeks sanctions against Plaintiff's counsel, Stephen A. Katz ("Katz") on the basis that Plaintiff's motion to amend the complaint was made for no legitimate purpose.  Under federal law, "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct."  28 U.S.C. § 1927.  To impose sanctions, the attorney's actions must be "so completely without merit as to require the conclusion that they must have been undertaken for some improper purpose such as delay." *Oliveri v. Thompson*, 803 F.2d 1265, 1273 (2d Cir. 1986); *see also Agee v. Paramount Commc'ns, Inc.*, 114 F.3d 395, 398 (2d Cir. 1997) (holding a court "must find clear evidence that

---

[3] None of the parties discussed yet another additional allegation that Plaintiff "qualified for a prime-rate loan." (PFAC ¶ 34.)  As Plaintiff fails to identify any evidence in the record supporting this allegation, leave to amend paragraph 34 must also be denied as futile.

(1) the offending party's claims were entirely meritless and (2) the party acted for improper purposes") (citing *Oliveri*, 803 F.2d at 1273).  There must also be a showing of "subjective bad faith by counsel."  *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 73 F.3d 1253, 1262 (2d Cir. 1996); *accord Johnson ex rel. United States v. Univ. of Rochester Med. Ctr.*, 642 F.3d 121, 125–26 (2d Cir. 2011); *Gollomp v. Spitzer*, 568 F.3d 355, 368 (2d Cir. 2009).

Countrywide asserts that Plaintiff's PFAC is so meritless and without demonstrable purpose that it establishes Katz's bad faith.  Countrywide identifies purportedly glaring inconsistencies between each previous complaint and the PFAC which have been previously addressed, including, *inter alia*, the extent to which Plaintiff and her husband had contact with Countrywide directly and the now-asserted falsehood that Plaintiff was told an adjustable rate loan was right for her.  Countrywide also takes issue with Plaintiff's speculation that it introduced Dragna and Sciacca to each other, claims in the PFAC precluded by the law of the case doctrine, and the new affidavit from Plaintiff's husband which contradicts his prior affidavit submitted in 2010.  The Court notes, however, that some of Plaintiff's proposed amendments were not *entirely* meritless, based on the existence of evidence in the record, despite having found either prejudice or apparent dilatory motive sufficient to deny amendment.[4]  *Cf. Oliveri*, 803 F.2d at 1273.  The Court otherwise hesitates to impose sanctions where there has been no previous misconduct, *see, e.g.*, *Johnson*, 642 F.3d at 126 (attorney pursued claims with no basis in law or fact); *Gollomp*, 568 F.3d at 369 (numerous similar actions previously dismissed as meritless), and no harassing filings, *see, e.g.*, *Ransmeier v. Mariani*, 718 F.3d 64, 69–71 (2d Cir.

---

[4] Katz's improper submission of almost 60 pages of reply briefs in connection with the motion to amend, and his use of an additional ten pages of the brief in opposition to Countrywide's motion for § 1927 sanctions to argue that the motion to amend should be granted, demonstrate Katz's utter disregard for the page limits appearing in the Court's individual rules of practice (Rule 3.B.).  Despite this, the submissions do not detract from the arguable merit of these few proposed amendments.

2013) (attorney argued that district court judge could not be impartial because he was Jewish); *60 E. 80th St. Equities, Inc. v. Sapir (In re 60 E. 80th St. Equities, Inc.)*, 218 F.3d 109, 113–14, 116–17 (2d Cir. 2000) (attorney made slanderous statements about bankruptcy court judge and trustee in appeal to district court).  Accordingly, the motion for sanctions pursuant to 28 U.S.C. § 1927 is denied.

## IV. SANCTIONS UNDER RULE 11

Countrywide seeks the sanctions of dismissal and/or payment of its reasonable legal expenses against Plaintiff and Katz for knowingly making false factual allegations in the PFAC and previous complaints.  Under the Federal Rules of Civil Procedure,

> By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, *formed after an inquiry reasonable under the circumstances*:
>
> . . .
>
> > (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]
> >
> > (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery . . . .

Fed. R. Civ. P. 11(b)(2)–(3).  The rule imposes on attorneys the affirmative duty "to conduct a reasonable inquiry into the viability of a pleading before it is signed."  *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 253 (2d Cir. 1985); *accord Bus. Guides, Inc. v. Chromatic Commc'ns Enters., Inc.*, 498 U.S. 533, 542 (1991).  The standard imposed is an objective standard of reasonableness under the circumstances of the individual case.  *MacDraw, Inc. v. CIT Grp. Equip. Fin., Inc.*, 73 F.3d 1253, 1257 (2d Cir. 1996) (citing *Bus. Guides, Inc.*, 498 U.S.

at 548).  To determine whether a violation has occurred, a court must avoid hindsight and resolve

all doubts in favor of the signer.  *Oliveri v. Thompson*, 803 F.2d 1265, 1275 (2d Cir. 1986).  "If

. . . the court determines that Rule 11(b) has been violated, the court may impose an appropriate

sanction on any attorney, law firm, or party that violated the rule or is responsible for the

violation." Fed. R. Civ. P. 11(c)(1).  Monetary sanctions may not be imposed on a represented

party for violations of Rule 11(b)(2).  Fed. R. Civ. P. 11(c)(5)(A).  Finally, the decision whether

to impose sanctions is left to a court's discretion.  *Perez v. Posse Comitatus*, 373 F.3d 321, 325

(2d Cir. 2004).

### A. Asserted Rule 11 Violations

Countrywide asserts the following constitute violations of Rule 11(b): (i) Plaintiff alleges

in the TAC without likelihood of evidentiary support that Countrywide made statements to her

and asserts a meritless GBL claim; (ii) Plaintiff seeks to alter the allegations about the nature of

the promised loan without evidentiary support; (iii) Katz deliberately distorts the clear words of

the Good Faith Estimate in his motion to amend filings; (iv) Plaintiff seeks to falsely allege

without evidentiary support that Countrywide brought Evolution into the deal to bring a meritless

Banking Law claim; (v) Katz inconsistently characterizes the proposed amendment alleging

Plaintiff's incapacity in moving papers and reply, while his assertion that requiring a borrower to

attend the loan closing constitutes a deceptive practice is legally untenable; (vi) Plaintiff

previously alleged that the Brokers were her agents but now seeks to allege they were

Countrywide's agents; and (vii) the "fraud in the execution" theory of Plaintiff's motion to

amend is meritless and brought in an underhanded fashion.

### 1. Allegations that Countrywide Made Statements to Plaintiff

As noted in the discussion of Evolution and Watermark's purported agency relationship with Countrywide, Plaintiff alleges in the TAC that Countrywide made deceptive statements directly to her.  (TAC ¶ 57(a), (b), (c), (j), (k), (n).)  As proof that Katz failed to conduct a reasonable inquiry into Plaintiff's factual contentions, Countrywide identifies deposition testimony of Plaintiff and her husband where they admit they never had direct communications with Countrywide.  (*See* Countrywide Rule 11 Ex. R, G. Hutter Dep. at 26:7-13.)  Countrywide argues that Plaintiff knew and Katz knew or should have known before filing suit that Plaintiff had never had direct contact with Countrywide.  Countrywide also notes that the PFAC still retains allegations that Countrywide communicated to Plaintiff.

Plaintiff counters that Countrywide's witness Jenkins admitted it sent Plaintiff a Good Faith Estimate.  (Pl.'s Rule 11 Opp'n Ex. D, Jenkins Dep. at 39:17-25, 41:15.)[5]  The testimony cited speaks in hypotheticals and generalizations about what Countrywide would have done, namely, input the information from a broker's Good Faith Estimates into its system and then send its own Good Faith Estimate to the borrower.  Jenkins does not actually admit to having sent out a Good Faith Estimate, although Plaintiff infers such.[6]  Additionally, no such estimate from Countrywide exists in its loan file or in Plaintiff's documents.  Plaintiff also testified to having seen one Good Faith Estimate sent by Watermark, but said nothing about one from Countrywide.

It appears the Jenkins deposition testimony may constitute evidentiary support for the contention that Countrywide had direct contact with Plaintiff, but only with respect to one

---

[5] Plaintiff also cites to page 40 of Jenkins's deposition but fails to include that page in her exhibit.

[6] Plaintiff's filings in support of her motion to amend fail to cite this portion of Jenkins's testimony.

allegation: "Countrywide, through [Plaintiff's] mortgage brokers . . . , promised her verbally and *in pre-closing documents* that the loan's interest rate would be 1.5% . . . ." (TAC ¶ 57(d).)  Thus, the Court cannot find that the GBL claim against Countrywide was wholly unwarranted.  *Cf.* Fed. R. Civ. P. 11(b)(2).  Nonetheless, the testimony does not support Plaintiff's contentions that the bank "told [Plaintiff] that she could afford the monthly payments," TAC ¶ 57(a); *cf.* PFAC ¶ 57(a) (bank through its purported agents "convinced [Plaintiff] that she could afford the monthly payments"), that it "assured [Plaintiff] that refinancing would help her," TAC ¶ 57(b); *accord id.* ¶ 57(n), that it "told [Plaintiff] that an adjustable-rate loan was right for her," *id.* ¶ 57(c), or that it "assured her that housing prices would keep rising," *id.* ¶ 57(j).  Thus, as Plaintiff and her husband testified that they had no contact with the bank, these allegations— which have existed in the operative complaint for years—were not likely to be supported by any evidence.  Fed. R. Civ. P. 11(b)(3).  Accordingly, Plaintiff and Katz violated Rule 11(b)(3).

### 2. Promise of Adjustable Rate Loan Becomes Promise of Fixed Rate Loan

The original complaint, AC, SAC, and TAC allege that "the bank and the two mortgage brokers told Hutter that she could afford the monthly payments on a $1,875,000 monthly adjustable-rate Pay Option loan, when in actuality the payments were beyond her means," (*see* TAC ¶ 57(a)), and "the defendants told Hutter that an adjustable-rate loan was right for her," (*see id.* ¶ 57(c)).  In support of Plaintiff's motion to amend, Katz wrote the following:

> Hutter wants to remove an **untrue statement** from the complaint.  It is that the **defendants told her that an adjustable-rate mortgage would be suitable for her.  In fact the defendants never said that** to Hutter, since no one from Watermark Capital or Evolution Mortgage ever mentioned that Hutter would receive an adjustable-rate loan.  Only at the closing . . . did Countrywide unexpectedly make an adjustable-rate loan to her.
>      **So since the defendants did not try to convince Hutter that an adjustable-rate loan would suit her, the paragraph alleging that wrongdoing should be eliminated.**

35

(Pl.'s Br. 7–8 (emphasis added).)  In opposition to Countrywide's motion for Rule 11 sanctions,

Katz wrote the following:

> The Third Amended Complaint and the earlier complaints do not specify whether
> Hutter was offered a fixed or a variable-rate loan; rather they say that she was
> promised a 1.5% interest rate . . . .
>           The only language that Countrywide can point to to show that Hutter
> previously pled that she was promised a variable-rate loan is Third Amended
> Complaint paragraph 57(c) . . . .  But the paragraph does not *say* that Hutter was
> offered a variable-rate loan, only that she was told that such a loan was 'right for
> her.'  Countrywide twists the actual statement to try to make it mean that Hutter
> was *offered* variable-rate loan, but the paragraph does not say that.  **It is perfectly
> possible that Hutter was told that an adjustable-rate rate [sic] loan was right
> for her, but that *on another occasion* she was promised a fixed-rate loan.**
>           So it is only now, in seeking to amend, that Hutter for the first time
> clarifies whether she was offered a fixed or a variable-rate loan.  Thus Mrs.
> Hutter's proposed amendment does not contradict her prior complaints.

(Pl.'s Rule 11 Opp'n Br. 16–17 (emphasis added).)

The Court is baffled by Katz's inconsistent arguments in his motion filings—first

asserting Plaintiff was never actually told an adjustable-rate mortgage was right for her, but

subsequently arguing it was possible she was told such.  Likewise, the new proposal that Plaintiff

was promised a fixed interest rate all along directly contradicts the previous complaints, from

which the obvious inference to be drawn is that Plaintiff was informed the loan would have a

variable interest rate.  Plaintiff's new affidavit, in which she contends she "did not discuss"

whether she had "been offered a loan with a fixed or a variable-rate loan" prior to filing the

original complaint or any subsequent complaint, (Doc. 156, Pl.'s Aff. of June 5, 2014 ¶ 7), and

that "up until [her] deposition was held, [she] did not tell [her] attorney that [she] had been

promised a fixed-rate loan," (*id.* ¶ 8), confirms that Katz failed to conduct a reasonable inquiry

into which type of loan Plaintiff believed she had been offered before filing the instant action, *cf.*

Fed. R. Civ. P. 11(b).  Accordingly, Katz violated Rule 11(b)(3) in seeking to amend the complaint to include the above allegations.

### 3. Mischaracterization of Good Faith Estimate

As previously noted, the Good Faith Estimate upon which Plaintiff relies clearly states "MTA Option Arm" in the upper right-hand corner.  Despite this, Katz asserts in his memorandum of law in support of the motion to amend that the Good Faith Estimate promised a 1.5% fixed interest rate.  Countrywide takes issue with this characterization of the document. Katz now asserts that the phrase is "too cryptic to have notified [Plaintiff] that she was being offered an adjustable rate loan," (Pl.'s Rule 11 Opp'n 17), relying on Plaintiff's new affidavit, (Doc. 156, Pl.'s Aff. of June 5, 2014).  Plaintiff, for her part, now avers she did not know what the term meant and believed from its placement on the page that it was "internal language intended for the broker referring to his commission."  (*Id.* ¶ 13.)  Plaintiff also avers that she was confused because the document did not capitalize all three letters of "Arm."  (*Id.* ¶ 14.)

This last contention is problematic for Plaintiff, as she actually received multiple Good Faith Estimates, at least one of which capitalized "OPTION ARM" in its entirety.  (Pl.'s Rule 11 Opp'n Exs. H, I.)  Countrywide asserts—and the Court agrees—that because Plaintiff had previously taken out adjustable rate mortgages on her home, (*see* Doc. 12-5), her contention that she did not know ARM meant adjustable rate mortgage appears to be self-serving.  More significantly, Katz's assertion that the Good Faith Estimate clearly indicated it was for a fixed rate loan, (*see* Pl.'s Countrywide Reply 17–18), is indicative of his failure to make diligent efforts to investigate the meaning of "Option Arm" either before bringing the action or before filing the motion to amend.  His contention that the term is ambiguous and should be construed against the drafter is not only belatedly asserted, but is also meritless.  Accordingly, the Court

finds Plaintiff and Katz violated Rule 11(b)(3) in asserting the Good Faith Estimate promised a

fixed-rate loan, a factual assertion without evidentiary support.

### 4. Countrywide Purportedly Bringing Evolution into the Transaction

As previously mentioned, Katz submitted an affidavit from Plaintiff's husband in

opposition to Defendants' motions to dismiss.  (Doc. 20-3, G. Hutter Aff. of June 3, 2010.)  At

that time, Plaintiff's husband averred that "Matthews told me that his company was not licensed

as a mortgage broker in New York State, so *he would get a local mortgage broker* to handle our

loan.  He did not mention Evolution Mortgage's name, but just said that he would have to hire a

local broker."  (*Id.* ¶ 7.)  Katz subsequently submitted a second affidavit from Plaintiff's husband

in support of Plaintiff's motion to amend the complaint.  (Doc. 129, G. Hutter Aff. of Nov. 23,

2013.)  There, Plaintiff's husband averred that "Matthews told me that because Watermark

Capital was not licensed as a mortgage broker in New York State, Countrywide had arranged for

the New York-licensed broker Evolution Mortgage Inc. to be the broker of record for Mrs.

Hutter's Countrywide loan."  (*Id.* ¶ 3.)  Katz pointed to no evidence produced during discovery

to support this contention.  Countrywide identifies the above affidavits as contradictory and

asserts Plaintiff's new contention is knowingly false.  Countrywide also notes that Plaintiff's

husband testified at deposition he had no idea Countrywide was in the picture, and that Sciacca

and Dragna both testified that they met independently of Countrywide.

In opposition to the Rule 11 motion for sanctions, Katz submits a third affidavit from

Plaintiff's husband.  (Doc. 157, G. Hutter Aff. of June 5, 2014.)  There, Plaintiff's husband avers

that "[a]t one point, Matthews told me that he would have to locate a mortgage broker 'from your

neck of the woods' who was licensed in New York State 'to close this deal['] (the Mortgage),

because the broker he worked for[,] Watermark Capital, which had been processing my wife's

38

loan, was not licensed in New York." (*Id.* ¶ 3.)  Plaintiff's husband continues, saying that "[l]ater, Matthews told me that 'we asked Countrywide Bank to locate one of their local Brokers in New York to close that deal for us.'  They 'found' mortgage broker Evolution Mortgage . . . ." (*Id.* ¶ 4.)  Katz argues that Sciacca and Dragna's accounts of how they met in Florida are "evasive" and lack detail, including Dragna's "inaccurate physical description" of Sciacca, whereas Plaintiff saw Sciacca at deposition and affirms he is 5'10" tall and does not have white hair.  (Pl.'s Rule 11 Opp'n Br. 23.)

The first two affidavits of Plaintiff's husband are obviously in conflict with each other. The belated effort to harmonize them is evidence of Katz's failure to conduct a reasonable inquiry to determine what Matthews actually said to Plaintiff's husband before submitting the first affidavit opposing the motions to dismiss.  Accordingly, these submissions demonstrate a Rule 11(b)(3) violation.  Moreover, even if the third affidavit is accurate, Plaintiff's effort to assert the Banking Law claim against Countrywide was not a legitimate attempt to extend the reach of the law and thus violated Rule 11(b)(2).  As mentioned above, the statutory language of the Banking Law provision is clear.  A private right of action under § 598 is limited to recovery of liquidated damages against a bank "for breach of contract or agreement to make a mortgage loan," N.Y. Banking Law § 598(3), or recovery from a "non-exempt unlicensed or unregistered person or entity" which brokered a loan, *id.* § 598(5).  Neither of these situations is present. Katz's assertion that Plaintiff may assert a right of action pursuant to § 598 on the basis that other courts have read implicit rights of action into statutes lacks legal support.  Katz cites to no legal authority to support his contention.[7]

---

[7] His citation to a federal case and a secondary authority involving federal courts implying private rights of action under federal statutes, without explanation, is insufficient to establish this Court's authority to imply such a right under state law.

**5. Plaintiff's Incapacity: Reason to Rescind or Proof of Deceptive Act**

Countrywide asserts that Katz violated Rule 11 by propounding inconsistent theories concerning Plaintiff's purported incapacity in the motion to amend and in the reply brief. Specifically, the initial moving papers indicate that Plaintiff did not understand what happened at the closing, (Pl.'s Br. 13), while the PFAC alleges her "medical condition and incapacity rendered her incapable of contracting," (PFAC ¶ 10(c)), and seeks to void the loan, (*id.* Request for Damages ¶ b (first of two)).[8]  By contrast, the reply asserts that Plaintiff does not seek to bring a "common-law rescission claim to void her Countrywide loan due to her lacking capacity to contract.  Rather, she seeks to . . . charge that it was unfair and deceptive of the defendants to make [Plaintiff] close on her loan or else forfeit it, when she was so badly injured."  (Pl.'s Countrywide Reply 1–2.)

The above inconsistencies do not demonstrate a failure to investigate facts.  Fed. R. Civ. P. 11(b)(3).  They do, however, evince frivolous legal contentions, since (a) the PFAC clearly adds a new claim which is barred by the statute of limitations, and (b) the contention that Defendants' behavior constitutes a deceptive act is not a valid attempt to extend the reach of GBL § 349.  It is untenable to assert that a bank's insistence on the borrower attending the loan closing constitutes a misleading action.[9]  Accordingly, the Court finds that Katz violated Rule 11(b)(2).

---

[8] In the discussion of duress and incapacity above, the Court found that these allegations constitute a new claim for rescission.

[9] Katz contests that requiring a borrower to show up to a closing should be grounds for a GBL § 349 claim:

> Society believes that a party who sees that a person is disabled or incapacitated by drugs, alcohol, or some other condition takes advantage of her by forcing her to give a consent that she cannot knowingly give.  Just as a fraternity brother can exploit a college coed in that situation, a mortgage banker's requiring a borrower to close on a loan when she was obviously mentally incapacitated . . . takes advantage of her.

**6. Fraud in the Execution Asserted in Plaintiff's 28 U.S.C. § 1927 Opposition**

In opposition to the § 1927 motion for sanctions, Plaintiff explained that the PFAC amendments would strengthen her case and were thus not futile.  In particular, Plaintiff asserted that "the defendants insisted that [she] close on her Countrywide loan when they knew that she was badly injured."  (Pl.'s § 1927 Opp'n 15.)  For support, Plaintiff cited an unpublished state court case which states: "Fraud in the execution . . . arises where a party did not know the nature or the contents of the document being signed, or the consequences of signing it, and was nonetheless misled into doing so."  *Presvelis v. Forella*, No. 15521/05, 2008 N.Y. Misc. LEXIS 9585, at *26 (Sup. Ct. Queens Cnty. Mar. 14, 2008) (citations omitted).  Countrywide contends that Katz either sought to add a new claim or desired to launch an improper attack on it. Countrywide also notes that the Court previously dismissed Plaintiff's fraudulent inducement claim and refused to allow her to plead fraud in the factum in the SAC.  (Hr'g Tr. of Mar. 10, 2011 (Seibel, J.) at 32:11–33:14; *see also* Doc. 39, Order of May 23, 2011 (Seibel, J.) ¶ 3, at 3.)

Katz defends his citation of the "fraud in the execution" case by stating it supported Plaintiff's attempt to add to her GBL claim that she was mentally incapacitated when Countrywide "made her close" on December 11, 2006.  (Pl.'s Rule 11 Opp'n 25.)  Katz asserts that a GBL deceptive practices claim shares certain characteristics with breach of contract and fraud claims because it involves contracts and misrepresentations, and thus he cited cases dealing with contracts and fraud.  As explained above, his effort to extend the reach of GBL § 349 is frivolous and violates Rule 11(b)(2).  However, this "fraud in the execution" violation may be subsumed in the previous discussion of Plaintiff's incapacity.

---

(Pl.'s Rule 11 Opp'n 25–26.)  This contention is rejected in the following "fraud in the execution" discussion.

41

**7. Changing Agency Theory Regarding Watermark and Evolution**

Plaintiff alleged previously that she "hired Watermark Capital and Evolution Mortgage as her agents to obtain a loan to refinance her . . . home," (Doc. 7, AC ¶ 80), and that "Watermark Capital and Evolution Mortgage were agents of [Plaintiff] by contract and by operation of law," (*id.* ¶ 81).  Plaintiff now seeks to allege that Watermark and Evolution were Countrywide's agents, which contention the Court addresses above.  Countrywide essentially argues that Plaintiff misinterprets and misapplies the legal theory of apparent authority, also referred to as agency by estoppel.  It asserts there is no evidence to support Katz's argument in his reply brief that Plaintiff "relied on the offer [of a 1.5% fixed rate] because it appeared to come from Countrywide," since Katz cites to nothing in the record to support this contention.  (Pl.'s Reply 6.)  As previously discussed, Plaintiff had no contact with Countrywide and her husband "had no idea what Countrywide is and never heard the name before."  (Countrywide Rule 11 Ex. R, G. Hutter Dep. at 25:17-25.)

In opposition to the Rule 11 motion, Katz explains he removed the allegation that the Brokers were Plaintiff's agents because in 2010 the Brokers produced a mortgage loan origination agreement apparently signed by Plaintiff which states they were not Plaintiff's agents.  The existence of this contract demonstrates Katz conducted some inquiry in formulating the original agency assertion.  Since that agreement was produced, however, Plaintiff has maintained that her signature on the document was forged.  Her forgery contention is inconsistent with the AC's allegation that the Brokers were her agents "by contract," (AC ¶ 81), as she disavows all but the oral communications between Matthews and her husband.

Nonetheless, the Court hesitates to find that the Brokers-as-Plaintiff's-agents contention was not likely to have evidentiary support when the AC was filed.[10]

As to the characterization of Plaintiff's reliance on the Brokers' purported offer of a 1.5% fixed rate, Plaintiff continues to assert that the Brokers were Countrywide's agents. In so doing, Katz cites to additional evidence not previously identified in connection with Plaintiff's motion to amend. Katz also proffers arguments not previously made, namely, that Countrywide exercised control over the Brokers. His arguments lack support and are merely conclusory, as the provisions he cites in the Wholesale Broker Agreements merely set forth the Brokers' contractual obligations. (*See* Pl.'s Rule 11 Ex. C.) However, this renewed effort to argue agency, though improper, is not necessarily unwarranted by existing law; nor is the previous effort to argue agency by estoppel, though the legal theory was misapplied. Accordingly, the Court cannot find a violation of Rule 11(b)(2). Plaintiff's mischaracterization of the documentary evidence has previously been discussed.

### B. Sanctions for Rule 11 Violations

The imposition of sanctions for Rule 11 violations is discretionary. Any imposed sanction "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed. R. Civ. P. 11(c)(4). Possible sanctions include "nonmonetary directives; an order to pay a penalty into court; or, if imposed on motion and warranted for effective deterrence, an order directing payment to the movant of part or all of the reasonable attorney's fees and other expenses directly resulting from the violation." *Id.* Nonmonetary directives may include "striking the offending paper; issuing an admonition,

---

[10] The Court need not address the purported letter from Plaintiff's husband to the New York Attorney General, as it is not obviously addressed to anyone, it is unsigned, it is not written by Plaintiff or Katz, and it is not a paper filed by Plaintiff or Katz in the instant action.

reprimand, or censure; requiring participation in seminars or other educational programs; . . . [and] referring the matter to disciplinary authorities."  Fed. R. Civ. P. 11, Advisory Committee Note to 1993 Amendments, Subdivs. (b) & (c).  In determining the appropriate sanction, if any, a court should consider:

> (1) whether the improper conduct was willful, or negligent; (2) whether it was part of a pattern or activity, or an isolated event; (3) whether it infected the entire pleading, or only one particular count or defense; (4) whether the person has engaged in similar conduct in other litigation; (5) what effect it had on the litigation process in time or expense; (6) whether the responsible person is trained in the law; (7) what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case.

*Ho Myung Moolsan Co. v. Manitou Mineral Water, Inc.*, 665 F. Supp. 2d 239, 265 (S.D.N.Y. 2009); *accord* Fed. R. Civ. P. 11, Advisory Committee Note to 1993 Amendments (stating that courts should additionally consider whether there was intent to injure the opponent).

Countrywide asserts that Plaintiff and Katz willfully filed numerous complaints based on facts they knew would not be substantiated, and that such filings constitute a pattern.  It asserts that Plaintiff's misstatements infected the entire pleading because most violations were committed in support of the GBL claim, which is purportedly "at the heart" of the action and "presents the greatest potential damages award."  (Countrywide Rule 11 Br. 17.)  Countrywide states Plaintiff's intent to injure is evinced by her flip-flopping and overreaching damages claims.  It asserts further that Plaintiff's false allegations have profoundly affected the time and expense required to prosecute the action.  Countrywide finally notes that Plaintiff was recently sanctioned in a state court action, involving a similar loan from another bank, for failure to withdraw frivolous claims before causing Watermark and Joutz to file a motion for summary judgment.  (Countrywide Rule 11 Reply Ex. BB, Decision & Order (Westchester Cnty. Sup. Ct. June 4, 2014).)  According to Countrywide, dismissal is the only means of ensuring Plaintiff and

Katz discontinue their pattern of improper conduct.  Countrywide also seeks attorneys' fees for the entire litigation against both, or alternatively fees from March 10, 2011, when Judge Seibel purportedly would have dismissed the GBL claim but for Plaintiff alleging direct contact between herself and Countrywide.

Plaintiff's only pertinent argument against the imposition of sanctions, where a violation is found, is that Rule 11 is meant to deter misconduct, not to compensate the opposing party for its legal fees.  *See also* Fed. R. Civ. P. 11, Advisory Committee Note to 1993 Amendments, Subdivs. (b) & (c) ("Since the purpose of Rule 11 sanctions is to deter rather than to compensate, . . . if a monetary sanction is imposed , it should ordinarily be paid into court as a penalty.").

The Court finds that Plaintiff and Katz acted willfully; that their conduct appears to fit a pattern; that their conduct infected only two of the claims, namely, the GBL and Banking Law claims; that their conduct added unnecessary time and expense to the litigation process; and that one of the responsible people is trained in the law.  Dismissal of the action, however, is an extreme sanction which is not warranted at this juncture. Nonetheless, the Court finds an award of reasonable attorneys' fees incurred in opposing Plaintiff's predominantly frivolous motion to amend the complaint, as against Katz, is warranted.  Additionally, an order directing Plaintiff to pay a penalty into the Court is warranted for repeatedly altering her factual contentions without an evidentiary basis to do so, and for doing so for the sole purpose of delaying the litigation.

## V. CONCLUSION

For the stated reasons, Plaintiff's motion to amend the complaint is DENIED in its entirety.  Countrywide's motion for sanctions pursuant to 28 U.S.C. § 1927 is DENIED. Countrywide's motion for sanctions pursuant to Rule 11 is GRANTED to the extent of (a) requiring Plaintiff's attorney to compensate Countrywide for reasonable attorneys' fees

incurred to oppose Plaintiff's motion to amend, and (b) ordering Plaintiff to pay a penalty into Court in the amount of $100.00.  Plaintiff and Countrywide shall appear before the Court on October 7, 2014, at 11:00 a.m. for a hearing to determine the amount of reasonable attorneys' fees to be awarded, unless the parties can agree on a reasonable amount.  Any letters requesting a pre-motion conference in contemplation of filing motions for summary judgment shall be submitted no later than October 31, 2014.  The Clerk of Court is respectfully requested to terminate the motions (Docs. 115, 127, & 150).

Dated: August 22, 2014
        White Plains, New York

SO ORDERED:

_____
NELSON S. ROMÁN
United States District Judge

46