UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

NANCE HUTTER,

                Plaintiff,

   -against-

COUNTRYWIDE BANK, N.A., a subsidiary of
COUNTRYWIDE FINANCIAL CORPORATION;
WATERMARK CAPITAL, INC.; and
EVOLUTION MORTGAGE, INC.,

                Defendants.

No. 09-cv-10092 (NSR)

OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

      This action was originally commenced in October 2009.  The Court presumes that the parties are familiar with the protracted procedural history in this matter, including Plaintiff Nance Hutter's numerous amendments to her complaint.  Plaintiff's Third Amended Complaint ("TAC") alleges the following: (1) Countrywide Bank, N.A., which has been acquired by Bank of America, N.A. ("Countrywide"), violated the Truth in Lending Act, 15 U.S.C. §§ 1601–1607f ("TILA"), by failing to give Plaintiff proper notice of her right to cancel a loan she obtained from Countrywide (the notice is hereafter referred to as the "NRC"); (2) Countrywide, Watermark Capital, Inc. ("Watermark"), and Evolution Mortgage, Inc. ("Evolution") (collectively, the "Defendants") violated N.Y. General Business Law §§ 349 to 350-e ("GBL") by engaging in unfair and deceptive conduct aimed at consumers that was misleading in a material way; (3) Countrywide and Evolution violated the Real Estate Settlement Procedures Act, 12 U.S.C. §§ 2601–2617 ("RESPA") because Countrywide paid Evolution kickbacks and unearned fees; and (4) Watermark violated the New York Licensed Mortgage Bankers Law, N.Y. Banking Law §§ 589–599 ("Banking Law"), by brokering Plaintiff's mortgage loan even though it was neither

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 9|14|2015

licensed by the State of New York nor exempt from the licensing requirement.  Plaintiff seeks

monetary damages and rescission of the $1.785 million mortgage loan provided to her by

Countrywide on December 11, 2006 (the "Loan").

Before the Court are motions for summary judgment filed individually by each of the

Defendants seeking dismissal of all claims asserted by Plaintiff, as well as Countrywide's motion

for summary judgment on cross-claims asserted by Evolution and Watermark.  For the following

reasons, the Defendants' motions for summary judgment are GRANTED in part and DENIED in

part.

## BACKGROUND

As an initial matter, Plaintiff's Local Rule 56.1 statements and supporting documents

submitted in opposition to the Defendants' motions for summary judgment are not accompanied

by an affidavit, declaration, or other form of attestation.  "Where a party wishes to have a court

consider documents which are not yet part of the court's record, the documents must be attached

to and authenticated by an appropriate affidavit and the affiant must be a competent witness

through whom the documents could be received into evidence at trial."  *New York ex rel. Spitzer*

*v. Saint Francis Hosp.*, 94 F. Supp. 2d 423, 426 (S.D.N.Y. 2000) (citing *Crown Heights Jewish*

*Community Council, Inc. v. Fischer*, 63 F. Supp. 2d 231 (E.D.N.Y. 1999)).  Thus, to the extent

that the documents proffered by Plaintiff in opposition to the instant motions are not self-

authenticating, *see* Fed. R. Evid. 902, or are not otherwise found in the Court's record, the Court

will not consider them.

The following facts, unless otherwise noted, are based on the undisputed facts in this

matter or support Plaintiff's version of events.

In or about the summer and fall of 2006, Todd Matthews, a mortgage broker located in California, discussed with Plaintiff's husband, Gerhard Hutter ("Mr. Hutter"), the possibility of refinancing the mortgages on Plaintiff's home.  (Hutter's Response to Evolution Mortgage's Statement of Material Facts in Its Motion for Summary Judgment ("Pl.'s Evolution 56.1") ¶ 7; Declaration of Michael Janus ("Janus Decl."), Docket No. 185, Ex. 5, 17-18.)[1]  During the course of negotiating the Loan, Mr. Hutter spoke only with Matthews, (Pl.'s Evolution 56.1 ¶ 11), and did not speak with anyone else from Evolution, Watermark, or Countrywide.  (*Id.*; Pl.'s Countrywide 56.1 ¶ 10.)  Plaintiff did not have any contact with Countrywide prior to the closing of the Loan (Pl.'s Countrywide 56.1 ¶ 8); did not have contact with Evolution or any of its personnel (Pl.'s Countrywide 56.1, Ex. I ¶ 6)[2]; and aside from a single "sales pitch" conversation with Matthews, who may or may not have been an employee of Watermark at the time, did not otherwise have any contact with Watermark or its employees.  (Hutter's Response to Watermark Capital's Statement of Material Facts in Its Motion for Summary Judgment ("Pl.'s Watermark 56.1") ¶ 22; Declaration of John T. Serio ("Serio Decl."), Docket No. 194, Ex. H, 254-256.) Plaintiff also acknowledged that her husband negotiated all of the loans on Plaintiff's property. (Serio Decl., Ex. H, 256:5-6.)

Although there is limited evidence in the parties' Local Rule 56.1 statements and supporting documents explaining how the Loan was referred from Matthews to Charles Dragna, purportedly a principal of Watermark, it is without dispute that Evolution was the broker of record for the Loan.  (Pl.'s Watermark 56.1 ¶ 7; Serio Decl., Ex. F at 14:17-24, Ex. N at 44:10-

---

[1] Though Plaintiff denies the veracity of paragraph 7 of Evolution's Statement of Material Facts About Which There Is No Genuine Issue ("Evolution's 56.1"), Plaintiff admits the same statement in paragraph 7 of her Response to Countrywide Bank's Statement of Material Facts in Its Motion for Summary Judgment ("Pl.'s Countrywide 56.1").  Plaintiff's deposition testimony unequivocally states that Mr. Hutter discussed refinancing their home mortgages with Matthews in or around the summer and fall of 2006.

[2] Plaintiff's Affidavit is already properly before the Court and is otherwise self-authenticating.  (*See* Docket No. 20.)

20.)  It appears that Matthews, Dragna, and Watermark were not licensed to conduct business in New York, (Watermark Mot. at 10-11), so the Loan was referred to Joseph Sciacca at Evolution. (Serio Decl., Ex. F.)

During the course of the Loan negotiations, three good-faith estimates were prepared for the Loan – two by Evolution and one by Watermark.  (Pl.'s Countrywide 56.1, Ex. D; Countrywide 56.1, Exs. 15-16.)  Plaintiff received one or both of Evolution's good-faith estimates, (Pl.'s Evolution 56.1 ¶ 13), and recalls that her husband received a good-faith estimate, but does not recall whether he received an estimate from Watermark.  (Pl.'s Countrywide 56.1 ¶ 16.)  Each of the good-faith estimates provided an estimate for a type of adjustable rate mortgage or "ARM," and listed an interest rate of 1.5%.  (Pl.'s Countrywide 56.1, Ex. D; Countrywide 56.1, Exs. 15-16.)

Plaintiff closed on the Loan on December 11, 2006 – a "Monthly Adjustable Rate Pay-Option Note" (the "Note") with an initial yearly interest rate of 8.125% and an initial minimum payment interest rate of 1.5%.  (*See* Countrywide 56.1, Ex. 23 at 2(A); Pl.'s Countrywide 56.1, Ex. E.)  The interest rate was subject to change based on the terms of the Note.  (*Id.*)  At the closing, Plaintiff signed two copies of an acknowledgement that stated she received two copies of a notice of her right to cancel the Loan.  (Pl.'s Countrywide 56.1 ¶ 40, Ex. I ¶ 14; Countrywide 56.1, Ex. 25.)  Plaintiff contends that she actually received only one copy of the NRC, (Pl.'s Countrywide 56.1 ¶ 40, Ex. I ¶ 14), and asserts that she signed the two acknowledgments because she "was forced to sign many documents without being given time to read them."  (*Id.* ¶ 15.)  Plaintiff also signed a loan application at the closing, which stated that she had a monthly income of $38,500.  (Pl.'s Countrywide 56.1 ¶¶ 30-31.)  Plaintiff concedes

that she had no income at that time.  (*Id.* ¶ 32.)  Plaintiff claims that she did not understand the loan application when she signed it.  (*Id.* ¶ 33.)

## STANDARD ON A MOTION FOR SUMMARY JUDGMENT

Rule 56 of the Federal Rules of Civil Procedure provides: "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of pointing to evidence in the record, "including depositions, documents [and] affidavits or declarations," *id.* at 56(c)(1)(A), "which it believes demonstrate[s] the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  The moving party may also support an assertion that there is no genuine dispute by "showing . . . that [the] adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(B).  If the moving party fulfills its preliminary burden, the onus shifts to the non-moving party to identify "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal citation and quotation marks omitted).  A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.* at 248; *accord Benn v. Kissane*, 510 F. App'x 34, 36 (2d Cir. 2013) (summary order).  Courts must "constru[e] the evidence in the light most favorable to the non-moving party and draw[ ] all reasonable inferences in its favor." *Fincher v. Depository Trust & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (internal quotation marks omitted).  In reviewing the record, "the judge's function is not himself to weigh the evidence and determine the truth of the matter," nor is it to determine a witness's credibility. *Anderson*, 477 U.S. at 249.  Rather, "[t]he inquiry performed is the threshold inquiry of determining whether there is the need for a trial."  *Id.* at 250.

Summary judgment should be granted when a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. The party asserting that a fact is genuinely disputed must support their assertion by "citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence . . . of a genuine dispute." Fed. R. Civ. P. 56(c)(1). "Statements that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment." *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999). The nonmoving party "may not rely on conclusory allegations or unsubstantiated speculation." *FDIC v. Great Am. Ins. Co.*, 607 F.3d 288, 292 (2d Cir. 2010) (internal citation and quotation marks omitted). Moreover, "[a non-moving party's] self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment." *Fincher v. Depository Trust & Clearing Corp.*, No. 06 Cv. 9959 (WHP), 2008 WL 4308126, at *3 (S.D.N.Y. Sept. 17, 2008) *aff'd*, 604 F.3d 712 (2d Cir. 2010) (citing *Gonzales v. Beth Israel Med. Ctr.*, 262 F. Supp. 2d 342, 353 (S.D.N.Y. 2003)).

## DISCUSSION

### I.   TILA Claim

#### A.   *Plaintiff Received Meaningful Disclosure Of Her Right To Rescind*

"The main purpose of TILA is to inform consumers of the true cost of credit." *Bonanno v. Sec. Atl. Mortgage Co.*, No. 07 Cv. 4071 (JGW)(DW), 2010 WL 2134155, at *5 (E.D.N.Y. May 26, 2010) (citing 15 U.S.C. § 1601 *et seq.*). To that end, TILA "requires creditors to provide borrowers with clear and accurate disclosures of terms dealing with things like finance charges, annual percentage rates of interest, and the borrower's rights." *Beach v. Ocwen Fed. Bank*, 523 U.S. 410, 412 (1998) (citing 15 U.S.C. §§ 1631, 1632, 1635, 1638). One of the

borrower's rights of which TILA requires disclosure is the right of rescission – when a consumer credit transaction is secured by the borrower's principal dwelling, the borrower "shall have the right to rescind the transaction until midnight of the third business day following the consummation of the transaction or the delivery of the information and rescission forms required" under TILA.  15 U.S.C. § 1635(a).  To notify the borrower of this right, the regulations implementing TILA require a creditor to deliver two copies of a notice of the right to rescind to the borrower.  12 C.F.R. § 226.23(b)(1).  If the creditor fails to provide the requisite forms to the borrower, the time for rescission is extended to "three years after the date of consummation of the transaction or upon the sale of the property, whichever occurs first."  15 U.S.C. § 1635(f).  A borrower's written acknowledgement of receipt of such disclosures creates a rebuttable presumption of their delivery.  *Id.* at § 1635(c).

Plaintiff alleges that Countrywide violated TILA's notice requirement by providing her only one copy of the NRC under TILA, rather than the two copies required by statute.  Although Plaintiff admits that she signed two copies of an acknowledgement that stated she received two copies of the NRC, (Pl.'s Countrywide 56.1 ¶ 40, Ex. I ¶ 14), Plaintiff contends that she actually received only one copy of the NRC.  (*Id.*)  Plaintiff asserts that she signed the two acknowledgments because she "was forced to sign many documents without being given time to read them."  (*Id.* ¶ 15.)  Countrywide counters that Plaintiff's affidavit testimony is insufficient to rebut the presumption of delivery created by her signatures on the acknowledgements, and in any event she received one copy of the NRC, which provided meaningful disclosure of her right to cancel.

Although other courts have held that affidavit testimony of this sort may be sufficient to rebut the presumption when a Plaintiff swears that he or she did not receive any copies of the

notice of the right to cancel, *see Iannuzzi v. Am. Mortgage Network, Inc.*, 727 F. Supp. 2d 125, 135-36 (E.D.N.Y. 2010), this case is distinguishable, as Plaintiff's receipt of one copy of the NRC, rather than the none, satisfies TILA's requirements in this Circuit.

The Second Circuit has not directly addressed whether the failure to provide more than one copy of a notice of the right to cancel triggers the extended three-year rescission period, but "it has held that 'perfect disclosure' is not required under TILA," *Kahraman v. Countrywide Home Loans, Inc.*, 886 F. Supp. 2d 114, 120 (E.D.N.Y. 2012) (quoting *Gambardella v. G. Fox & Co.*, 716 F.2d 104, 118 (2d Cir. 1983)), and its "purpose is to require 'meaningful disclosure,' not 'more disclosure.'" *Id.* (citing *Turner v. General Motors Acceptance Corp.*, 180 F.3d 451, 457 (2d Cir.1999)).  Following the Second Circuit's guidance, in *Kahraman*, the Eastern District of New York granted summary judgment to the defendant, finding that the defendant's delivery of one notice of the right to cancel "accurately disclosed plaintiffs' rights under TILA, including their right of rescission," *Kahraman*, 886 F. Supp. 2d at 121, thereby providing them with "meaningful disclosure." *Id.*  Furthermore, courts in this Circuit "have largely . . . dismissed purely technical claims" under TILA. *Schwartz v. HSBC Bank USA, N.A.*, No. 13 Cv. 769 (PAE), 2013 WL 5677059, at *8 (S.D.N.Y. Oct. 18, 2013) (collecting cases).

The Court finds *Kahraman* persuasive.  Plaintiff does not allege in her affidavit or her opposition papers that she was unaware of her right to rescind, but instead states only that she failed to receive more than one copy of the NRC in violation of TILA.  (Pl.'s Opp. to Countrywide at 5-6; Pl.'s Countrywide 56.1, Ex. I ¶ 14.)  Although Plaintiff highlights cases denying summary judgment for technical violations of TILA in her memorandum in opposition to the instant motion, those cases are not controlling in this Circuit.  Plaintiff's reliance on foreign cases is an understandable attempt to sway the Court to apply a more stringent standard

in this case, but the fact remains that this Circuit applies the more lenient "meaningful disclosure" standard in TILA cases.  Decisions in the Southern and Eastern Districts of New York confirm this and the Court sees no reason to depart from the Second Circuit's standard applied in TILA cases, even if the issue of delivery of notices of the right to cancel has not been squarely decided by the Circuit.  Accordingly, Plaintiff's TILA claim is dismissed.

      B.      *Plaintiff Is Unable To Tender*

Even if this Court applied a more stringent standard to Plaintiff's TILA claim, her claim would still fail at this stage due to her failure to raise a genuine dispute of material fact that she could tender the unpaid balance of the Loan.

Rescission under TILA follows a statutorily prescribed sequence of events:

> Within 20 days after receipt of a notice of rescission, the creditor shall return to the obligor any money or property given as earnest money, downpayment, or otherwise, and shall take any action necessary or appropriate to reflect the termination of any security interest created under the transaction.  [. . .]  Upon the performance of the creditor's obligations under this section, the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value.  [. . .]  The procedures prescribed by this subsection shall apply except when otherwise ordered by a court.

15 U.S.C. § 1635(b).  The Court may nevertheless alter this sequence of events and require tender of the loan proceeds by the debtor prior to, rather than following, rescission.  *Id.* ("The procedures prescribed by this subsection shall apply except when otherwise ordered by a court."); *see also Midouin v. Downey Sav. & Loan Ass'n, F.A.*, 834 F. Supp. 2d 95, 106 (E.D.N.Y. 2011).  "Whether the court, in its equitable discretion, should require plaintiff to tender the loan proceeds prior to rescission 'will depend on the equities present in a particular case.'" *Id.* (citing *Palmer v. Wilson*, 502 F.2d 860, 862 (9th Cir. 1974)).  "Numerous courts have exercised their discretion under TILA to condition rescission on tender at the summary judgment stage when there is sufficient evidence to assess the equities and evaluate the borrower's

willingness and ability to repay the balance of loan." *Nunes v. Wells Fargo Bank, NA*, No. 10

Cv. 1270 (DLI) (RLM), 2013 WL 1169762, at *3 (E.D.N.Y. Mar. 20, 2013) (citing *Demarest v.*

*Ocwen Loan Servicing, LLC*, 481 F. App'x 352, 353 (9th Cir. 2012); *Am. Mortg. Network, Inc. v.*

*Shelton*, 486 F.3d 815, 822 (4th Cir. 2007); *Derisme v. Hunt Leibert Jacobson P.C.*, 880 F. Supp.

2d 311, 334 (D. Conn. 2012); *Moazed v. First Union Mortg. Corp.*, 319 F. Supp. 2d 268, 272 (D.

Conn. 2004); *Jobe v. Argent Mortg. Co., LLC*, 373 F. App'x 260, 262 (3d Cir. 2010)).

Plaintiff asserts in opposition to the instant motion that she is not yet required to tender

because Countrywide has not removed its security interest from her property or repaid her

closing costs and interest.  In support of this contention, Plaintiff cites to the statutory sequence

of events outlined in 15 U.S.C. § 1635(b), as well as a single case from the Southern District of

Ohio, which is not binding on this Court.  Countrywide counters that equitable principles weigh

in favor of requiring Plaintiff to tender before she is entitled to rescission.  The Court agrees with

Countrywide.

Plaintiff admits that "[a]t all times relevant to the Complaint and this action, Plaintiff had

no income."  (Pl.'s Countrywide 56.1 ¶ 6.)  Similarly, Plaintiff and her husband did not file tax

returns between 2004 and 2013, and did not have income in 2013, other than social security

income and proceeds from a pension in Austria.  (*Id.* ¶ 42.)  Further, Plaintiff has refused to state

whether she has the ability to tender the Loan proceeds to Countrywide, (*id.* ¶ 43), and does not

dispute her inability to tender in opposition to Countrywide's motion.  The record is devoid of

evidence that Plaintiff has the ability to tender the $1,785,000 proceeds of the Loan, which she

has had more than five years to collect since instituting the action.  Thus, this Court, as others in

this Circuit have done, "finds it appropriate to condition rescission on tender, and, in doing so,

10

concludes that Plaintiff is not entitled to rescission under TILA." *Nunes*, 2013 WL 1169762, at

*4.  Accordingly, Countrywide's request for summary judgment is granted.

## II.    GBL Claims

Plaintiff's second claim for relief alleges against all Defendants violations of N.Y.

General Business Law §§ 349 to 350-e.  GBL §§ 349 and 350 are "directed at wrongs against the

consuming public," *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*,

85 N.Y.2d 20, 24 (1995), and were enacted to protect consumers from sellers' deceptive

practices.  *Id.* at 25.

In order to assert a *prima facie* case under GBL §§ 349 or 350, "a plaintiff must

demonstrate that (1) the defendant's deceptive acts were directed at consumers, (2) the acts are

misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio v.*

*Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000) (citing *Oswego*, 85 N.Y.2d at 25).  Nevertheless, a

plaintiff is not required to "show that the defendant committed the complained-of acts

repeatedly—either to the same plaintiff or to other consumers—but instead must demonstrate

that the acts or practices have a broader impact on consumers at large." *Oswego*, 85 N.Y.2d at

25.  "Private contract disputes, unique to the parties" and "single shot transaction[s]" fall outside

of the statute.  *Id.* at 25, 26 (internal citation omitted).  Although Plaintiff does not specify the

section under which she brings this claim, the Second Circuit has interpreted the requirements of

a *prima facie* case to be the same for §§ 349 and 350.  *Maurizio*, 230 F.3d at 522.

Plaintiff asserts myriad theories against each of the defendants in support of her GBL

claims.  The Court will discuss the claims asserted against each defendant in turn.

### A.    Countrywide

Plaintiff asserts four instances of deceptive practices carried out by Countrywide in

violation of GBL §§ 349 and 350, including that Countrywide: (1) "instigated" Evolution to

11

provide Plaintiff with a false good-faith estimate promising her a 1.5% interest rate loan (Pl.'s Opp. to Countrywide at 10-14); (2) violated New York Banking Law by working with Watermark, an unlicensed mortgage broker, on Plaintiff's loan (*id.* at 15); (3) drafted a loan application falsely stating that Plaintiff earned $38,500 in monthly income, when she actually earned no income, and then had her sign it (*id.* at 15-19); and (4) sold Plaintiff's loan to a securitization trust, knowing that she would probably default on the loan.  (*Id.* at 20-22.)  The Court need not reach the substance of each of these alleged deceptive practices, as Plaintiff has failed to show a genuine dispute of material fact on the first element of her claim – "that the acts or practices have a broader impact on consumers at large."  *Oswego*, 85 N.Y.2d at 25.

In the TAC, Plaintiff alleges that the conduct underlying her GBL claims "affect[ed] many borrowers and consumers, not just Hutter.  Indeed, those violations have helped cause a nationwide epidemic of foreclosures and a worldwide financial crisis."  (TAC ¶ 58.)  Although not explicitly stated in Plaintiff's memorandum in opposition to the instant motion, Plaintiff appears to support this argument by asserting that Countrywide's settlement with The Bank of New York "confirms Hutter's charge that Countrywide lent to her knowing that she could not afford its loan" and that Countrywide has "admitted by making [an] $8.5 billion settlement . . . that it committed that same wrongdoing with many other mortgage borrowers on a vast scale." (Pl.'s Opp. to Countrywide at 21.)  Although Plaintiff includes a copy of the settlement with her 56.1 statement, the document is not properly authenticated and cannot be considered as evidence by the Court in support of her opposition to the instant motion.  Nevertheless, even if the Court were to consider the settlement, Plaintiff's contention that Countrywide's settlement constitutes an admission is belied by the clear and unambiguous language of the settlement, which states that Countrywide did not admit to any wrongdoing.  (Pl.'s Countrywide 56.1, Ex. P ¶ 20 (the

settlement may not be "admitted as evidence of an admission or a concession on the part of [Countrywide]" and Countrywide has "denied and continue[s] to deny any and all wrongdoing of any kind whatsoever, and retain[s], and do[es] not waive, any and all positions, defenses, and responses that they may have with respect to such matters."))  Plaintiff's arguments to the contrary are at best unsupported by her proffered evidence and at worst disingenuous and misleading to the Court.

Plaintiff also advances a second theory of impact on consumers at large – that Countrywide had a "policy of deliberately misleading prospective borrowers of a pay-option loan in to[sic] believing that their loan would have a 1.5% interest rate."  (Pl.'s Opp. to Countrywide at 10.)  In support of the existence of this purported policy, Plaintiff asserts that Countrywide "instigated" Evolution to provide Plaintiff with a 1.5% interest rate on her good-faith estimate, and that Countrywide's witness, Lanisa Jenkins, "defended th[e] false rate" at her deposition. (*Id.*)  Moreover, Plaintiff argues that Countrywide actually sent Plaintiff a good-faith estimate promising the purportedly false 1.5% interest rate.  Plaintiff's contentions, however, are wholly unsupported by the evidence.

Plaintiff provides no evidence that the 1.5% interest rate listed on Evolution's good-faith estimate was "instigated" by or originated from Countrywide, or that Countrywide ever sent a good-faith estimate containing the 1.5% interest rate to Plaintiff.  Although Plaintiff argues that Jenkins "defended the false 1.5% interest rate[] appearing in the good-faith estimate," (*id.* at 11), the cited portions of Jenkins' testimony are not properly authenticated and cannot be considered by the Court.

In any event, a review of Jenkins' testimony clearly shows that she was merely explaining how the 1.5% interest rate may have appeared on Evolution's and Watermark's good-

faith estimates, and at no time did she say that the rate originated with Countrywide.  (Pl.'s Countrywide 56.1, Ex. K at 100-101).  Moreover, Jenkins testified that the good-faith estimates from Evolution and Watermark proffered by Plaintiff's counsel were "a type of Good Faith Estimate that *would have* been sent by Countrywide to Ms. Hutter" and Countrywide "*would have* printed its own Good Faith Estimate and sent it to the borrower."  (*Id.* at 39:21-23; 41:13-15) (emphasis added.)  The distinction between Jenkins' testimony – that Countrywide *would have* sent good-faith estimates to Plaintiff of the type proffered by Plaintiff – and Plaintiff's argument that Countrywide therefore *must have* "sent her a good-faith estimate that falsely promised a 1.5% interest rate" – appears lost on Plaintiff, as she falls far short in her leap to reach this conclusion.  (Pl.'s Opp. to Countrywide at 12.)  There is, quite simply, no evidence that Countrywide ever sent Plaintiff a good-faith estimate for a 1.5% interest rate loan, and the fact that Countrywide normally would have sent Plaintiff a good-faith estimate does not show, nor even suggest, that it sent her one with a 1.5% interest rate in this instance.  Plaintiff acknowledges that she does not have a copy of this purported good-faith estimate, but argues that Countrywide's late discovery of a loan-file document, which was produced at Jenkins' deposition, provides evidence that Countrywide misplaced or actively suppressed documents from Plaintiff's loan file, and thus it is possible the missing Countrywide good-faith estimate reflecting a 1.5% interest rate was sent to Plaintiff.  Plaintiff does not provide the document produced at Jenkins' deposition, but Countrywide does, and that document consists of Countrywide's good-faith estimate for a conventional fixed-rate loan at 6.125%, which is certainly not the 1.5% good-faith estimate Plaintiff claims Countrywide sent to her.  (Declaration of BJ Finneran ("Second Finneran Decl."), Docket No. 178, ¶¶ 3-5, Ex. 28.)  Thus, Plaintiff's

theory that Countrywide sent her a good-faith estimate reflecting a 1.5% interest rate is specious and unsupported by the record.

The Court has also considered the five cases cited by Plaintiff in support of her GBL claims that purportedly permitted cases like Plaintiff's to move forward – *Williams v. Aries Fin., LLC*, No. 09 Cv. 1816 (JG)(RML), 2009 WL 3851675 (E.D.N.Y. Nov. 18, 2009); *Barkley v. Olympia Mortgage Co.*, No. 04 Cv. 875 (RJD)(KAM), 2007 WL 2437810 (E.D.N.Y. Aug. 22, 2007); *M & T Mortg. Corp. v. Miller*, 323 F. Supp. 2d 405 (E.D.N.Y. 2004); *Popular Fin. Serv., LLC v. Williams,* 50 A.D.3d 660 (2d Dep't 2008); and *Delta Funding Corp. v. Murdaugh,* 6 A.D.3d 571 (2d Dep't 2004).  These cases, which Plaintiff may have collected directly from *Karakus v. Wells Fargo Bank, N.A.*, 941 F. Supp. 2d 318, 343 (E.D.N.Y. 2013) (discussing all five cases cited by Plaintiff in the exact same order, in a case that Plaintiff's counsel prosecuted), are inapposite.  As the court in *Karakus* explained, and with which this Court agrees:

> Two [of the] cases—*Popular Financial Services* and *Murdaugh*—provided no relevant discussion of the facts, while each of the other [cases] "describe[d] a broad scheme involving affirmative efforts to mislead home purchasers about the condition of the homes being sold, the terms of their loans, or the lenders' interests."  *Hayrioglu* [*v. Granite Capital Funding, LLC*], 794 F.Supp.2d [405,] 411 [(E.D.N.Y. 2011)]. These cases also involved a large network of actors working in concert to mislead consumers.

*Karakus*, 941 F. Supp. 2d at 343.  Plaintiff fails to show the existence of any scheme – broad or otherwise – similar to those described in the cited cases.  As discussed above, Plaintiff's reliance on Countrywide's settlement with The Bank of New York to show a deceptive scheme is clearly inappropriate, and she has failed to offer any evidence of Countrywide's purported policy to deliberately mislead borrowers about the interest rate they would receive.

Plaintiff's failure to present any evidence that Countrywide's actions impacted consumers at large requires dismissal of her GBL §§ 349 and 350 claims.

B.      *Evolution and Watermark*

Plaintiff's GBL §§ 349 and 350 claims asserted against Evolution and Watermark are similar to those asserted against Countrywide.  The Court, however, need not reach the substance of the alleged deceptive acts because Plaintiff once again fails to show that there is a genuine dispute of material fact about whether the acts or practices of Evolution or Watermark had a broader impact on consumers at large.

Plaintiff contends that Evolution's and Watermark's purportedly deceptive acts were directed at consumers based on Countrywide's settlement with The Bank of New York.  (Pl.'s Opp. to Evolution at 11; Pl.'s Opp. to Watermark at 8-9.)  Plaintiff writes that because "the trusts could force th[e] settlement shows that they had proof that Countrywide knowingly made bad loans, and then knowingly sold the bad loans to the trusts."  (Pl.'s Opp. to Evolution at 11; *see also* Pl.'s Opp. to Watermark at 8-9.)  As the Court explained above, this argument is specious and fails to take into account Countrywide's clear and unequivocal denial of wrongdoing in the settlement.

Even if the Court could deem Countrywide's settlement as an admission of wrongdoing, Plaintiff's attempt to ascribe blame to Evolution and Watermark for Countrywide's purported actions is unsupported by the record.  Plaintiff claims that both brokers: (1) used false good-faith estimates as part of a trend to help Countrywide "lend[] to people who [could not] afford their loans" (Pl.'s Opp. to Watermark at 9; *see also* Pl.'s Opp. to Evolution at 11-12); and (2) entered into contracts with Countrywide to broker loans for it, "mak[ing] it likely" that both brokers helped Countrywide make "bad . . . loans" supported by falsified documents.  (Pl.'s Opp. to Watermark at 10; *see also* Pl.'s Opp. to Evolution at 12.)  Although Plaintiff believes that it is "likely" that both brokers provided Countrywide with falsified documents in other loans, (*see* Pl.'s Opp. to Evolution at 12; Pl.'s Opp. to Watermark at 10), she offers no evidence that either

16

Evolution or Watermark closed any other loans with Countrywide, let alone that they included falsified documents.[3]  Absent such evidence, the Court cannot find that either broker's purported conduct had a broader impact on consumers at large, and Plaintiff's GBL claims therefore fail.

## III.   RESPA Claims

Plaintiff asserts claims against Countrywide and Evolution for violations of RESPA's "anti-kickback" and "fee-splitting" provisions, codified at 12 U.S.C. §§ 2607(a) and (b).  Section 2607(a) prohibits the giving or accepting of "any fee, kickback, or thing of value pursuant to any agreement or understanding, oral or otherwise, that business incident to or a part of a real estate settlement service involving a federally related mortgage loan shall be referred to any person." 12 U.S.C. § 2607(a).  Similarly, Section 2607(b) prohibits the giving or accepting of "any portion, split, or percentage of any charge made or received for the rendering of a real estate settlement service in connection with a transaction involving a federally related mortgage loan other than for services actually performed."  *Id.* at § 2607(b).  RESPA contains a "safe harbor" provision – the statute "does not prohibit payment for goods or facilities actually furnished or services actually performed."  *Cedeno v. IndyMac Bancorp, Inc.*, No. 06 Cv. 6438 (JGK), 2008 WL 3992304, at *3 (S.D.N.Y. Aug. 26, 2008) (citing 12 U.S.C. § 2607(c)(2)).

Plaintiff alleges that Countrywide's payment of a $13,387.50 yield-spread premium to Evolution was a fee or kickback made pursuant to an agreement that Evolution would refer mortgage borrowers to Countrywide in violation of 12 U.S.C. § 2607(a).  (TAC ¶ 69(a).) Plaintiff also alleges that Evolution accepted a $1,500 processing fee, as well the aforementioned

---

[3] Plaintiff proffers an expert report in support of this contention, which states that "mortgage brokers and other lender agents engaged in fraudulent marketing of their loan products . . . ."  (Pl.'s Opp. to Evolution at 12 n.59.)  This report is not properly authenticated and therefore is not considered by the Court, but in any event, the cited paragraphs appear only to discuss generalities, without any evidence specifically related to Evolution or Watermark.

yield-spread premium, in violation of 12 U.S.C. § 2607(b), for services it did not actually perform. (*Id.* ¶ 69(b).) Plaintiff's opposition to Countrywide's motion abandons her "anti-kickback" claim under § 2607(a), and instead charges that Countrywide violated RESPA's "unearned-fees provision" under § 2607(b). (Pl.'s Opp. to Countrywide at 24.) Plaintiff's arguments concerning Countrywide and Evolution are discussed in turn.

      A.    *Countrywide*

      Plaintiff argues that Countrywide paid Evolution a fee "other than for services actually performed," (Pl.'s Opp. to Countrywide at 24), because Evolution purportedly sent Plaintiff a falsified good-faith estimate promising her a 1.5% interest rate loan, when her loan ultimately had an interest rate of 8.125%. Without citation to any authority, Plaintiff concludes that "'services actually performed' do not include a mortgage broker's giving a borrower a document containing a false interest rate, as Evolution Mortgage did." (*Id.* at 24.)

      Similar arguments have been considered and rejected by courts in this Circuit and others. In *Cedeno*, "[t]he plaintiff attempted to avoid [RESPA's] 'safe harbor' provision by arguing that the appraisal [performed by the defendant] was 'faulty and inaccurate.'" *Cedeno*, 2008 WL 3992304, at *4. Judge Koeltl of the Southern District of New York reasoned that because there was "no dispute that the appraisal was performed and paid for . . . plaintiff's attempt[] to modify the plain meaning of the safe harbor by requiring an analysis of the quality and price of the services actually performed [was an] . . . interpretation [that] exceed[ed] the plain meaning of the statute," and concluded that plaintiff failed to state a claim under RESPA. *Id.*; *see also Kruse v. Wells Fargo Home Mortgage, Inc.*, 383 F.3d 49, 56 (2d Cir. 2004) (noting that "nothing in [the] language [of § 2607(b)] authorizes courts to divide a 'charge' into what they or some other person or entity deems to be its 'reasonable' and 'unreasonable' components."). Likewise, the Eleventh Circuit explained that RESPA's provisions "are not the appropriate vehicle for

considering . . . whether a broker provided fair, honest, and competent services to a borrower. Instead, we consider whether the broker performed *actual* brokerage services; whether it completed tasks or provided goods related to the arrangement of a mortgage that warrant payment from the lender or borrower." *Sutton v. Countrywide Home Loans, Inc.*, 417 F. App'x 833, 835-36 (11th Cir. 2009) (emphasis in original).[4]  The court concluded that because the broker "performed tasks to further the processing and origination of the loan," the defendant's payment was not a kickback or unearned fee under RESPA, even though the broker received a yield-spread premium and substantially overstated the plaintiff's income on his loan application. *Id.* at 834, 836.

There is no dispute that Evolution performed services in connection with the Loan, and Plaintiff admits as much.  (Pl.'s Countrywide 56.1 ¶ 23.)[5]  Plaintiff's contention that the services performed by Evolution were not legitimate and therefore are not protected under RESPA's safe harbor provision is not persuasive, particularly in light of the decisions discussed above and Plaintiff's lack of citation to any authority, controlling or otherwise, in support of her argument. Accordingly, Plaintiff's RESPA claim against Countrywide is dismissed.

    *B.*    *Evolution*

Plaintiff advances the same theory of liability under RESPA against Evolution – that it drafted "false documents [that] are not legitimate mortgage-brokerage services that deserve to be

---

[4] The Eleventh Circuit went on to add a second prong to its RESPA test – whether the payment bears "a reasonable relationship to the value received *by the person or company making the payment.*"  *Sutton*, 417 F. App'x at 836 (emphasis in original).  The Second Circuit rejected this reasonableness requirement in *Kruse v. Wells Fargo Home Mortgage, Inc.*, 383 F.3d 49 (2d Cir. 2004), and in any event, Plaintiff does not allege, let alone provide evidence of, the unreasonableness of the fee and yield-spread premium ultimately paid to Evolution.

[5] Although Plaintiff "denies" that "Evolution performed broker services for the Loan," (Pl.'s Countrywide 56.1 ¶ 22), Plaintiff's denial merely states that Evolution did not provide "legitimate" services, but admits that it provided purportedly "false" services.  In the next paragraph of the 56.1 statement, Plaintiff admits that Evolution verified Plaintiff's employment and her outstanding loans, ordered an appraisal and title policy, and scheduled the Loan closing.  (*Id.* ¶ 23.)

compensated." (Pl.'s Opp. to Evolution at 25.)  Plaintiff further argues that Evolution's

purported violation of New York Banking Law by using unlicensed brokers to work on

Plaintiff's loan, and then sharing the fees with them, also violated RESPA.

As discussed above, because Evolution provided services in connection with the Loan,

Plaintiff's RESPA claim must fail.  Plaintiff's alternative theory – that the violation of New York

Banking Law supports a RESPA claim – is not supported by citation to any authority and, in any

event, appears based on the theory that an illegitimate provision of services can support a

RESPA claim.  The Court has already rejected such an interpretation of RESPA.  Accordingly,

Plaintiff's RESPA claim against Evolution is dismissed.

## IV.    New York Banking Law Claim

Plaintiff alleges that Watermark violated § 590(2)(b) of the N.Y. Banking Law by

arranging and processing the Loan while unlicensed to provide such services in New York.

(TAC ¶¶ 88-96.)  At the time Plaintiff closed on the Loan, § 590(2)(b) proscribed the following:

> No person, partnership, association, corporation or other entity shall engage in the
> business of soliciting, processing, placing or negotiating a mortgage loan or offering to
> solicit, process, place or negotiate a mortgage loan in this state without first being
> registered with the superintendent as a mortgage broker in accordance with the
> registration procedure provided in this article and by such regulations as may be
> promulgated by the banking board or prescribed by the superintendent. The registration
> provisions of this subdivision shall not apply to any exempt organization or mortgage
> banker.

N.Y. Banking Law § 590(2)(b) (Consol. 2006).

Watermark argues that Plaintiff's claim should be dismissed on three grounds.  First,

Watermark is not the broker of record and thus cannot be liable under § 590(2)(b).  Second, §

590(2)(b) was not operative at the time Plaintiff closed on the Loan.  And third, Charles Dragna,

not Watermark, provided services related to the Loan, and Dragna was properly authorized to

work on the Loan in New York.  Watermark does not contend that it is exempt from § 590's

licensing requirement.

Plaintiff counters that § 590(2)(b) was operative at the time of the Loan.  Plaintiff also

proffers documentary evidence in support of her claim, (*see* Pl.'s Opp. to Watermark at 4-6), the

majority of which is not properly authenticated and cannot be considered by the Court.  Among

other theories, Plaintiff contends that because Watermark sent her a good-faith estimate, there is

a genuine issue of fact to be decided at trial as to whether Watermark, and not Dragna in his

personal capacity, worked on her Loan.[6]

Although Watermark correctly notes that the current version of § 590 did not become

effective until 2009, the relevant portions of § 590, including subsection (2)(b), have been

effective in one form or another since 1987.  *See* N.Y. Banking Law § 590 (Consol. 1992 and

2009).  In other words, § 590(2)(b) was in effect in 2006 and therefore operative at the time

Plaintiff closed on the Loan.

Turning to the substance of the claim, Plaintiff has raised a genuine dispute of material

fact.  The statute makes clear that "[n]o person, partnership, association, corporation or other

entity shall engage in the business of soliciting, processing, placing or negotiating a mortgage

loan" without being properly registered in New York.  N.Y. Banking Law § 590(2)(b).  It is

undisputed that Dragna provided "broker services" in connection with the Loan.  (Watermark's

Reply at 8) ("It is admitted without hesitation that Charles Dragna provided broker services for

this loan.").  Although Watermark contends that Dragna was authorized to conduct business in

New York in connection with the Loan pursuant to an "Undertaking of Accountability," (Serio

---

[6] Although Plaintiff's version of Watermark's good-faith estimate is not properly authenticated, the same
document is already before the Court in support of Countrywide's motion for summary judgment, (*see* First
Finneran Decl., Ex. 15), and may therefore be considered in connection with the instant motion.

Decl., Ex. E), the Undertaking states that Dragna was hired by Evolution on December 21, 2006, ten days after Plaintiff closed on the Loan on December 11, 2006, (Watermark's 56.1 ¶ 1), raising the question of whether Dragna was properly authorized to work on the Loan before closing.  Moreover, documentary evidence suggests that Watermark prepared a good-faith estimate for the Loan, raising the question of whether Watermark, rather than Dragna in his individual capacity, solicited, processed, or negotiated the Loan.  (*See* Declaration of BJ Finneran ("First Finneran Decl."), Docket No. 176, Ex. 15.)

Finally, Watermark contends that it was not the broker of record for the Loan and therefore § 590(2)(b) is inapplicable in this case.  Neither Plaintiff nor Watermark cite to any legal authority concerning actions brought pursuant § 590(2)(b) and the Court's research reveals a dearth of precedent in this area.  Without any authority to the contrary, the Court relies on a plain reading of the statute, and finds that Plaintiff raises a genuine dispute of material fact as to whether Watermark solicited, processed, or negotiated the Loan, notwithstanding the fact that Watermark was not the broker of record.  Accordingly, Watermark's request for summary judgment is denied.

**V.     Cross-Claims**

Countrywide moves to dismiss Evolution's and Watermark's cross-claims as meritless. Neither party opposes Countrywide's motion.  The cross-claims are therefore deemed abandoned and summary judgment is granted.  *See Bellegar de Dussuau v. Blockbuster, Inc.*, No. 03 Cv. 6614(WHP), 2006 WL 465374, at *7 (S.D.N.Y. Feb. 28, 2006) (granting summary judgment after plaintiff failed to oppose claim in its opposition to the motion for summary judgment).

## CONCLUSION

For the foregoing reasons, the Defendants' motions for summary judgment are GRANTED in part and DENIED in part. Plaintiff's first, second, and third claims are dismissed in accordance with this Opinion. The Court respectfully directs the Clerk to terminate the motions at ECF Nos. 174, 184, and 193 and to update the caption to reflect that all defendants with the exception of Watermark Capital, Inc., are hereby dismissed from this action. The parties are directed to appear for an in-person pretrial conference at 12 p.m. on October 23, 2015.

Dated:   September 14, 2015                                    SO ORDERED:
         White Plains, New York

                                                          NELSON S. ROMÁN
                                                      United States District Judge